FILED
JUL 15 2008
U.S. COURT OF FEDERAL CLAIMS

ORIGINAL

Patrick D. Webb, Esq., State Bar No. 82857
**WEBB & CAREY**
402 West Broadway, Ste 680
San Diego, Calif. 92101
Tel:(619) 236-1650
Fax:(619) 236-1283

Attorneys for Plaintiffs

**IN THE UNITED STATES COURT**

**OF FEDERAL CLAIMS**

| | |
|---|---|
| WALTER ROSALES, AND KAREN TOGGERY,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, DEPARTMENT OF INTERIOR, SECRETARY DIRK KEMPTHORNE, BUREAU OF INDIAN AFFAIRS, and ASSISTANT SECRETARY OF INDIAN AFFAIRS, GEORGE SKIBINE, DOES 1-20,<br><br>Defendants. | Case No. 08-512 L<br><br>**PETITION AND COMPLAINT**<br><br>**1) BREACH OF FIDUCIARY DUTY AND GENERAL TRUST RESPONSIBILITY**<br><br>**2) TAKING** |

Plaintiffs allege upon information and belief as follows:

**PARTIES**

1. Plaintiffs, WALTER J. ROSALES, and KAREN TOGGERY, are Native American residents of San Diego County of one-half or more degree of California Indian blood, are enrolled members and have been, originally in 1981, again at various subsequent times, and since 1995, lawfully elected officers of the general council majority of all qualified voters of the Plaintiff, JAMUL INDIAN VILLAGE (hereinafter VILLAGE), which is a tribal governmental entity of Kumeyaay Indians, recognized by the United States' Congress, governed by a

ORIGINAL

Constitution adopted on May 9, 1981, pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. 461 et seq., and located in Jamul, California.

2. Plaintiff, WALTER J. ROSALES, is also a lineal descendant and son of Native American, Helen Cuero, the personal representative of his mother's estate, the Estate of Helen Cuero, the personal representative of his son's estate, the Estate of Dean Rosales, the personal representative of his un-named younger brother's estate, and a lienal descendant with ownership and control of their human remains and Native American cultural items, as set forth in 25 U.S.C. 3001-2, 43 C.F.R. 10.1-17, and Cal. Pub. Res. Code 5097.9-5097.99.

3. Plaintiff, KAREN TOGGERY, is also a lineal descendant and daughter of Native American, Marie Toggery, and the personal representative of her mother's estate, the Estate of Marie Toggery, as well as the mother of her son Matthew Tinejero Toggery, and the personal representative of the Estate of Matthew Tinejero Toggery, and a lineal descendant with ownership and control of their human remains and Native American cultural items, as set forth in 25 U.S.C. 3001-2, 43 C.F.R. 10.1-17, and Cal. Pub. Res. Code 5097.9-5097.99.

4. The Defendants are the UNITED STATES OF AMERICA, and its divisions, including, but not limited to, the DEPARTMENT OF THE INTERIOR, through its Secretary DIRK KEMPTHORNE, the BUREAU OF INDIAN AFFAIRS, through its Assistant Secretary for Indian Affairs, GEORGE SKIBINE.

5. The true names and capacities, whether individual, corporate, associate or otherwise, of DOES 1-20, inclusive, are unknown to Plaintiffs at this time, who, therefore, sue said Defendants by said fictitious names. Plaintiffs are informed and believe, and based thereon allege, that each of the fictitiously named Defendants is responsible in some measure for the actions, events and happenings herein alleged, and was the legal cause of injury and damages to the Plaintiffs as herein alleged. When the true names and capacities of said Defendants are ascertained by Plaintiffs, Plaintiffs will seek leave to amend this complaint to insert their true names and capacities, or will serve said Doe Defendants when they become known.

6. At all times herein mentioned, Defendants, and each of them, were the agent, employee and/or joint venturer of their co-defendants, and were acting within the course and scope of such agency, employment and/or joint venture, with the permission and consent of their co-defendants and defendants. Furthermore, that at all times herein mentioned, Defendants, while acting as principals, expressly directed, consented to, approved, affirmed and ratified each and every action taken by the other herein alleged. Each reference to one defendant is also a reference to each and every other defendant. Plaintiffs are informed and believe and thereon allege that the defendants, and each of them, conspired with each other, to engage in acts in furtherance of a conspiracy to wrongfully and illegally violate the Plaintiffs' rights, rendering each of the defendants jointly and severally liable for all resulting and irreparable injury and damage to Plaintiffs.

## JURISDICTION

7.. This court has jurisdiction over this matter pursuant to 28 U.S.C. 1331, federal question, 28 U.S.C.1337, commerce with Indians, 28 U.S.C. 1491(a)(1), claims against the U.S., 25 U.S.C. 465, the Indian Reorganization Act of 1934, 25 U.S.C. 3001 et seq., Native American Graves Protection Act, 16 U.S.C. 470aa et seq., Archaeological Resources Protection Act, and the government's fiduciary duty and general trust responsibility over the management of Indian property.

8. This action also arises under Article I, section 3 and the Fifth Amendment to the Constitution of the United States, Acts of Congress, 25 U.S.C. 323 and 324, and federal regulations 25 C.F.R. 161.3 and 161.28.

## GENERAL ALLEGATIONS

### Rosales and Toggery's Beneficial Ownership of Parcel 597-080-04

9. On September 26, 1912, J.D. Spreckel's Coronado Beach Company deeded 2.21 acres of land, later surveyed to include 2.34 acres of land, in Jamul, California, to the Roman Catholic Bishop of Monterey and Los Angeles, a corporate in sole of the State of California, "to be used for the purposes of an Indian graveyard and approach thereto," "to have and to hold the

above granted and described premises unto the said Grantee, his successors and assigns **forever** for the purpose above specified," as set forth in Exhibits A and B hereto, and now known as parcels 597-080-05 and 597-080-06. In 1912, Father LaPointe and the Roman Catholic church erected a chapel at the cemetery, and since 1956 the diocese of St. Pius Xavier has maintained the chapel, on the parcel now known as 597-080-05, for the purpose of ministering at the Indian cemetery.

10. From their birth, the Plaintiffs were the lineal descendants of the Native American families that have occupied and possessed that cemetery and the property contiguous to that Indian graveyard in Jamul, California, since before 1852, which private property was owned at various times since 1831 by Mexican Governor and Don, Pio Pico, U.S. General Henry S. Burton and his widow Maria Amparo Ruiz de Burton, John D. Spreckel's Coronado Beach Company, and later by the Lawrence and Donald Daley families, and the Catholic Diocese, as reflected in Exhibits A, B, C and D hereto.[1]

11. On December 12, 1978, title to 4.66 acres of land then occupied by the Plaintiffs' families, Parcel 597-080-01, now known as parcel 597-080-04, as depicted in Exhibit G, was conveyed to the United States in trust for the explicit benefit of those half-blood Jamul Indians then occupying the property. On December 27, 1978, Lawrence and Donald Daley, recorded the grant deed of parcel 597-080-01 to "the United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate," as set forth in Exhibit D hereto. This provided a place for those half-blood Jamul Indians then occupying the property to live, and be inhumed, interred, deposited, dispersed, and placed in perpetuity, and a place to be protected by the United States as a trustee for the living and the dead of those half-blood Jamul Indians then occupying the property, against all forms of alienation, trespass, desecration, mutilation, disinterment, and any other wrongful infringement.

---

[1] See also, <u>United States v. Pio Pico</u> (1870) 27 F.Cas. 537; <u>Estate of Burton</u> (1883) 63 Cal. 36; <u>G.W.B.McDonald, Administrator v. Burton</u> (1886) 68 Cal. 445; <u>Henry H. Burton v. Maria A. Burton</u> (1889) 79 Cal. 490; <u>In re Burton's Estate</u> (1892) 93 Cal. 459; and <u>McDonald v. McCoy</u> (1898) 121 Cal. 55.

12. The Secretary of the Interior through his subordinates designated the individual Plaintiffs and the Native American families then possessing and residing on parcel 597-080-04, as the beneficial owners thereof, consistent with the federal regulations for unorganized groups of individual Indians, by locating said individual Indians on the parcel, providing for their needs, acquiescing in their continued presence on, and use of, the parcel for more than 28 years, in building houses for them on the parcel, in providing them with services usually accorded to Indians living on such property, allowing them to inhume, inter, deposit, disperse and place the human remains and funerary objects of their dead, below, on, and above the property, and further providing strong and uncontroverted evidence of their designation as the beneficial owners of parcel 597-080-04, as a matter of law, within the meaning of the grant deed, and as set forth in Coast Indian Community v. U.S. ("Coast") (Fed. Cl. 1977) 550 F.2d 639, United States v. Assiniboine Tribe ("Assiniboine Tribe") (Fed. Cl. 1970) 428 F.2d 1324, 1329-30, and 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-1974 ("Mem. Sol. Int.") at 668, 724, 747, and 1479, attached hereto as Exhibit J.

13. Similar forms of grant deeds have long been accepted by the BIA and similar designations of individual Indians' beneficial ownership have long been made by the BIA, and enforced by the courts. See, Coast, 550 F.2d 639, 651, n32; State Tax Comm., 535 F.2d 300, 304; Assiniboine Tribe 428 F.2d 1324, 1329; and the Memoranda of the Solicitor of the Interior, reprinted in Mem. Sol. Int. at 668, 724, 747, and 1479, involving for e.g., the Mississippi Choctaws, the St. Croix Chippewas, the Nahma and Beaver Indians, and the Nooksack Indians, attached as Exhibit J hereto.

14. The December 27, 1978 grant deed was recorded nearly three years before the Constitution of the Jamul Indian Village was adopted, and three years before the Congress of the United States recognized the creation of the Jamul Indian Village, as an Indian tribe under the Indian Reorganization Act of 1934. When the Village was created, under the terms of the Indian Reorganization Act of 1934, it was a landless governmental entity. To date, the United States has not set aside or created an Indian reservation for the VILLAGE. This deed was accepted by

the United States on December 21, 1978, pursuant to 25 U.S.C. 81 and Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. 465. Parcel 597-080-01, now known as parcel 597-080-04, was not acquired for an Indian tribe, and has never been recognized by the federal government as being a parcel over which the subsequently federally recognized entity, known as the Jamul Indian Village, exercises governmental power. Nor has it ever been lawfully subject to the exercise of any tribal governmental power. The United States Department of Interior, Bureau of Indian Affairs, August 3, 2000 response to the Plaintiffs' Freedom of Information Act (FOIA) request, confirms that the "current trust parcel was accepted into trust in 1978 for Jamul Indians of ½ degree (4.66 acres)," and that there is "no record of the 1978 trust parcel being known as the Jamul Village," as reflected in Exhibit E hereto. This is consistent with the tribe's constitution, Article II, Territory, which fails to identify the 4.66 acres, parcel 597-080-04, as within the territory of the Jamul Indian Village, as reflected in Exhibit I hereto.

15. Parcel 597-080-01, now known as parcel 597-080-04, was not acquired for a tribe, nor could it have been acquired for a tribe that did not then exist, leaving only the possibility under 25 U.S.C. 465 that it was purchased and taken in trust for the individual Native American families then possessing and residing on the parcel, including the Plaintiffs and their families, as set forth in Coast, Assiniboine Tribe, and Mem. Sol. Int., supra.

16. Therefore, Walter Rosales and Karen Toggery are the beneficial owners of parcel 597-080-04, designated by the Secretary of Interior, since they are Jamul Indians of one-half degree or more Indian blood, and were located on the parcel by the federal government, that provided for their needs, acquiesced in their continued presence on, and use of, the parcel for more than 28 years, and which government built houses for them on the parcel, provided them with services usually accorded to Indians living on such property, allowed them to inhume, inter, deposit, disperse and place the human remains and funerary objects of their dead, below, on, and above the property, and further provided strong and uncontroverted evidence that they were designated as the beneficial owners of parcel 597-080-04, which land was acquired and held in trust for individual Indians pursuant to 25 U.S.C. 465. As the beneficial owners of this parcel

and the homes thereon, in addition to their rights under the federal and California NAGPRA statutes, Walter and Karen were entitled to be secure in their homes, and to exclude all others, save the United States, from their property.

17. Congress specifically enacted 25 U.S.C. 465, to ensure that land acquired in trust for individual Indians would not be alienated by anyone without the government's express approval. In fact, the Indian Reorganization Act (IRA) continues to specifically provide for the acquisition of land by the United States for the benefit of individual Indians "through purchase, relinquishment, gift, exchange, or assignment...for the purpose of providing land for Indians." 25 U.S.C. 465.

> Title to any lands or rights acquired pursuant to sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be taken in the name of the United States in trust for the Indian tribe **or individual Indian** for which the land is acquired, and such lands or rights shall be exempt from State and local taxation. 25 U.S.C. 465. (emphasis added).

18. The 1934 House Report on the IRA clearly evidences a policy that includes acquiring land in trust for individual Indians, and not just for recognized tribes: "Section 5 [25 U.S.C. 465] authorizes the Secretary of the Interior to purchase or otherwise acquire land for landless Indians." H.R. Rep. No. 1804, 73d Cong., 2d Sess. 6-7 (1934).

19. The Federal government's own Handbook of Federal Indian Law,[2] authorized and funded by Congress in the Indian Civil Rights Act of 1968, 25 U.S.C. 1341(a)(2), provides that "...[A] number of statutes have allowed individual Indians to obtain trust or restricted parcels out of the public domain and not within any reservation. ... The government has at times...purchased trust lands for individuals. Fn. 118. Since 1934 this has been done pursuant to provisions of the Indian Reorganization Act. 25 U.S.C. 465." Felix S. Cohen's Handbook of Federal Indian Law ("Handbook of Federal Indian Law") (DOI 1982) Ch. 1, Sec. D3c, p. 40-41, citing City of Tacoma v. Andrus, 457 F. Supp. 342 (D.D.C. 1978), and Chase v. McMasters, 573 F.2d 1011,

---

[2] Congress directed the Secretary of Interior to revise and republish Cohen's Handbook of Federal Indian Law in the Indian Civil Rights Act of 1968. 25 U.S.C. 1341(a)(2). Hence, the United States is estopped to deny its admissions with regard to the lands held in trust for individual Indians.

1016 (8th Cir. 1978), cert. denied, 439 U.S. 965 (1978), wherein the court enforced an individual Indian's beneficial ownership of trust land acquired for her benefit under the IRA, stating: "The Secretary may purchase land for an individual Indian and hold title to it in trust for him...Section 465 lists gifts among the means by which the Secretary may acquire land, and it was amended to authorize acquisition of land in trust for individual Indians... See 78 Cong. Rec. 11126 (1934)... The land acquired may be located... without a reservation."Id., at 1016. "The Act not only authorized the Secretary to acquire land for Indians, 25 U.S.C. 465, but continued the trust status of restricted lands indefinitely, 25 U.S.C. 462..." Id, at 1016.

20. On May 9, 1981, Plaintiff WALTER J. ROSALES, Chairperson of those Indians seeking to adopt a constitution, certified on behalf of the election board, that sixteen of twenty three registered voters adopted the VILLAGE constitution. The United States approved the adoption of the constitution on July 7, 1981, but did not recognize the existence of the tribe.

21. Subsequently, the Catholic Diocese agreed to deed another portion of the Indian Cemetery to the United States in trust for the Jamul Indian Village for the purpose of maintaining the Indian graveyard and approach thereto, as required by, and provided in, the original Coronado Beach Company deed to the Catholic Diocese. On July 27, 1982, the Roman Catholic Bishop of San Diego, successor to the Roman Catholic Bishop of Monterey and Los Angeles, a corporation sole, recorded a grant deed of a portion of parcel 597-080-02, now known as 597-080-05 and 597-080-06, consisting of approximately 1.372 acres, to "the United States of America in trust for the Jamul Indian Village," as set forth in Exhibit F hereto.

22. Excepted from the July 27, 1982 deed for parcel 597-080-02 was that portion of the Coronado Beach Company land grant, now known as parcel 597-080-06, consisting of approximately .838 acres, where some of the Native American human remains were inhumed, interred, deposited, dispersed and placed, below, on, and above the property, to which the Catholic Diocese retains title. The Catholic Diocese also explicitly reserved "to [itself and its] successors or assigns an easement [over, on, and in, parcel 597-080-05] for (1) utility service lines and (2) ingress and egress over the existing well-traveled road," which extends the entire

length of the north edge of the 1.372 acres, and which the San Diego County tax assessor's maps continue to describe as "the Indian cemetery," as set forth in Exhibits F and G hereto.

23. However, on July 27, 1982, the Jamul Indian Village had not yet been recognized by the United States. The Congress of the United States first recognized the VILLAGE, as an Indian tribe, by publication in the Federal Register on November 24, 1982. 47 Fed. Reg. 53130, 53132 (Nov. 24, 1982).

24. By virtue of these afore-described acts, a Native American sanctified cemetery, place of worship, religious and ceremonial site, and sacred shrine, as defined by 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.9, and Cal. Health & Safety Code sections 8551-53, have been dedicated on the parcels now known as 597-080-04, 597-080-05, and 597-080-06. The recorded declaration by the Coronado Beach Company and the Catholic Diocese provided constructive notice to all persons and the United States of the dedication of said property to cemetery purposes, pursuant to 25 U.S.C. 3009(4) and Cal. Heath & Safety Code sections 8551-8558.

25. During 1996 a faction of individuals, who were not all Jamul Indians of one-half degree of Indian blood, illegally staged a Secretarial election, along with the illegal assistance of the Bureau of Indian Affairs, which is the subject of Rosales v. U.S., U.S. Court of Federal Claims, Case No. 98-860. This faction claims to have elected to amend the tribal constitution to admit, and claims to have admitted, a majority of Jamul Indians, who were only one-quarter Indian blood, as members of the tribe. Walter Rosales and Karen Toggery have sued the government for damages, resulting from the government having illegally staged the Secretarial election at which that amendment was purportedly adopted, in their original Court of Federal Claims action. However, in the meantime, the Jamul Indian Village, is legally precluded, as a matter of law, from making any legally protectable claim to parcel 597-080-04, since the deed granted the property to the United States in trust for only "such Jamul Indians of one-half degree or more Indian blood," and did not create any trust over the property for any Jamul Indians of less

than one-half degree Indian blood, and the tribe contends that its majority is no longer Jamul Indians of one-half degree or more Indian blood.

26. As concluded by the BIA Director of the Office of Tribal Services on July 1, 1993:

> The Jamul Indians lived on one acre of private land and on land deeded to the Diocese of San Diego as an Indian cemetery. On June 28, 1979, the United States acquired from Bertha A. and Maria A. Daley a portion of the land known as "Rancho Jamul" which it took "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate."...The United States accepted these conveyances of land in accordance with the authority contained in Sections 5 and 19 of the Indian Reorganization Act of 1934 [25 U.S.C. 465, and 479 respectively]...
>
> The Constitution of the Jamul Indian Village was approved by the Deputy Assistant Secretary-Indian Affairs on July 7, 1981. In approving the IRA Constitution, the Village was authorized to exercise those self-governing powers that have been delegated by Congress or that the Secretary permits it to exercise. A number of "tribes" have been created, from communities of adult Indians, or expressly authorized by Congress under provisions of the IRA and other Federal statutes. For example, some IRA entities availed themselves of the opportunity to adopt an IRA constitution and are considered to be IRA "tribes." However, they are composed of remnants of tribes who were gathered onto trust land. Those persons had no historical existence as self-governing units. They now possess only those powers set forth in their IRA constitution. They are not an inherent sovereign. Rather, that entity is a created tribe exercising delegated powers of self-government. Such is the case with Jamul Indian Village. Ex. K, page 2-3.

27. The Jamul Indian Village therefore has never had jurisdiction over, nor lawfully exercised governmental power over, parcel 597-080-04, and there has never been a transfer of the parcel to the subsequently recognized tribe, nor has the Secretary of the Interior ever designated the subsequently recognized tribe to be a beneficiary of any grant deed. The government has long conceded that it has "no record of the 1978 trust parcel [04] being known as the Jamul Indian Village." Ex. E. The Jamul Indian Village is only a tribal governmental entity, landless at its creation, and did not exist until its constitution was adopted in 1981.

28. Since "[a]n Indian tribe's jurisdiction derives from the will of Congress," Kansas v. Norton, 249 F.3d 1213, 1229-31 (10th Cir. 2001), and Congress never granted the subsequently recognized tribe "jurisdiction" over parcel 04, the express beneficiaries of the deed to the United States for parcel 597-080-04 were, and still are, the individual half-blood Jamul Indians residing on the property in 1978, and not the tribal governmental entity that was subsequently recognized

in 1981. Thus, the government is estopped to deny, that the "only possible" designation that exists in the 1978 grant deed, as a matter of law, is that parcel 04 was taken in trust for the "individual" "Jamul Indians of one-half degree or more Indian blood," including the individual Plaintiffs and their families, as was held in Coast, 550 F.2d at 651, n32, and State Tax Comm., 535 F2d. at 304.

29. Coast, 550 F.2d 639, held on nearly identical facts, that the parcel in question, "was not acquired for a tribe, leaving only the possibility under the [Indian Reorganization] Act that it was purchased for individual Indians." 550 F2.d 639, 651, n. 32. The Coast deed "was conveyed to the United States: ...'in Trust for such Indians of Del Norte and Humboldt Counties, in California, eligible to participate in the benefits of the [Indian Reorganization] Act of June 18, 1934, as shall be designated by the Secretary of the Interior...'" 550 F.2d 641-41. The Jamul deed was conveyed to the United States "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." See, Ex. D. There, as here, "the United States acquired the [land]...pursuant to ... 25 U.S.C. 465. Section 465 provided that the title to land acquired under it 'shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired...'" Coast, 651, n32.

> Section 479... defined "tribe" for the purposes of the Act as '...any Indian tribe, organized band, pueblo, or the Indians residing on one reservation.' The Coast Indian Community [and the Jamul Indian Village] does not come within this definition, for it is not a tribe in the anthropological sense of the term, nor is it organized or a pueblo, nor were its members residing together on one reservation before or at the time of the Rancheria acquisition. The Rancheria, then, was not acquired for a tribe, leaving only the possibility under the Act that it was purchased for individual Indians. The deed and proclamation say nothing to contradict this. Thus, the land was taken in trust for the individual Coast Indian Community members." Coast., at 651, n32.

30. Here, Walter Rosales and Karen Toggery are among the individual "Jamul Indians of one-half degree or more Indian blood" that were designated in the 1978 grant deed, Ex. D, as the beneficiaries of the trust acquisition of parcel 597-080-04, under 25 U.S.C. 465. Since the Government has conceded that there was no recognized tribe of Jamul Indians in 1978, this is the only possible designation of beneficiaries permitted as a matter of law, as held in Coast, 550 F.2d 639, 651, n32; U.S. v. State Tax Comm. (5th Cir.1976) 535 F.2d 300, 304.

31. The U.S. has no evidence that the subsequently created "tribe," known as the "Jamul Indian Village," was ever designated as the beneficiary of the parcel, nor that a grant deed ever transferred the parcel to the tribe. In fact, the only evidence is that the Secretary of the Interior designated the individual "Jamul Indians of one-half or more Indian blood" to be the beneficiaries of the Parcel, by allowing them to reside upon the trust land for 28 years, just as occurred in Coast, 550 F.2d at 651, n32; see also Ex. D.

32. It is undisputed that the Tribe did not exist, had not been created under the I.R.A., and was not recognized, in 1978, when the Government accepted the grant deed for the parcel in trust for the individual Indians described therein. There is no authority in real property law that allows a grant deed to convey an interest in real property (in trust or otherwise) to a beneficial owner that does not exist, or is merely an "anticipatory expectancy." Either a beneficial owner exists at the time of a conveyance, or it does not. A non-existent person or entity simply cannot be "designated" a beneficial owner of trust property. Real property law only recognizes ownership by an existing person. Cal. Civil Code 679 and 680; Greenwald & Asimow, Cal.Practice Guide: Real Property Transactions (Rutter 2002) 4:133, p. 475.

33. It also cannot be disputed that the Government failed to follow its own guidelines for recording a grant deed to a subsequently recognized tribe, and therefore the existing grant deed for 597-080-04, as a matter of law, only created a beneficial interest in the individual Jamul Indians of one-half degree or more Indian blood. Mem. Sol. Int.at 668, 724, 747, and 1479; Exhibit J. There, the Solicitor of the Interior specifically advised the field personnel of the BIA that any transfer of the individual Indians' designated beneficial interest to any subsequently recognized tribe, must still be accomplished the old-fashioned way by recording a grant deed. Here, no grant deed ever transferred Walter Rosales and Karen Toggery's individual designated beneficial interest in the parcel to any tribe. Following the recording of the original 1978 grant deed for parcel 597-080-01, now known as 597-080-04, there is no subsequent record of any transfer of the parcel from the United States' trust on behalf of the individual half-blood Jamul

Indians designated by the Secretary, to any tribe, including the federally recognized Jamul Indian Village.

34. The Government cannot deny that its own Handbook of Federal Indian Law, Ch. 11, B3, pp. 615-16 (DOI 1982), concedes that all individual designated beneficiaries are cotenants in the trust land held by the U.S. Cotenants have equal rights to possession of the property, and no single cotenant has the right to exclude any other cotenant from the property. Cal. Civil Code 685-86; Zaslow v. Kroenert, 29 Cal.2d 541, 548 (1946). Therefore, all of the individual cotenants, including Walter Rosales and Karen Toggery, must consent to any transfer of their individual beneficiaries' designation to a subsequently recognized "tribe," before the subsequently recognized "tribe" may lawfully be designated as the beneficiary and acquire "jurisdiction" over the parcel. Id.

35. Here, there is no evidence of any such consent by the individual Indian co-tenants, including the individual Plaintiffs, to transfer their beneficial interest in the parcel, and the government never recorded a subsequent grant deed, transferring the individual Indian beneficiaries' interest in the parcel to any subsequently recognized tribe, including the Jamul Indian Village.

36. Here, it is no wonder that the "Jamul Indians of one-half degree or more Indian blood" have never consented to transfer their individual designation as beneficial owners to any subsequently created "tribe," since the IBIA found non-members participating in the tribal government, perhaps from the time the entity was first recognized, at 32 IBIA 166. Where, as here, no subsequent grant deed was recorded, the individual Plaintiffs' beneficial ownership of the trust property cannot, as a matter of law, have been transferred to any subsequently recognized tribe.

37. The government's own Handbook of Federal Indian Law explains the significant distinction between (1) taking land into trust for "individual" Indians, before they are allowed to become a recognized tribe under the IRA, as here, and (2) recognizing a landless "tribe" under the IRA, and then requiring the Secretary to transfer the land in trust from the individual Indians,

with their consent, to the "tribe," after it was recognized. Here, after the tribe was finally recognized in 1982, the government never obtained the consent of the individual Indians, including the Plaintiffs to transfer the parcel 597-080-04 into trust for the tribe. Nor did the government ever convey title to parcel 597-080-04 in trust for the tribe.

38. The government's own Handbook of Federal Indian Law, Ch.1, Sec. B2e, at 15-16 (1982 Ed.), also admits that: "One provision of the IRA gives the Secretary discretionary authority to accept or purchase land in trust for Indians included within its provisions. 25 U.S.C. 465. The Solicitor has held that the Secretary may exercise this authority for all individuals of one-half or more Indian blood.... This approach has also been used for the Quartz Valley Indians, Duckwater Shoshone Indians, Yomba Shoshone Indians, Port Gamble Band of Clallam Indians, and Sokaogan Chippewa Indians (Mole Lake Band)... This procedure has been suggested for other Indian groups as well. *E.g.*, Memo. Sol. Int. May 1, 1937, *reprinted in* 1 Interior Opinions, *supra* not 76, at 1479 (status of Nahma and Beaver Island Indians). Handbook. Ch.1, Sec. B2e, pp.15-16 fn. 86. In other cases non-reservation tribes have become eligible for organization under the IRA by first being recognized as a tribe under the Act and then having the Secretary take land in trust for the tribe."

39. In fact, the government Handbook's citation of the DOI Solicitor's Memorandum Opinion concerning the St. Croix Chippewas, Mem. Sol. Int., at 724, Ex. K, confirms that where the grant deed, Ex. D, fails to contain the final phrase, "until such time as they organize under section 16 of the [IRA] and then for the benefit of such organization," the property remains in trust for the individual Indians, who may, or may not have ever decided to transfer their beneficial interest to any subsequently recognized tribe.

40. This is exactly what happened here. The original grant deed, Ex. D, failed to contain the final phrase transferring the beneficial interest in the property to the subsequently recognized Jamul Indian Village. It is still undisputed that the Tribe did not exist, had not been created under the I.R.A., and was not recognized, in 1978, when the Government accepted the grant deed for the parcel in trust for the individual Indians described therein. There is also no

dispute that the Government failed to follow its own guidelines in recording the grant deed. Mem. Sol. Int. at 668, 724, 747, and 1479, attached in Exhibit J. Hence, for there to be any subsequent transfer of the individual Jamul Indians' designated beneficial interest in parcel 597-080-04 to any subsequently recognized tribe, such a transfer must still be accomplished the old fashioned way by recording a grant deed. Here, no grant deed ever transferred the individual Indians' designated beneficial interest in the parcel to any tribe.

41. These Solicitors' memoranda further admit that the 1978 trust acquisition cannot be made for a "tribe" that did not then exist. With regard to the Mississippi Choctaw, the Solicitor found that a grant deed simply cannot "designate" a "tribe" that doesn't exist as a beneficiary, since "there is in fact no existing tribe of Indians in Mississippi known as the Choctaw Tribe." Mem. Sol. Int., at 668, Ex. J. There, Solicitor Margold describes how the grant deed should have been prepared to put the property in trust for the Mississippi Choctaws: "The United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior, **until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe** pursuant to the act of June 18, 1934 (48 Stat. 984), and **then in trust for such organized tribe**." Mem. Sol. Int., at 668 (emphasis added), Ex. J. Similarly, no such language appears in the 1978 Jamul grant deed. Ex. D.

42. There, the Choctaw deed had to be amended and re-recorded to designate any subsequently recognized tribe a beneficiary. Since the deed did not contain the words: **"until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe"** or **"then in trust for such organized tribe,"** the property remained in trust for the individual Indians, and not a tribe, as in Coast, 550 F.2d at 651, and State Tax Comm., 535 F.2d 300, 304, where the court held that the absence of the words "then in trust for such organized tribe" in a relief act designating individual Choctaw beneficiaries meant that "only those individuals designated by the Interior Secretary were to have the benefit of this" designation, since "[n]either a tribe nor a reservation is mentioned."

43. The government's own Solicitor's written instructions to its BIA field superintendents states: "[i]In all of those cases where the title papers have already been returned to the field, instructions should be given to the field agents to have the deeds corrected before they are recorded. In that case where the deed has already been recorded and accepted, it will be necessary to secure a new deed. The necessary corrections will be made in the other cases which are now pending in this office. The error...arises perhaps out of unusual circumstances, but its one that might have been avoided." Mem. Sol. Int., at 668, Ex. J.

44. Here, the deed was never corrected. The 1978 grant deed does not contain the words, "until such time as they organize," proscribed by the Defendants' Solicitor to put the property into trust for the tribe, after the tribe was recognized. Ex. D. Nor does it state: "and then in trust for such organized tribe." Moreover, it is conceded that there was no transfer of the designation of the individual Indian beneficiaries, including the individual Plaintiffs, to any subsequently recognized tribe, since no subsequent grant deed has ever been recorded.

45. Therefore, as a matter of law, the government is estopped by its own Solicitor's memoranda to deny that the parcel 597-080-04 is held in trust for the designated individual Jamul Indian beneficiaries, who are of one-half degree Indian blood, including the individual Plaintiffs, since the government concedes that the "Jamul Indians of one-half degree or more Indian blood,"were not recognized as a tribe in 1978. Memos. Sol. Int. at 668, 724, 747, 1479, Ex. J, and Ex. K.

46. Hence, since there was never a subsequent transfer of the individual Indians' beneficial interest in the trust land of parcel 597-080-04 to the subsequently recognized tribe, the individual Plaintiffs' beneficial ownership of trust parcel 597-080-04 has never been under the governmental power of the Jamul Indian Village, and as such, remains subject to the protections of the U.S., its Constitution, the Indian Reorganization Act, both the federal and California NAGPRA statutes, and held in trust for the Plaintiffs' possession, use and quiet enjoyment.

**Unlawful Eviction and Violation of federal and California NAGPRA**

47. For more than 100 years, the Native American families of which the Plaintiffs are the lineal descendants have inhumed, interred, deposited, dispersed and placed hundreds of their deceased family members' human remains, and items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in 25 U.S.C. 3001, 43 C.F.R. 10.2, and Cal. Pub. Res. Code 5097.9-5097.99, below, on, and above, three parcels of land, originally known as 597-080-01 and 597-080-02, and now known as 597-080-04, 597-080-05, and 597-080-06.

48. Plaintiff Walter J. Rosales was personally present when his younger brother's human remains, his mother, Helen Cuero's human remains, and his son, Dean Rosales' human remains, were inhumed, interred, deposited, dispersed, and placed, along with the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal. Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. 3001, below, on, and above, what are now known as Parcels 597-080-04 and 597-080-06.

49. Plaintiff Karen Toggery was personally present when her mother, Marie Toggery's human remains and her son, Matthew Tinejero Toggery's human remains, were inhumed, interred, deposited, dispersed, and placed, along with the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal. Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. 3001, above, on, and below, what are now known as Parcels 597-080-04 and 597-080-06.

50. Recently, the San Diego Museum of Man repatriated a significant collection of Native American human remains and funerary objects, which have also been inhumed, interred, deposited, dispersed, and placed, below, on, and above, Parcels 597-080-04, 597-080-05, and 597-080-06.

51. The Plaintiffs have personal knowledge of at least 20 Native Americans whose human remains, and items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal. Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. 3001, have been inhumed, interred, deposited, dispersed, and placed below, on, and above, the three parcels of land, originally known as 597-080-01 and 597-080-02, and now known as 597-080-04, 597-080-05, and 597-080-06.

52. On or about December 10, 2005, all residents of Parcels 597-080-04 and 597-080-05, and 597-080-06, except Walter Rosales, Karen Toggery and Vivian Flores, abandoned their residences on the Parcels, and have been living continuously in other locations in San Diego County.

53. On March 10, 2007, Walter Rosales, Karen Toggery and her son, Ayhule Louis Gomez, were forcibly removed from their residences at gunpoint by armed thugs, against their will, after they were beaten and pepper sprayed. The armed thugs that forcibly removed Walter Rosales and Karen Toggery from their homes against their will and their rights under the First and Fourth Amendments to the U.S. Constitition, had no color of authority, nor authority of law to remove them from their property, nor any right under the law to deprive them of their religious freedom to protect the sepulcher of their dead.

54. After the armed thugs agreed in writing that Plaintiffs' homes would not be destroyed for seven days to allow them to obtain injunctive relief from the courts to prevent their removal from the property, which agreement was witnessed by San Diego Sheriffs, the armed thugs breached their agreement not 48 hours later, when Plaintiffs were further prevented from returning to their homes, and their homes were bulldozed on March 12, 2007.

55. This grading, excavation, demolition, operation of heavy equipment, moving dirt and/or gravel, and other construction activities, which continue today, on the parcels now known as 597-080-04, 597-080-05, and 597-080-06, have knowingly and/or willfully mutilated, disinterred, wantonly disturbed, and willfully removed, and caused irreparable damage to, the

Plaintiffs' Native American human remains, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in 25 U.S.C. 3001, 43 C.F.R. 10.2, and Cal. Pub. Res. Code 5097.9-5097.99, that have been inhumed, interred, deposited, dispersed, and placed below, on, and above, these three parcels of land, in violation of 25 U.S.C. 3002(c), 43 C.F.R. 10.3, 10.4, 10.5, 10.6, and 10.10, 16 U.S.C. 470aa et seq., 25 U.S.C. 262 et seq., 43 C.F.R. 7.5 and 10.3(b)(1), 25 U.S.C. 3009(4), Cal. Health & Safety Code 7050.5 and 7052, and Cal. Pub. Res. Code 5097.98 and 5097.99.

56. Knowingly mutilating, disinterring, wantonly disturbing, and willfully removing such human remains without authority of law is a crime, under 25 U.S.C. 3009(4) and Cal. Health & Safety Code 7050.5, and any person willfully mutilating or disinterring any remains known to be human without authority of law is guilty of a felony, under 25 U.S.C. 3009(4) and Cal. Health & Safety Code 7052, as is anyone obtaining or possessing, or who removes with malice or wantonness, and without authority of law, any Native American artifacts or human remains from a Native American grave or cairn, pursuant to 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.99.

57. 25 U.S.C. 3009(4) and Cal. Health & Safety Code 7050.5 provide that: "In the event of discovery or recognition of any human remains in any location other than a dedicated cemetery, there shall be no further excavation or disturbance of the site or any nearby area reasonably suspected to overlie adjacent remains until...the recommendations concerning the treatment and disposition of the human remains have been made to the person responsible for the excavation, or to his or her authorized representative, in the manner provided in Section 5097.98 of the Public Resources Code," which includes the lineal descendants' preference for "preservation of the Native American human remains and associated items in place."

58. 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.98, as amended September 30, 2006, provide that upon the discovery of Native American human remains, which may be an inhumation or cremation, and in any state of decomposition or skeletal completeness, the landowner is obligated to ensure that the immediate vicinity, according to generally accepted

cultural or archaeological standards or practices where the Native American human remains are located, is not damaged or disturbed by further development activity, so long as the lineal descendants' preferences are to preserve the Native American human remains and associated items in place, and that any items associated with the human remains that are placed or buried with the Native American human remains are to be treated in the same manner as the remains.

59. Plaintiffs have repeatedly put the world, including the Defendants, on written notice of:

(1) Plaintiffs' beneficial ownership of parcel 597-080-04;

(2) Plaintiffs' ownership and control, as lineal descendants, of their deceased Native American family members' human remains, and the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal. Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. 3001, that for more than 100 years have been inhumed, interred deposited, dispersed, and placed, below, on and above these three parcels of land known as 597-080-04, 597-080-05, and 597-080-06; and

(3) Plaintiffs' preference, as lineal descendants, to leave their families' human remains and funerary objects in place, as required by 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.98, the CEQA Guidelines 14 Cal. Code Regs. 15126.4 (b)(3), and 25 U.S.C. 3001 et seq., 43 C.F.R. 10.1-10.17, and the directives of the National Center for Cultural Resources and the National NAGPRA Program, as published on its website. Exhibit H hereto.

60. Such notice has been published in the records of the Catholic Diocese, newspapers of general circulation, letters to the U.S. Department of Interior and the Bureau of Indian Affairs, the records and files in the San Diego Superior Court and the U.S. District Court for the So. Dist. of California, and in the Public Access to Court Electronic Records. In addition, the recorded declaration by the Coronado Beach Company and the Catholic Diocese provided constructive notice to all persons of the dedication of said property to cemetery purposes,

pursuant to 25 U.S.C. 3009(4) and Cal. Heath & Safety Code sections 8551-8558.

61. No permit required by 25 U.S.C. 3002(c), 43 C.F.R. 7.5 and 10.3(b)(1), 16 U.S.C. 470aa et seq., 25 U.S.C. 262 et seq., and Cal. Health & Safety Code 7500 et seq., has been posted by any federal land manager on parcels 597-080-04 and 597-080-05 for anyone to grade, excavate, damage, disinter, remove or otherwise alter or deface, or attempt to grade, excavate, damage, disinter, remove or otherwise alter or deface, human remains or funerary objects from the parcels now known as 597-080-04, 597-080-05 and 597-080-06. Nor can any such permit be granted by any federal land manager, without the consent of the Indian owning the land and owning and controlling the human remains and funerary objects, which consent the Plaintiffs, who are the beneficial owners of the land with ownership and control of their families' human remains and funerary objects, have not granted. 25 U.S.C. 3002(c), 43 C.F.R. 10.3, 16 U.S.C. 470cc(g)(2) and 470ee, and 25 C.F.R. 262 et seq.

62. Based upon the foregoing, Plaintiffs are the beneficial landowners of parcel 597-080-04, and the lineal descendants' with ownership and control of their predecessors' human remains and Native American and associated cultural items, as set forth in 25 U.S.C. 3001-2, 43 C.F.R. 10.6, and Cal. Pub. Res. Code 5097.9-5097.99, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, which have been inhumed, interred, deposited, dispersed, and placed, below, on and above the parcels now known as 597-080-04, 597-080-05 and 597-080-06 over the last 100 years. The United States is the titled landowner of Parcel 597-080-04.

63. The United States has breached its fiduciary duty and general trust responsibility to the Plaintiffs by failing to:

(1) enforce the grant deed of San Diego Co. parcel 597-080-04 and Walter Rosales and Karen Toggery's beneficial ownership of that parcel;

(2) block Walter Rosales and Karen Toggery's eviction from, and prevent any further alienation of Walter Rosales and Karen Toggery's beneficial interests in, parcel 597-080-04;

(3) seek the return of parcel 597-080-04 to Walter Rosales and Karen Toggery for their possession, use and quiet enjoyment;

(4) prevent any further knowing and/or willful mutilation, disinterment, wanton disturbance, and willful removal of Plaintiffs' Native American human remains, along with the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in 25 U.S.C. 3001, 43 C.F.R. 10.2, and Cal. Pub. Res. Code 5097.9-5097.99, without authority of law, caused by further grading, excavation, demolition, operation of heavy equipment, moving dirt and/or gravel, and other construction activities, which have begun and continue on the parcels now known as 597-080-04, 597-080-05, and 597-080-06, without a permit issued pursuant to 25 U.S.C. 3002(c), 43 C.F.R. 7.5 and 10.3(b)(1), 16 U.S.C. 470aa et seq., 25 C.F.R. 262 et seq., and Cal. Health & Safety Code 7500, and which have caused, and will continue to cause, irreparable damage to the Plaintiffs' Native American human remains, along with the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in 25 U.S.C. 3001, 43 C.F.R. 10.2, and Cal. Pub. Res. Code 5097.9-5097.99;

(5) complete, execute, and provide a copy of, a written plan of action to Walter Rosales and Karen Toggery, specifically including Walter Rosales and Karen Toggery's ownership, custody and control of, and the kind of traditional and planned treatment, care and handling of, and the disposition and repatriation of, any of their human remains, funerary objects sacred objects, or objects of cultural patrimony which have been, or may be, discovered and/or excavated, below, on, or above, the surface of parcels 597-080-04, 597-080-05, and 597-080-06, in violation of 25 U.S.C. 3002(c), 43 C.F.R. 10.3, 10.5(a), (b), and (e), 10.6, and 10.10(a) and (b)(1), and 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.98;

(6) transfer custody to Walter Rosales and Karen Toggery any of their Native American human remains and funerary objects that are excavated or otherwise removed from parcels 597-080-04 and 597-080-05, in violation of 25 U.S.C. 3002, and 43 C.F.R. 10.6,

(7) repatriate to Walter Rosales and Karen Toggery any of their Native American human remains and funerary objects that are excavated or otherwise removed from parcels 597-080-04 and 597-080-05, in violation of 25 U.S.C. 3002, and 43 C.F.R. 10.10;

(8) prevent further excavation or disturbance of parcels 597-080-04 and 597-080-05, where human remains and funerary objects are located or any nearby area reasonably suspected to overlie adjacent remains until the recommendations concerning the treatment and disposition of the human remains have been made to the person responsible for the excavation, or to his or her authorized representative, which includes Walter Rosales and Karen Toggery's preference for the preservation of their Native American human remains and associated items in place, in violation of 25 U.S.C. 3009(4), Cal. Health and Safety Code 7050.5 and Cal. Pub. Res. Code 5097.98;

(9) ensure as the titled landowner of parcels 597-080-04 and 597-080-05, that the immediate vicinity, according to generally accepted cultural or archaeological standards or practices where the Native American human remains are located, is not damaged or disturbed by further development activity, so long as Walter Rosales and Karen Toggery's preferences are to preserve their Native American human remains and associated items in place, and that any items associated with the human remains that are placed or buried with the Native American human remains are to be treated in the same manner as the remains, in violation of 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.98;

(10) discuss and confer with Walter Rosales and Karen Toggery concerning their preference for the preservation of their Native American human remains and associated funerary objects, sacred objects and cultural patrimony, in place, and that if, the U.S. rejects the recommendation of Walter Rosales and Karen Toggery to preserve their Native American human remains and associated funerary objects, sacred objects and cultural patrimony, in place, failing to apply to, and mediate before, the California Native American Heritage Commission, Walter Rosales and Karen Toggery's preference for the preservation of their Native American human remains and associated funerary objects, sacred objects and cultural patrimony, in place, and that

if, such mediation fails to provide measures acceptable to both the U.S., as titled landowner, and Walter Rosales and Karen Toggery, as beneficial landowners, failing to reinter the human remains and items associated with their Native American human remains and associated funerary objects, sacred objects and cultural patrimony, with appropriate dignity on the parcel from which they were located in a location not subject to further and future subsurface disturbance, in violation of 25 U.S.C. 3009(4) and Cal. Pub. Res. Code 5097.94 and 5097.98.

64. These breaches of fiduciary duty and the general trust responsibility to the Plaintiffs by the Defendants have caused, and will further cause, Plaintiffs' substantial damages, in an amount in excess of $1 million dollars, subject to further proof at trial, due to the loss of the quiet enjoyment of their beneficial ownership of said parcels and the damage to the Plaintiffs' Native American human remains, along with the items associated with their human remains, including, but not limited to grave goods, cultural items, associated funerary objects, sacred objects, and objects of cultural patrimony, as defined in Cal. Pub. Res. Code 5097.9-5097.99, and 25 U.S.C. 3001, by the above described eviction, taking, knowing and/or willful mutilation, disinterment, wanton disturbance, and willful removal of them without authority of law.

65. These breaches of fiduciary duty and the general trust responsibility to the Plaintiffs by the Defendants have also caused substantial irreparable damage to, and interfered with, the Plaintiffs' free expression and exercise of Native American religion as provided in the United States Constitution and the California Constitution, and has caused and shall further cause severe and irreparable damage to the Plaintiffs' Native American sanctified cemetery, place of worship, religious or ceremonial site, and sacred shrines located on said parcels, in an amount in excess of $1 million dollars, subject to further proof at trial.

## FIRST CLAIM FOR RELIEF

(Breach of Fiduciary Duty and General Trust Responsibility)

66. Plaintiffs incorporate by reference paragraphs 1 through 67 of this petition and complaint as though fully set forth herein.

67. Defendants owe plaintiffs a fiduciary duty, a common law trust duty, and a general trust responsibility, for the management of Indian affairs, as described by the United States Supreme Court in Mitchell v. United States (Mitchell II) (1983) 463 U.S. 206, based upon the comprehensive nature of the federal statutes and regulations adopted pursuant to Titles 25 and 16 of the United States Code, and the fact that the Federal government has taken on, controlled, and supervised the Plaintiffs' Indian trust properties, human remains, and funerary objects, as defined in the Indian Reorganization Act, 25 U.S.C. 465 et seq., and the Native American Graves Protection Act, 25 U.S.C. 3001 et seq., and the Archaeological Resources Protection Act, 16 U.S.C. 470aa et seq.

68. By virtue of the Plaintiffs having placed confidence in the fidelity and integrity of the Federal defendants, a confidential relationship existed at all times herein mentioned between Plaintiffs and said defendants. Because defendants had superior knowledge and access to information not available to Plaintiffs, and knew that Plaintiffs were acting in reliance upon their skill and expertise, and because defendants represented to Plaintiffs that they were acting in the best interests of Plaintiffs, defendants had a fiduciary duty to deal honestly, fairly and in good faith with the Plaintiffs and to provide Plaintiff with full, complete and accurate information at all times.

69. By virtue of the acts alleged herein, defendants breached their fiduciary duty, common law trust duty, and their general trust responsibility to Plaintiffs by doing the acts alleged more particularly above, including, but not limited to, failing to enforce the deed to, and Plaintiffs' beneficial ownership of, parcels 597-080-04 and 597-080-05, failing to block the Plaintiffs' eviction from these parcels, failing to block the grading of these parcels, failing to prevent the desecration of the Plaintiffs' human remains and funerary objects, and failing to seek return of the Plaintiffs' possession, use and quite enjoyment of these parcels and their human remains and funerary objects, as described more fully above.

70. As a result of the Defendants breach of fiduciary duty, common law trust duty, and general trust responsibility, as more fully described above, Plaintiffs have suffered general

damages and diminution of value of their trust property, rights and benefits in an amount in excess of $1 million dollars, subject to proof at trial, including, but not limited to the loss of possession, use, and quiet enjoyment of their trust property, human remains and funerary objects, with interest thereon, and any and all attorneys' fees, costs and expenses incurred in prosecuting this action.

71. Plaintiffs have been greatly and irreparably damaged by reason of Defendants' conduct, and unless Defendants are incidentally enjoined by this court, they will continue their violation of plaintiffs' rights further irreparably harming the plaintiffs.

72. As a result of the wrongful conduct of the defendants as herein alleged, plaintiffs are incidentally entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable injury resulting from the infringement and violation of their rights, from the likelihood that Defendants will be unable to respond in damages, and from the difficulty or impossibility to ascertain the exact amount of personal bodily injury and property damage plaintiffs have, and will in the future, sustain. These ongoing and continuing injuries sustained by plaintiffs cannot be fully compensated in damages and plaintiffs are without an adequate remedy at law without the imposition of the requested incidental equitable injunctive relief.

**SECOND CLAIM FOR RELIEF**

(Taking)

73. Plaintiffs incorporate by reference paragraphs 1 through 74 of this complaint as though fully set forth herein.

74. Defendants have unlawfully failed to enforce the deed to, and Plaintiffs' beneficial ownership of, parcels 597-080-04 and 597-080-05, failed to block the Plaintiffs' eviction from, and failed to block the grading of, and the failed to seek return of the Plaintiffs' possession, use and quiet enjoyment of, these parcels and their human remains and funerary objects, as described above.

75. Plaintiffs have demanded that Defendants return said property to Plaintiffs, but Defendants and each of them, have refused and continue to refuse to return said property.

76. As a result of the Defendants' taking of Plaintiffs' trust property without just compensation, as more fully described above, Plaintiffs have suffered general damages and diminution of value of their trust property, rights and benefits in an amount in excess of $1 million dollars, subject to proof at trial, including, but not limited to the loss of possession, use, and quiet enjoyment of their trust property, human remains and funerary objects, with interest thereon, and any and all attorneys' fees, costs and expenses incurred in prosecuting this action.

77. Plaintiffs have been greatly and irreparably damaged by reason of Defendants' conduct, and unless Defendants are incidentally enjoined by this court, they will continue their violation of plaintiffs' rights further irreparably harming the plaintiffs.

78. As a result of the wrongful conduct of the defendants as herein alleged, plaintiffs are incidentally entitled to a temporary, preliminary and permanent injunction to prevent great and irreparable injury resulting from the infringement and violation of their rights, from the likelihood that Defendants will be unable to respond in damages, and from the difficulty or impossibility to ascertain the exact amount of personal bodily injury and property damage plaintiffs have, and will in the future, sustain. These ongoing and continuing injuries sustained by plaintiffs cannot be fully compensated in damages and plaintiffs are without an adequate remedy at law without the imposition of the requested incidental equitable injunctive relief.

**WHEREFORE** plaintiffs petition for judgment as follows:

1. That plaintiffs be awarded general damages subject to proof at trial, in an amount in excess of $1,000,000;

2. That plaintiffs be awarded their reasonable attorneys' fees, costs, and expenses in this action;

3. That plaintiffs be awarded interest and costs; and

//

//

//

//

4. That plaintiffs be awarded such other and further relief, including, but not limited to, incidental temporary, preliminary, and permanent injunctive relief, as this court may deem just and proper.

Dated: July 10, 2008

**WEBB & CAREY**

Patrick D. Webb, Attorneys for Plaintiffs

**EXHIBIT LIST**

| | |
|---|---|
| Exhibit A | September 26, 1912 Deed from Spreckel's Coronado Beach Company to the Catholic Diocese. |
| Exhibit B | 1931 Map of Survey of Rancho Jamul |
| Exhibit C | August 7, 1971 San Diego Union article |
| Exhibit D | December 12 1978 Daley Grant Deed to the United States for parcel 597-080-04 |
| Exhibit E | May 9, 2000 Memo from Carmen Facio to Nancy Pierskalla DC/BIA/DOI |
| Exhibit F | May 25, 1982 Catholic Grant Deed to United States for parcel 597-080-05 |
| Exhibit G | July 13, 1993 RHO Jamul Survey Map |
| Exhibit H | 2007 NAGPRA Guidelines from National Park Service website |
| Exhibit I | May 9, 1981 constitution of Jamul Indian Village |
| Exhibit J | 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs 1917-74 ("Mem. Sol. Int.") at 668, 724, 747, and 1479 |
| Exhibit K | July 1, 1993 Letter of Carol Bacon, BIA Director Office of Tribal Services to Jamul Indian Village |

# EXHIBIT A

Photographed by T. FADER, Deputy Recorder

State of California
County of [illegible]

On this [illegible] day of September 1912 before me Loie B. Mathews a Notary Public in and for said County, residing therein, duly commissioned and sworn, personally appeared Ed. Fletcher personally known to me to be the person described in and whose name is subscribed to the within instrument, as the attorney in fact of Charles B. Gould, and acknowledged to me that he subscribed the name of Charles B. Gould thereto as principal, and his own name as attorney in fact.

In Witness Whereof I have hereunto set my hand and affixed my official seal the day and year in this Certificate first above written.

Loie B. Mathews Notary Public San Diego Co. Cal.

Loie B. Mathews
Notary Public in and for the County of San Diego, State of California.

Recorded at Request of R. C. Sparks (S. D. Weller), Sep 26 1912 at 15 Min. past 10 o'clock A.M.

John H. Ferry County Recorder
[illegible] By W. Howard Lee [illegible] Deputy Recorder

COMPARED: Harold I. Angier

---

Coronado Beach Company, a corporation of the City of San Diego County of San Diego, State of California,
For and in consideration of the sum of One Dollar, Does Hereby Grant to The Roman Catholic Bishop of Monterey and Los Angeles, a corporation sole, of the State of California to be used for the purpose of an Indian graveyard and approach thereto, All that Real Property situated in the County of San Diego, State of California, bounded and described as follows:

Commencing at a point on the north boundary line of the Rancho Jamul distant 648.5 feet east from the Rancho Jamul corner No 16; thence east along said north boundary line 383.0 feet to a point on the westerly line of County Road; thence South 48° 13' east along said westerly line of County Road 26.2 feet to a point; thence west 594.7 feet to a point, thence south 58.0 feet to a point, thence south 86° 45' west 70.70 feet to a point; thence south 43° 30' west 88.5 feet to a point, thence south 57.9 feet to a point, thence west 84.2 feet to a point; thence north 234.0 feet to the point of beginning; containing 2.21 acres.

To have and to hold the above granted and described premises unto the said Grantee, his successors and assigns forever for the purposes above specified.

In Witness Whereof, said corporation has caused this deed to be signed by its Vice President and Secretary and its corporate seal to be affixed hereto this 11th day of July 1912.

Coronado Beach Company

Photographed By T. FADER, Deputy Recorder

Signed an Executed By W. Clayton Vice President
in presence of — And Harry L. Titus Secretary

Coronado Beach Company

State of California } ss.
County of San Diego }

On this 11th day of July in the year one thousand nine hundred and twelve before me Fred G. Whitehead, a Notary Public in and for said County, personally appeared W. Clayton known to me to be the Vice President, and Harry L. Titus, known to me to be the Secretary of the Corporation that executed the within instrument, known to me to be the persons who executed the within instrument on behalf of the corporation therein named, and acknowledged to me that such corporation executed the same.

Fred G. Whitehead

Notary Public Fred G. Whitehead San Diego Co. Cal.

Notary Public in and for the County of San Diego, State of California

Recorded at Request of Father E. Lapointe. Sep 26. 1912, at 30 Min Past 10 O'clock A. M.

John H. Ferry County Recorder

Fee $ .90 COMPARED: Harold I. Angier By Harold Angier Deputy Recorder

---

This Indenture made this 27th day of August 1912, Between Chase + Ludington, a Corporation, duly organized existing and doing business under and by virtue of the laws of the State of California and having its principal place of business at the City of San Diego, County of San Diego, State of California, the party of the first part, and L. May Taber party of the second part, Witnesseth:-

That said party of the first part, pursuant to a resolution duly passed at a meeting of its Board of Directors held at their office on August 27th 1912, and of record in Minute Book # 1 at page 59 et seq, for and in consideration of Ten ($10.00) Dollars, Gold Coin of the United States of America to it in hand paid by said party of the second part, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed, and by these presents does grant, bargain, sell and convey unto the said party of the second part, her heirs and assigns forever, subject however to the County and State taxes of 1912 and the covenants and conditions hereinafter named, all that certain real property situate in the City of San Diego, County of San Diego, State of California, bounded and described as follows, to-wit:

Lots Nine (9) and Ten (10) Block Sixty-three (63) of La Jolla Park according to Map thereof # 352, filed in the office of the

# EXHIBIT B

# L.S. NO. 430

## MAP OF SURVEY OF
# RANCHO JAMUL
## SAN DIEGO COUNTY - CALIFORNIA

Surveyed May, 1931 Scale - 1 inch = 1000 feet

3 SHEETS - SHEET 1

Total Area - 8886.77 Acres

Meridian determined by solar observation

Surveyed for G.R. Daley, San Diego, California.

Survey by Hugo Kuehmsted, Licensed Surveyor.

I hereby certify that I am a Licensed Surveyor, and that this survey was made under my supervision as shown on this map, and that the monuments were set as shown hereon.

Hugo Kuehmsted
Licensed Surveyor.

Approved this 28th day of May, 1931

James Henry Johnson
County Assessor of San Diego County.
State of California.

No 29698
Filed at the request of Hugo Kuehmsted
at 03 minutes past 11:00 o'clock A M, this 1 st day
of ~~May~~ June, 1931

O. M. Swope
County Recorder of San Diego County, California.
By E. J. Hawkins
Deputy




Note: The concrete monuments set are 12"x6"x6" with copper center, and are marked "H.K."





Detail of Indian Cemetery
Scale 1 inch - 400 feet
R.J. 16
N88°42'W
530.52
(Deed 648.5)
1383.0 (Deed-East)
North Line Rancho
2.34 Ac.
S87°52'W 664.77
(Deed S86°45'W 704.0)
N88°42'W 554.7
(Deed-West)
Found stone and iron pin in stone mound.
N0°27'W 2630.0
N0°41'W 1808.0
Found stone and earth mound at fence cor. Set conc. mon. R.J. 16
N88°42'W 5312.6
2.34 Ac.
Indian Cemetery See Detail
147.25 Ac.
Found scribed stake in stone mound at fence cor. R.J. 17
S3°12'W
627.13
966.6
N89°36'W
974.5
N83°32'40"E
5208.9
Set conc. mon.
Found stone in earth mound at fence cor.
Found stake in stone mound at fence cor. Set conc. mon.
S.D.C.H.C. Route 16 Division 2
R.J. 14
6733.4
5384.8
S8°21'30"E
606.78 Ac.
Set conc. mon.

# EXHIBIT C



Frank Lechappa, upper right, a Barona Indian, inspects well tended graves at Indian Catholic Cemetery in Jamul. One grave is that of veteran Daniel Aldamas, lower left. Lower right is home of Indian family that has lived in area for years.

# Rabbi Attracts Youth With Rock Service

By DIANA DIMARCO

PITTSBURGH (AP) — Rabbi Fredric S. Pomerantz is a round little man with longish red hair and a throbbing drive who looks more like a musician than a rabbi. He's both.

He worked his way through college playing drums in a band.

Now, at 31, he is associate rabbi of one of the country's largest Jewish congregations, the 1,800-family Temple Rodef Shalom. And he has set out on a course heretofore generally uncharted in Judaism.

It involved setting the traditional Hebrew prayer service to a rock beat, and organizing two coffeehouses for young people — gentile as well as Jewish.

AIDS IN SHARING

The approach, common in Christian youth activities but still rare in Jewish worship, helps young people share mutual interests, Rabbi Pomerantz says, and adds: "It's the sharing that's important, the entertainment is secondary."

A restless, energetic man, he also is Jewish chaplain at Western Psychiatric Hospital, rabbinic advisor to the Pennsylvania Federation of Temple Youth, and originator of a free, informal education program that opened for high school students two years ago. It now also includes college students and adults.

The two coffeehouses, "The Back Door" for university students and "The Exit" for high schoolers, are open every weekend to all comers.

NEEDS CITED

"Kids need to feel part of a group and they also need someone to show them they have responsibilities," he says.

The title of the "rock" service, Sim Shalom, means "grant us peace," and that is its basic message, says Rabbi Pomerantz, who did the update arrangement for brass, guitar, organ and drums.

"You've got to listen to the ideas and questions of the prayers," he says. "Yet if its the beat and the music that draws you into the meaning, there's nothing wrong with that."

## JAMUL INDIAN FAMILIES

# Cemetery Houses The Living

By ERNESTO FLORES

In 1912, when San Diego was still a part of the Roman Catholic Diocese of Monterey, about three acres of hilly land in Jamul was turned over to the church by a realty company for use as a cemetery for Indians.

To fulfill that stipulation, the church for years has buried hundreds of Indians in the cemetery. It also erected a small chapel where services for the dead are held.

That the church regards the property as simply a place of burial was confirmed by administrators of the San Diego Roman Catholic Diocese. "As far as we are concerned the land is a cemetery and it will remain that way," they said.

SOME LIVE THERE

Actually, only a small portion of the land has been used as a burial ground. The church, for years, has allowed Indians to live on the open areas. Today about seven families make their homes on the cemetery land.

The families, who come from various tribes in the county, live under extremely poor conditions. Having no plumbing, they get their supply from a lone well pump at the bottom of a dry wash.

They have no electricity, no sewage system and no transportation except one or two dilapidated autos. Their houses are wooden shacks surrounded by piles of junk and garbage.

In spite of these problems, however, many of them express a desire to live and die there as their parents and grandparents before them.

Church authorities are not particularly happy with the activities of various groups taking an interest in the Indians at Jamul. Because of such activities, publicity has been given the plight of the Indians.

A church spokesman said he hopes the publicity about the Indians living in the cemetery will not reflect adversely on the church. He added, "we have tried our best to help them. They should do something to help themselves, too."

Mrs. Isabel Rosales, 77, is the oldest resident of the place. She said she has lived there all her life and she remembers the time when there were more Indians living there.

"Many of them are buried in that cemetery," she said pointing work-gnarled fingers at the rows of wooden crosses on a hill about 500 yards away. "Others left and didn't come back."

Mrs. Rosales' three surviving children are all married and live in other areas of the county. She lives alone. She said she has no place to go and intends to end her days there.

WON'T MOVE

This thinking is shared by Mrs. Marie Toggery, 50, whose husband died recently. She said her three children may not think as she, but as far as she is concerned, she is not going to live anywhere else.

Mrs. Toggery's son, Jessie, 19, wants to be a lawyer. His sister, Connie, 18, studies at Grossmont Continuation School and hopes to go to college next year. The other daughter, Karen, 17, is a student at Granite Hills high school but wants to drop out and work.

Having experienced a marginal existence all their lives, the Toggerys seem to have developed an immunity to suffering. They could even laugh at the thought of death.

Mrs. Toggery was seriously ill for some time.

"I told my mother that if she dies, we just have to bury her in the cemetery," said Jessie jocularly. Mrs. Toggery joined her daughter in laughter.

NO EVICTION

The family's only means of income is a Veterans Administration benefit for the late Mr. Toggery, who was a veteran. Their monthly check formerly was $291, but this has been reduced to $287 for no apparent reason, said Mrs. Toggery.

With this amount they buy food, clothing and other necessities and send the children to school.

The Indians at Jamul have one consolation, however. According to church officials, the diocese has no plan to evict the families.

"Although technically they have no business being there, we can't remove them just like that," a diocesan spokesman said.

Nevertheless, officials have a few complaints. Although the San Diego Gas & Electric Co. has agreed to extend electric lines to that part of Jamul, the residents, except for one family, refuse to spend money to bring power to their homes.

GROUPS VISIT THEM

The diocese built a small chapel on a slope of a hill. The Rev. J. Walshe Murray, pastor of St. Pius X Church in Jamul under whose jurisdiction the cemetery falls, said he officiates in most of the funeral services. The church also erected a community house which the families use for meetings.

For years the Indian families have been left largely to their own devices. Lately, however, some concerned groups have visited them and asked about their welfare.

One such group is the Grassroot Indian Association which has the objective of "improving the living conditions of Indians in the county by peaceful and legal means."

Frank LaChappa, 22, a Barona Indian from Poway and the association's vice chairman, said his group has met in Jamul twice.

"We are a new group and our first task is to find out the condition of living in various Indian communities. That's why we come here as often as we can," he said.

Earl Ridenhour, himself a part Indian from Oklahoma and a member of the association, said the conditions in which most local Indians live "are so deplorable, we just have to do something to help them."

# Younger Upholds Tax For Cable TV

SAN FRANCISCO (AP) — Atty. Gen. Evelle Younger has ruled that California's 332 general law cities can build and run their own cable television systems and tax citizens to fund the operation.

In the opinion requested by Senate President pro tem James Mills of San Diego, Younger said such a system is "a public work" and could be run as a public utility.

The state's 75 charter cities, including most major cities, were not covered by the ruling. Most cable television systems built to date have been private ventures.

Revenues for the system could come from general obligation bonds and available tax money, Younger said.

FIRST CH…
RELIGIOUS…
3795 GEORGIA STRE…
CHET CASTE…
9:30 THE WEAKNESS…
AND THE STREN…
11:00 GOD POWER, T…
EQUALIZER

IN EL CAJON
CALVARY BAPTIST CHURCH
10:45 a.m. —
Rev. DAVE MARSTELLER
7:00 p.m. — BROADCAST — KECR FM
… LINCOLN

THE EV…
PRESBYTE…
of San …
HWY. …
WILLIAM D. LIVINGSTON
"HEATHE…
HER HA…
ADULT CLASS 9:00 A.M. …
SUNDAY SCHOOL …
Morning Worship …
Church Office …

Saturday, August 7, 1971

# RELIGION

## Child Worship Needs Stressed In New Book

WASHINGTON (UPI) — One of the most difficult problems parents, Sunday school teachers and pastors face is making the experience of worship meaningful and rewarding for children.

Adult worship is largely word oriented and makes worshipers spectators rather than participants. All too often, children's worship is little more than an insipid and simplified version of adult services.

Fortunately there are signs the situation is changing.

Not long ago, the Liturgical Conference, an independent association concerned with renewal of the life and worship of the Christian church, published a 200-page loose-leaf book called "Children's Liturgies."

What makes children's liturgies so potentially useful is the way it capitalizes both on children's wonder and awe about the world and their sometimes aggravating inability to sit still for any length of time.

Now the conference has issued a supplement to the book by devoting the entire issue of its monthly magazine ... what is called ... children's ...



Frank Lechappa, upper right, a Barona Indian, inspects well tended graves at Indian Catholic Cemetery in Jamul. One grave is that of veteran Daniel Aldamas, lower left. Lower right is home of Indian family that has lived in area for years.

## Rabbi Attracts Youth With Rock Service

By DIANA DEMARCO

## JAMUL INDIAN FAMILIES

# Cemetery Houses The Living

By ERNESTO FLORES

... where San Diego was still a part of the Roman Catholic Diocese of Monterey, about three acres of hilly land ... was turned over to the church for a ...

Church authorities are not particularly happy with the activities of various groups taking an interest in the Indians of Jamul. Because of such activities, publicity has been given. The plight of the ...

... daughter, Karen ... is a student at Granite Hills High School but wants to drop out and work.

... For years the Indian ... have been left largely ...

# EXHIBIT D

RECORDING REQUESTED BY 258

AND WHEN RECORDED MAIL TO

Name Bureau of Indian Affairs
Street Address Southern California Agency
5750 Division Street, Suite 201
City & State Riverside, California 92506

78-554597
FILE/PAGE NO.
BOOK 1978
RECORDED REQUEST OF
GRANTEE
DEC 27 1 49 PM '78
OFFICIAL RECORDS
RECORDER
SAN DIEGO COUNTY, CALIF.

SURVEY MONUMENT PRESERVATION USER FEE
$10.00

$5.00

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TAX ROLL PARCEL NO. 597-080-01

# GRANT DEED

DOCUMENTARY TRANSFER TAX $ -0-
____ COMPUTED ON FULL VALUE OF PROPERTY CONVEYED.
____ OR COMPUTED ON FULL VALUE LESS LIENS AND ENCUMBRANCES REMAINING AT TIME OF SALE.
William H. [illegible] Agency Realty Off.
Bureau of Indian Affairs
Signature of Declarant or Agent determining tax. Firm Name

THIS INDENTURE, made the ____ day of ____ 19__

BETWEEN Donald L. Daley and Lawrence A. Daley

, the parties of the first part

and The United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate

, the parties, of the second part,

WITNESSETH: That the said parties of the first part, ~~for and in consideration of the sum of~~ ~~____ DOLLARS~~

~~lawful money of the United States of America, to~~ ~~in hand paid by the said part~~

~~of the second part, the receipt whereof is hereby acknowledged~~, do ____ by these presents, GRANT for a valuable consideration unto the said parties of the second part, and to their heirs and assigns forever, all that certain ~~lot~~ ~~piece~~ or parcel of land, situate, lying and being in the ____, County of San Diego and State of California and bounded and particularly described as follows, to wit: SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

ACCEPTANCE OF CONVEYANCE BY THE UNITED STATES IS TO BE ATTACHED HERETO AS EXHIBIT "B" AND RECORDED WITH THIS DEED.
THIS CONVEYANCE IS MADE IN ACCORDANCE WITH SECTIONS 5 AND 19 OF THE INDIAN REORGANIZATION ACT OF JUNE 18, 1934 (48 Stat. 985 and 988; 25 U.S.C. 465 and 479) AND MADE SUBJECT TO EASEMENTS AND RIGHTS-OF-WAY OF RECORD IN FAVOR OF THE PUBLIC OR THIRD PARTIES.

TOGETHER with all and singular the tenements, hereditaments and appurtenances thereunto belonging, or in anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof.

TO HAVE AND TO HOLD, all and singular the said premises, together with the appurtenances, unto the said parties of the second part, and to their heirs and assigns forever.

IN WITNESS WHEREOF, the said parties of the first part have hereunto set their hand and seals the day and year first above written.

x [signature]
x [signature]
Donald L. Daley and Lawrence A. Daley

STATE OF CALIFORNIA,
County of San Diego } ss.

On December 12, 1978, before me, the undersigned, a Notary Public in and for said State, personally appeared Lawrence A. Daley and Donald L. Daley

known to me to be the persons whose names are subscribed to the within instrument and acknowledged that they executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
L. D. ARTHUR
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My Commission Expires April 9, 1982

[signature] L. D. Arthur
Notary Public in and for said State.

Title Order No. ____

Escrow or Loan No. ____

MAIL TAX STATEMENTS TO ____
NAME ADDRESS ZIP

78-554597

DEED - GRANT - WOLCOTTS FORM 770
REV 3-70

This standard form covers most usual problems in the field indicated. Before you sign, read it and make changes proper to your transaction. Consult a lawyer if you doubt the form's fitness.

LEGAL DESCRIPTION

All that portion of Rancho Jamul, in the County of San Diego, State of California, according to L.S. Map thereof No. 430, filed in the Office of the Recorder of said San Diego County, May 28, 1931, more particularly described as follows:

Beginning at corner R.J. 16 as shown on said L.S. Map No. 430; thence along the Northerly line of said Rancho Jamul S. 88°42'00" E., 529.24 feet (record N. 88°42' W., 530.52 feet) to the Westerly line of that certain parcel of land noted Indian Cemetery on said L.S. Map No. 430; thence along said Westerly line S. 01°20'53" W., 239.66 feet (record N. 01°18' E., 239.0 feet) to the Southwest corner of said Indian Cemetery; thence along the Southerly line of said Indian Cemetery S. 88°39'07" E., 83.55 feet (N. 88°42' W., 83.5 feet) to the TRUE POINT OF BEGINNING; thence continuing along said Southerly line as follows: N. 01°20'53" E., 59.94 feet (record S. 01°18' W., 59.9 feet); N. 44°50'53" E., 88.55 feet (record S. 44°48' W., 88.5 feet); N. 87°54'53" E., 665.17 feet (record S. 87°52' W., 664.77 feet); N. 01°20'53" E., 58.04 feet (record S. 01°18' W., 58.0 feet); S. 88°42'00" E., 598.46 feet to the Southwesterly line of Campo Road said point being on a 555.59 foot radius curve concave Southwesterly, a radial line from said points bears S. 47°16'18" W.; thence Southeasterly along the arc of said curve, through a central angle of 03°29'08" a distance of 33.80 feet; thence leaving said Southwesterly line N. 88°42'00" W., 338.54 feet; thence S. 21°58'02" E., 257.03 feet; thence N. 86°48'26" W., 721.24 feet; thence N. 86°21'37" W., 388.78 feet to the TRUE POINT OF BEGINNING, said described land consisting of 4.66 acres, more or less.

EXHIBIT "A" TO DEED FROM DONALD L. DALEY AND LAWRENCE A. DALEY DATED DECEMBER 12, 1978.

78-554597

260

IN REPLY REFER TO

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
Sacramento Area Office
2800 Cottage Way
Sacramento, California 95825

ACCEPTANCE OF CONVEYANCE

The United States of America, acting through the undersigned, an authorized representative of the Secretary of the Interior, does hereby accept the conveyance made by Donald L. Daley and Lawrence A. Daley in that certain Grant Deed dated December 12, 1978. Said Grant Deed, with this Acceptance of Conveyance attached, shall be recorded in the Official Records of San Diego County, California.

Date: DEC 21 1978

Charles L. Loyeba Jr.
ACTING Area Director

Pursuant to the authority delegated by 230 DM 1, 10 BIAM 2 (39 F.R. 32166) and 10 BIAM 3.1 (34 F.R. 637).

State of California )
) SS.
County of Sacramento)

On this 21st day of December, 1978, before me, the undersigned, a Notary Public in and for said State, personally appeared Charles L. Loyeba Jr., known to me to be the person whose name is subscribed to the within Acceptance of Conveyance and acknowledged to me that he executed the same for the United States of America.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this date.

CARMEN G. FACIO
NOTARY PUBLIC
My Commission Expires August 10, 19[illegible]

Carmen G. Facio

EXHIBIT "B" TO DEED FROM
DONALD L. DALEY AND
LAWRENCE A. DALEY DATED
DECEMBER 12, 1978.

..., before me, the undersigned, a Notary Public in and for said State, personally appeared Lawrence A. Daley and Donald L. Daley

known to me to be the persons whose names are subscribed to the within instrument and acknowledged that they executed the same.

WITNESS my hand and official seal.

OFFICIAL SEAL
L. D. ARTHUR
NOTARY PUBLIC
SAN DIEGO COUNTY
My Commission Expires April 9, 1982

L. D. Arthur
Notary Public in and for said State.

78-554597

Title Order No.
Escrow or Loan No.

MAIL TAX STATEMENTS TO
NAME ADDRESS ZIP

DEED—GRANT—WOLCOTTS FORM 779
REV. 2-70

This standard form covers most usual problems in the field indicated. Before you sign, read it, fill in all blanks, and make changes proper to your transaction. Consult a lawyer if you doubt the form's fitness for your purpose.

# EXHIBIT E

Carmen Facio
05/09/00 11:34 AM

To: Nancy Pierskalla/DC/BIA/DOI@BIA
cc: George Skibine/DC/BIA/DOI@BIA
Subject: Re: Gaming in San Diego

I forwarded your inquiry down to the SCA Supt. I currently have nothing on [illegible]
We'll let you know.

For several years now, Jamul has been talking about getting the contiguous property - @ one point for a casino, and then again, just for a parking lot.

The current trust parcel was accepted into trust in 1978 for Jamul Indians of 1/2 degree (4.66 acres). They've expanded their membership, but the constitution states thay have jurisdiction over the Jamul Indian Village. I have no record of the 1978 trust parcel being known as the Jamul Village. There was also a small parcel accepted into trust in 1982 by the SCA Supt. for the Jamul Indian Village (1.37 acre).

Cuyapaipe has a reservation land base that there is no legal access to. They have an off-reservation piece that is leased to the So. Calif. Indian Health Council for 50 years. There's talk that they want the Health Council to move to another location so that Cuyapaipe can use the off-reservation tract for gaming. This tract is about 8.7 acres. An addition to this 8.7 acres was made in 1997 (1.43 acre) & its purpose was as the site of the Pinto Home for Girls and it's also under a 50-year lease. Of course, there's talk about putting more land in trust for Cuyapaipe for relocation of the health facility.

# EXHIBIT F

TAX ROLL PARCEL NO.
597-080-02 Code Area #79019

DOCUMENTARY TRANSFER TAX $ 0

GRANT DEED

TAX SIGNATURE

I, The Roman Catholic Bishop of San Diego, hereby grant to the United States of America in trust for the Jamul Indian Village all that land situated in the County of San Diego, California, more particularly described as follows:

All that portion of Rancho Jamul described in Deed to the Roman Catholic Bishop of Monterey and Los Angeles recorded September 12, 1912 in Book 567, Page 332, in the Office of the County Recorder of San Diego County, California; EXCEPTING THEREFROM a piece of of land described as follows: Commencing at Rancho Jamul Corner No. 16; thence N. 88°42' E., 739.37 feet to the true point of beginning as shown on Record of Survey Map No. 8138, filed December 2, 1976 in the Office of said County Recorder; thence S. 1°18' W., 111.77'; thence S. 87°55'38" W., 65.81'; thence S. 44°51'28" W., 88.60'; thence S. 1°19'25" W., 59.80'; thence N. 88°41'06" W., 83.66'; thence N. 1°24'08" E., 239.63'; thence N. 88°42' E., 210 feet to the True Point of Beginning, containing 0.838 acre, more or less. The parcel granted to the Jamul Indian Village contains 1.372 acres, more or less.

The grantor reserves to himself and his successors or assigns an easement for (1) utility service lines and (2) ingress and egress over the existing well-traveled road, or over any road that subsequently is built to replace the existing one.

IN WITNESS WHEREOF, The Roman Catholic Bishop of San Diego, grantor, herein have hereunto affixed his name this 25th day of May, 1982.

82-229256

RECORDED IN OFFICIAL RECORDS OF SAN DIEGO COUNTY, CA.
1982 JUL 27 AM 9 41
VERA L. LYLE COUNTY RECORDER

| | |
|---|---|
| RF | 4 |
| MG | |
| TXPD | 12 |
| UF | — |

ROMAN CATHOLIC BISHOP OF SAN DIEGO
a corporation sole,

Incumbent

STATE OF CALIFORNIA )
) ss.
COUNTY OF SAN DIEGO )

On this 25th day of May, 1982, before me C.H. Guittard, a Notary Public in and for said County and State, personally appeared LEO T. MAHER, known to me to the Roman Catholic Bishop of San Diego and to be the Incumbent of the corporation sole that executed the within instrument and acknowledged to me that said corporation sole executed the same.

WITNESS my hand and official seal.

Notary Public in and for said County and State

OFFICIAL SEAL
C.H. GUITTARD
NOTARY PUBLIC-CALIFORNIA
PRINCIPAL OFFICE IN SAN DIEGO COUNTY
My Commission Expires Aug. 27, 1984

ACCEPTANCE OF CONVEYANCE BY THE UNITED STATES IS TO BE ATTACHED HERETO AS EXHIBIT "A" AND RECORDED WITH THIS DEED. THIS CONVEYANCE IS MADE IN ACCORDANCE WITH SECTIONS 5 and 19 OF THE INDIAN REORGANIZATION ACT OF JUNE 18, 1934 (48 Stat. 985 and 988; 25 U.S.C. 465 and 479).

№ 229256 82-

53

TAX ROLL PARCEL NO.

54

IN REPLY REFER TO:

Act No. 1

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
SOUTHERN CALIFORNIA AGENCY
5750 DIVISION STREET, SUITE 201
RIVERSIDE, CALIFORNIA 92506-3286

ACCEPTANCE OF CONVEYANCE

The United States of America, acting through the undersigned, an authorized representative of the Secretary of the Interior, in accordance with Sections 5 and 19 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 985 and 988; 25 U.S.C. 465 and 479), does hereby accept the conveyance made by The Roman Catholic Bishop of San Diego in that certain Grant Deed dated May 25, 1982.

Said Grant Deed, with this Acceptance of Conveyance attached, shall be recorded in the Official Records of San Deigo, California.

Date: July 2, 1982

[signature]
Acting Superintendent
Pursuant to the authority delegated by 230 DM 1, 10 BIAM 2 (39 F.R. 32166) and 10 BIAM 3,1 (34 F.R. 637), and Sacramento Area Office Redelegation Order 1 (43 F.R. 30131).

STATE OF CALIFORNIA)
) SS.
COUNTY OF RIVERSIDE)

On this 2nd day of July, 1982, before me, the undersigned, a Notary Public in and for said State, personally appeared Frank L. Haggerty, Jr., known to me to be the person whose name is subscribed to the within Acceptance of Conveyance and acknowledged to me that he executed the same for the United States of America.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this date.

[signature]
Notary Public in and for said State

OFFICIAL SEAL
ARLENE J. LACY
NOTARY PUBLIC
RIVERSIDE CO., CALIF.
My commission expires 10-27-83

EXHIBIT "A" TO DEED FROM THE ROMAN CATHOLIC BISHOP OF SAN DIEGO DATED May 25, 1982.

Return to:

RECORDING REQUESTED BY

MAIL TAX STATEMENT TO:
(Please print name & address)

[illegible] OF THE INTERIOR
[illegible] SUITE 201
[illegible] CA 92506

Nº 229256

82-

SAN DIEGO COUNTY
My Commission Expires Aug. 27, 1984

ACCEPTANCE OF CONVEYANCE BY THE UNITED STATES IS TO BE ATTACHED HERETO AS EXHIBIT "A" AND RECORDED WITH THIS DEED. THIS CONVEYANCE IS MADE IN ACCORDANCE WITH SECTIONS 5 and 19 OF THE INDIAN REORGANIZATION ACT OF JUNE 18, 1934 (48 Stat. 985 and 988; 25 U.S.C. 465 and 479).

# EXHIBIT G

AGRICULTURAL PRESERVE
597-08

1" = 400'
N

7-13-93

CHANGES

| BLK | OLD | NEW | YR | CUT |
| --- | --- | --- | --- | --- |
| 080 | PCK-UP | 2 | 76 | 11014 PA |
| | 1 | 3&4 | 79 | 4400 CANC |
| | 2 | 5&6 | 82 | 2864 |
| | 5 | AG CHANGE | 83 | 6165 |
| | 3 | 7&8 | 94 | 1131 |




AG. PR. (C) = AGRICULTURAL PRESERVE (CONTRACT)

LS 430 - RHO JAMUL SURVEY (SEC-10-T17S-R1E)
ROS 8756, 8961, 9173




THIS MAP WAS PREPARED FOR ASSESSMENT PURPOSES ONLY. NO LIABILITY IS ASSUMED FOR THE ACCURACY OF THE DATA SHOWN. ASSESSOR'S PARCELS MAY NOT COMPLY WITH LOCAL SUBDIVISION OR BUILDING ORDINANCES.

# EXHIBIT H

National Park Service
U.S. Department of the Interior

National Center for Cultural Resources
National NAGPRA

# 43 CFR 10, Subpart B Overview



**Priority of Custody (ownership or control) for Excavation or Removal on Federal and Tribal Land**
**43 CFR 10.6, 10.7**



## Will the human remains and other cultural items be left in place?

**Yes**
The Federal agency secures the site of discovery, and the disposition process does not continue further.

**OR**

**No**
**Excavation or removal of the human remains and other cultural items must take place following the requirements of the Archeological Resources Protection Act** (ARPA) (16 U.S.C. 470aa et seq.) and its implementation regulations. This includes issuance of an excavation permit by the cognizant Federal agency where required by ARPA.

## Prior to Disposition – Notice of Intended Disposition

**At least 30 days prior to transferring the human remains and other cultural items** to the claimant entitled to custody, the responsible Federal agency must first publish a **Notice of Intended Disposition**. The Notice must –

- be published two times (at least a week apart) in a newspaper of general circulation in the area in which the human remains and other cultural items were discovered;
- be published two times (at least a week apart) in a newspaper of general circulation in the area or areas in which the affiliated Indian tribes or Native Hawaiian organization members now reside;
- provide information as to the nature and affiliation of the human remains and other cultural items; and
- solicit further claims to custody.

The Federal agency official must send a copy of the notice and information on when and where it was published to the National NAGPRA program.

## Disposition

Disposition is the formal transfer of Native American human remains and other cultural items excavated or inadvertently discovered on Federal or tribal lands after November 16, 1990, to the lineal descendants, Indian Tribes, or Native Hawaiian organizations that have been determined to be the legitimate claimants.

In completing the disposition, the claimant formally accepts custody (ownership). Disposition should be documented, must be consistent with 25 USC 3002 (a), "Priority of Ownership," and 43 CFR 10.6, "Priority of Custody." Physical transfer may take place 30 days after the publication of the second Notice of Intended Disposition, as agreed upon by the claimant and the Federal agency official.

## Some Disposition Options

### Claimant Takes Physical Custody

The legitimate claimant takes physical possession of the human remains and other cultural items. Where allowable, and upon agreement with the claimant, the Federal agency may provide temporary care until the claimant is able to take physical custody.

### Reburial on Federal Land

The human remains and other cultural items may be reburied on Federal land, if the agency's policies and procedures permit such activities.

### Relinquishment

Under NAGPRA [25 USC 3002(e)], the governing body of an Indian tribe or Native Hawaiian organization may expressly relinquish control over any Native American human remains, or title to or control over any funerary object or sacred object.

# EXHIBIT I

WEBB

# CONSTITUTION
# OF THE
# JAMUL INDIAN VILLAGE
# SAN DIEGO COUNTY
# JAMUL, CALIFORNIA

## PREAMBLE

We the half blood members of the Jamul Indian Village, in order to form a better community government, to establish a formal organization, to promote our common welfare, and to secure the privileges and powers provided by the Indian Reorganization Act of June 18, 1934 (48 Stat. 984) do hereby ordain and establish this constitution and bylaws.

## ARTICLE - NAME

The name of this organization shall be the Jamul Indian Village, hereinafter referred to as the "village".

## ARTICLE II - TERRITORY

The jurisdiction of Jamul Indian Village shall extend to all lands now within the confines of the Jamul Indian Village and to such other lands as may hereafter be added thereto.

## ARTICLE III - MEMBERSHIP

Section 1. The members of the Jamul Indian Village shall consist of those persons who file applications for membership with and are found qualified by the executive committee under one of the following categories:

(a) Persons of 1/2 or more degree of California Indian Blood who filed as Jamul Indians and were listed on the September 21, 1968 Judgement Roll of Certain Indians of California.

(b) Persons of 1/2 or more degree of California Indian blood who reside in the Jamul Indian Village, Jamul, California, at the time of the adoption of this constitution.

(c) Persons of 1/2 or more degree of total California Indian blood whose ancestors meet the requirements of Sections 1 (a) or 1 (b) regardless of whether the ancestors are living or deceased.

(d) Persons who have been adopted by the village in accordance with an adoption ordinance approved by the Secretary of the Interior or his authorized representative, provided they are not less than 1/2 degree Indian blood.

EXHIBITS

Sec. 2. No persons shall be a member of the Jamul Indian Village if he:

(a) Has been allotted on another reservation or on the public domain.

(b) Is officially enrolled with or has received a land use assignment or payments by reason of membership in another tribe, band, rancheria or village. Land or money received through inheritance shall not be a bar to enrollment as a member of the Jamul Village.

(c) Has relinquished in writing his membership in the Jamul Indian Village.

(d) Is less than one-half (1/2) degree Indian blood.

Sec. 3. The governing body shall adopt an enrollment ordinance, subject to the approval of the Secretary of the Interior, governing loss of membership and the enrollment of new members and prescribe rules and procedures by which the membership roll shall be prepared and thereafter kept current.

## ARTICLE IV - GOVERNING BODY

Section 1. The governing body of the Jamul Indian Village shall be the general council composed of all qualified voters of the village who are eighteen (18) years of age or older. All actions of the general council shall be determined by the majority of the membership present, provided that a quorum is present.

Sec. 2. The general council shall elect from its members, by secret ballot, an executive committee consisting of a chairman, vice-chairman, and three (3) committee members who shall hold office for two (2) years or until their successors are duly elected and installed. The executive committee shall select a secretary-treasurer to asist them in the administration of tribal affairs. The secretary-treasurer may or may not be a member of the Jamul Indian Village, but shall not be entitled to vote as an officer.

Sec. 3. The general council may also appoint or elect such other committees as are deemed necessary or the chairman may be delegated the authority to appoint such committees if in the opinion of the general council it becomes necessary.

## ARTICLE V - ELECTIONS

Section 1. The officers of the executive committee in office at the time of approval of this constitution by the Secretary of the Interior or his authorized representative shall continue in office until their successors are duly elected and installed in office. The first regular election of officers under this constitution shall be held in June of 1981. Thereafter elections shall be every two years. Regular elections of officers shall be conducted at the Jamul Tribal Hall in accordance with an election ordinance.

Sec. 2. An election ordinance shall be developed by the executive committee and adopted by the general council within six (6) months following the effective date of this constitution. Such ordinance shall include but not be limited to provisions for a fair election, secret balloting, nomination of candidates, absentee balloting and procedures

for handling protests and resolving election disputes. Provisions shall also be included regarding the conduct of recall and referendum elections and a uniform procedure for submitting petitions. Elections to amend this constitution shall be conducted in accordance with Article XVI of this constitution.

Sec. 3. All enrolled members of Jamul Village who are eighteen (18) years of age or older shall be entitled to vote in tribal elections.

* Sec. 4. A candidate for a position on the executive committee must be a qualified voter of Jamul Village eighteen (18) years of age or older. No person who has been convicted of a felony or who within the last year preceding has been convicted of a crime involving dishonesty shall be eligible to hold office on the executive committee.

Sec. 5. All elections of tribal officers shall be by secret ballot.

Sec. 6 The time, place and manner of nominations shall be specified in the election ordinance adopted pursuant to Section 2 of this article.

## ARTICLE VI - REMOVAL, RECALL AND FORFEITURE

Section 1. Not more than ten (10) days after receipt of a petition signed by thirty percent (30%) of the qualified voters requesting the removal from office of an elected official, the executive committee shall call a special general council meeting to hear the charges against the official. The petition must set forth the specific reasons for which removal is sought. Such general council meeting shall be held not less than ten (10) days nor more than twenty (20) of the date that a valid petition for removal action is filed with the executive committee. It shall at the same time notify the accused in writing of the charges against him and of the date, hour and place of the general council meeting at which time he may appear and answer those charges. After the accused has had full opportunity to be heard by the general council, a secret ballot vote for or against removal shall be conducted. The decision of a majority of those present and voting shall govern, provided that at least fifty percent (50%) of those eligible to vote shall vote. If the official is found guilty by such vote, his office shall be automatically vacated and the general council shall proceed to nominate candidates and elect a replacement official who shall serve the unexpired term of office.

Sec. 2. Recall. Upon receipt of a petition signed by at least thirty percent (30%) of the qualified voters requesting the recall of any member of the executive committee, the exective committee shall call a special general council meeting within ten (10) days of receipt of the petition. Such general council meeting shall be held not less than ten (10) days nor more than twenty (20) days of the date that a valid petition is filed with the executive committee. The general council shall vote by secret ballot whether to recall the member or members named in the petition. If a majority of the voters vote to recall a member, the position shall immediately be declared vacant. Once an individual has been subjected to recall proceedings, he or she shall not again be subject to such action during the balance of his or her term of office. No cause is required for recall action.

Sec. 3. If any officer shall die, resign, be removed or recalled from office, permanently leave the community, or shall be found guilty in any Federal or State Court of a felony while in office or of a crime involving dishonesty, that office shall automatically be declared vacant.

## ARTICLE VII - VACANCIES

Except as provided in Section 1 of Article VI, any office which has been vacated, shall be filled by election of the general council at its next meeting and such replacement shall serve the unexpired term of office.

## ARTICLE VIII - POWERS

Section 1. The general council of the Jamul Indian Village shall exercise the following powers subject to any limitations imposed upon such powers by Federal law and the Constitution of the United States:

(a) To negotiate with Federal, State and local governments;

(b) To retain legal counsel, the choice of counsel and the fixing fees to be subject to the approval of the Secretary of the Interior or his authorized representative so long as such approval is required by law;

(c) To prevent the sale, disposition, lease or encumbrance or tribal lands, interests in lands or other tribal assets without the consent of the village;

(d) To advise the Secretary of the Interior with regard to all appropriation estimates for Federal projects for the benefit of the Jamul Indian Village prior to the submission of such estimates to the Office of Management and Budget and to Congress;

(e) To establish ordinances governing the conduct of tribal members; providing for the maintenance of law and order and the administration of justice by establishing a tribal court and defining its powers and duties subject to the approval of the Secretary of the Interior where such approval is required by law.

(f) To establish or join such housing and other authorities as are necessary to promote the welfare of the village.

(g) To promote and protect the peace, health, morals, education and general welfare of the village and its members.

(h) To administer tribal assets and manage all economic affairs of the village.

(i) To borrow money from any source whatsoever without limit as to amount, and on such terms and conditions and for such consideration and periods of time as the general council shall determine; to use all funds thus obtained to promote the welfare and betterment of the village and its members; to finance tribal enterprises; or to lend money thus borrowed.

(j) To adopt any ordinances and resolutions necessary or incident to the exercise of any of the foregoing powers and duties.

(k) To levy and collect taxes and raise revenue to meet the needs of the tribe or to support tribal government operations.

(l) To cultivate and preserve native arts and crafts, culture and ceremonials.

(m) To establish ordinances, subject to approval by the Secretary of the Interior, providing for the manner of making, holding and revoking of assignments of village lands or interests therein, and to make leases of village lands in accordance with applicable laws.

Sec. 2. The executive committee shall have the following powers, but shall not commit the Jamul Indian Village to any contract, lease or other transaction unless it is authorized in advance by a duly enacted ordinance or resolution of the general council;

(a) To carry out all ordinances, resolutions or other enactments of the general council;

(b) To represent the Jamul Indian Village in all negotiations with Federal, State and local government and advise the general council of the results of all such negotiations.

Sec. 3. Any rights or powers heretofore vested in the Jamul Indian Village, but not expressly referred to in this constitution, shall not be lost by their omission but may be exercised by the adoption of appropriate amendments to this constitution.

## ARTICLE IX - TRIBAL ENACTMENTS

Section 1. Ordinances. All final decisions on matters of general and permanent interest to members of the community shall be embodied in ordinances, such as an enrollment or an election ordinance. Such enactments shall be available for inspection by members of the general council during normal office hours.

Sec. 2. Resolution and Motions. All final decisions on matters of short term or one time interest where a formal expression is needed shall be embodied in resolutions. Other decisions of a temporary nature or relating to particular individuals, officials or committees shall be put in the form of motions and noted in the minutes and shall be available for inspection by members of the tribal council during normal office hours.

Sec. 3. All ordiances and resolutions shall be dated and numbered and shall include a certification showing the presence of a quorum and the number of members voting for or against the proposed enactment.

Sec. 4. No enactment of the Jamul General Council shall have any validity or effect in the absence of a quorum of the membership thereof at a legally called session.

Sec. 5. Approval of Tribal Enactments. Any resolution or ordinance which by the terms of this constitution or Federal law requires the approval of the Secretary of the Interior must be received by the local Bureau Superintendent no later than ten (10) days following its enactment in order to be considered for approval. It shall be the duty of the Secretary's local representative to issue acknowledgement of receipt of such enactment within five (5) working days of his receipt thereof. If timely filed, that enactment shall not become effective until it is approved by the Secretary's authorized representative, provided that if such enactment is not disapproved within ninety (90) days from the date it is timely received by the Secretary's local representative, it shall on the ninety-first (91st) day automatically become effective.

# ARTICLE X - BILL OF RIGHTS

Section 1. All members of the community shall enjoy without hindrance, freedom of worship, conscience, speech, press, assembly and association.

Sec. 2. This constitution shall not in any way alter, abridge, or otherwise jeopardize the rights and privileges of the members of the community as citizens of the State of California or the United Sates.

Sec. 3. The individual property rights of any member of the Jamul Community shall not be altered, abridged or otherwise affected by the provisions of this constitution.

Sec. 4. Community members shall have the right to review all tribal records, including financial records, at any reasonable time in accordance with procedures established by the executive committee.

Sec. 5. In accordance with Title II of the Indian Civil Rights Act of 1968(82 Stat. 77), the Jamul Community in exercising its powers of self-government shall not:

(a) Make or enforce any law prohibiting the full exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(b) Violate the right of the people to be secure in their persons, houses, papers and effects against unreasonable search and seizure, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

(c) Subject any person for the same offenses to be twice put in jeopardy;

(d) Compel any person in any criminal case to be a witness against himself;

(e) Take any private property for a public use without just compensation;

(f) Deny to any person in a criminal proceeding the right to a speedy trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and, at his own expense, to have the assistance of counsel for his defense;

(g) Require excessive bail, impose execessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six (6) months or a fine of $500.00 or both;

(h) Deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of laws;

(i) Pass any bill of attainder or ex post facto law;

(j) Deny to any person accused of imprisonment the right, upon request, to a trial by jury of not less than six (6) persons.

## ARTICLE XI - MEETINGS

Section 1. Regular meetings of the general council shall be held on the third (3rd) Saturday of each month at 12:00 p.m. at a place designated by the executive committee.

Sec. 2. Special meetings may be called at any time by the chairman and shall be called by him upon the written request of the majority of the executive committee or upon the written request of eight (8) members of the general council provided that at least ten (10) days written notice shall be given in advance of the meeting in each instance.

Sec. 3. Thirty percent (30%) of the qualified voters shall constitute a quorum at all meetings of the general council. Notices of all general council meetings shall be given in writing at least ten (10) days in advance of the meeting.

Sec. 4. Regular meetings of the executive committee shall be called by the chairman or, in his absence, by the vice-chairman when deemed necessary.

Sec. 5. Special meetings of the executive committee may be called by the chairman at his discretion, and shall be called by him upon the written request of three (3) members of the executive committee.

Sec. 6. Three (3) members of the executive committee shall constitute a quorum for the conduct of its business.

## ARTICLE XII - DUTIES OF OFFICERS

Section 1. The chairman shall preside at all meetings of the general council and of the executive committee. The chairman shall also be the chief executive officer of the village and exercise any authority delegated to him by the general council, such as to execute on behalf of the village all contracts, leases or other documents approved by the general council. When neither the general council nor the executive committee are in session the chairman shall be the official representative of the village. The chairman shall vote only in the case of a tie vote in either the general council or executive committee meeting.

Sec. 2. The vice-chairman, in the absence of the chairman, shall have the power and authority of the chairman and may, if authorized by the chairman, assist the chairman in the performance of his duties.

Sec. 3. The secretary-treasurer shall keep the minutes of both the general council and executive committee meetings. The secretary-treasurer shall certify the enactment of all ordinances or resolutions of both the general council and executive committee. The secretary-treasurer shall attend to the giving of all notices required by this document.

The secretary-treasurer shall have care and custody of all valuables for the village and deposit all money in an approved despository. The secretary-treasurer shall disburse all funds as ordered by the general council by check to be co-signed by the chairman. The secretary-treasure shall maintain all financial accounts, receipts and records which shall be available for inspection by officers of the general council. All financial records of the village shall be audited at least once each year and such other times as may be directed by the general council.

The secretary-treasurer shall notify by mail all members of the coming meetings or any special meetings at least ten (10) days prior to their occurance.

Also the secretary-treasurer will be expected to give a financial report at each general council meeting. All financial records shall be available for inspection by any member of the community through appointment according to procedures established by the executive committee, and shall be open at all times for audit and inspection by representatives of the Bureau of Indian Affairs. At the expiration of the term of office, all the records and papers in the possession of the secretary-treasurer shall be turned over to the successor or the executive committee.

## ARTICLE XIII - OATH OF OFFICE

Section 1. Each officer, elected or appointed hereunder, shall take an oath of office prior to assuming the duties thereof, by which oath he shall pledge himself to support and defend the Constitution of the United States and this constitution. Oath: I, ______________________ do solemnly swear that I will support and defend the Constitution of the United States against all enemies; that I will carry out, faithfully and impartially, the duties of my office to the best of my ability; that I will promote and protect the best interests of my village in accordance with the Constitution of the Jamul Indian Village.

## ARTICLE XIV - ORDER OF BUSINESS

Section 1. The following order of business is hereby established for all meetings:

(1) Call to order by the chairman.

(2) Roll Call.

(3) Ascertainment of a quorum.

(4) Reading of the minutes of the last meeting.

(5) Adoption of the minutes by voice vote.

(6) Treasurer's Report.

(7) Unfinished business.

(8) Reports.

(9) New Business.

(10) Adjournment.

## ARTICLE XV - SEVERABILITY

If any provision of this constitution shall, in the future, be declared invalid by a court of competent jurisdiction, the invalid provision shall be severed and the remaining provisions shall continue in full force and effect.

## ARTICLE XVI - AMENDMENTS

Section 1. This constitution may be amended by a majority vote of the qualified voters of the Jamul Village voting in an election called for that purpose by the Secretary of the Interior or his authorized representative, provided that at least fifty-one percent (51%) of those entitled to vote shall vote in such election, but no amendment shall become effective until approved by the Secretary of the Interior or his duly authorized representative.

Sec. 2. It shall be the duty of the Secretary of the Interior or his authorized representative to call an election on any proposed amendment at the request of the general council or upon receipt of a petition signed by at least thirty percent (30%) of the qualified voters of the Jamul Village.

## ARTICLE XVII - ADOPTION

Section 1. This constitution when adopted by a majority vote of the qualified voters of the Jamul Village, voting at an election called for that purpose by the Secretary of the Interior or his authorized representative in which at least fifty-one percent (51%) of those entitled to vote shall vote, shall be submitted to the Secretary of the Interior for his approval, and shall be effective from the date of his approval.

CERTIFICATE OF RESULTS OF ELECTION

Pursuant to an order issued on December 16, 1980, by William E. Hallett, Commissioner of Indian Affairs, the foregoing Constitution of the Jamul Indian Village, San Diego County, Jamul, California was submitted for ratification to the qualified voters of the village and was on May 9, 1981, duly ratified by a vote of 16 for, and 0 against, in an election in which at least fifty-one percent (51%) of the 23 (number) entitled to vote cast their ballots in accordance with Section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 984) as amended by the Act of June 15, 1935 (49 Stat. 378).

Frank L. Haggerty, Jr.
Chairman, Election Board

Walter J. Rosales
Election Board Member

[illegible signature]
Election Board Member

APPROVAL

I, /s/ M. W. Bobby, Acting Deputy Assistant Secretary - Indian Affairs (Operations) by virture of the authority granted to the Secretary of the Interior by the Act of June 18, 1934 (48 Stat. 984), as amended, and delegated to me by 209 D.M. 8.3, do hereby approve the Constitution of the Jamul Indian Village, San Diego County, Jamul, California.

Sgd M. W. Bobby

Acting Deputy Assistant Secretary - Indian Affairs (Operations)

Washington, D. C.

Date: July 7, 1981

# EXHIBIT J

# PURCHASES UNDER WHEELER-HOWARD ACT

*August 31, 1936.*

*Memorandum for the Office of Indian Affairs:*

The Office of Indian Affairs has submitted several titles for examination covering land in Mississippi being purchased under authority granted by the Wheeler-Howard Act (48 Stat. 984). Several opinions have been rendered and in one case the deed has been recorded and accepted. In every case submitted, the deed designates the grantee as the United States in trust for the Choctaw Tribe of Mississippi.

A further examination reveals that this designation is incorrect because there is in fact no existing tribe of Indians in Mississippi known as the Choctaw Tribe. The Choctaw tribe or nation of Indians, formerly of Mississippi, removed to Oklahoma and became one of the Five Civilized Tribes. Certain members of the tribe remained in Mississippi, taking allotments there and becoming citizens of the State, in accordance with the Dancing Rabbit Creek Treaty concluded September 27, 1830 (7 Stat. 333). Thereafter, when Oklahoma lands were allotted, some of the Indians remaining in Mississippi were permitted to enroll as citizens of the Choctaw nation in Oklahoma provided they removed to the Choctaw country. Those who remained, already citizens of Mississippi, thereby severed their relations with the Choctaw tribe. They therefore cannot now be regarded as a tribe.

The Wheeler-Howard Act, however, authorizes the purchase of land for Indians and defines the term "Indian" to include those persons of one half or more Indian blood regardless of membership in a recognized Indian tribe under Federal jurisdiction and regardless of residence on an Indian reservation. (Sec. 19 of the act of June 18, 1934, *supra.*) In so far as the Indians in Mississippi fall within this definition as to degree of blood, purchases may be made for their benefit. Moreover, these Indians may be organized under the provisions of the Wheeler-Howard Act after land has been acquired for them. Therefore, I suggest that the titles now being acquired be taken as follows:

> "The United States in trust for such Choctaw Indians of one-half or more Indian blood, resident in Mississippi, as shall be designated by the Secretary of the Interior, until such time as the Choctaw Indians of Mississippi shall be organized as an Indian tribe pursuant to the act of June 18, 1934 (48 Stat. 984), and then in trust for such organized tribe."

Several titles have already been examined, as I noted above, and no objection was made to the designation of the grantee there employed. In all of those cases where the title papers have already been returned to the field, instructions should be given to the field agents to have the deeds corrected before they are recorded. In that case where the deed has already been recorded and accepted, it will be necessary to secure a new deed. The necessary corrections will be made in the other cases which are now pending in this office.

The error discussed herein arises perhaps out of unusual circumstances, but is one that might have been avoided. I suggest that further difficulties of this kind can be reduced or eliminated by having the Indian Organization Unit of your office formally approve the designation of the grantee in each project undertaken. This formal approval should be recited in each title case submitted for my examination.

NATHAN R.

MARGOLD,

*Solicitor.*

ISLETA AND SANTO DOMINGO PUEBLOS-
RIGHTS-OF-WAY

*September 2, 1936.*

*Memorandum for the Commissioner of Indian Affairs:*

I am returning for further consideration your letters of July 28 and August 26, dealing with grants of rights of way over lands of the Isleta and Santo Domingo Pueblos in New Mexico to the A. T. & S. F. Railway Company and the Postal Telegraph-Cable Company.

While I agree with your conclusion that these grants may be made under authority of the acts of Congress cited in your letters I do not agree with the statement that the agreements entered into between the respective pueblos and the companies named above, are in violation of the restrictive provisions contained in the Indian Reorganization Act of June 18, 1934 (48 Stat. 984). The restrictive provisions to which you refer are contained in section 4 of the Reorganization Act and declare, with exceptions not here material, that "No sale, devise, gift, exchange or other transfer of restricted Indian lands * * * shall be made or approved." The right conveyed by these right of way grants is in interest in land and if the conveyance of such

---



an interest is prohibited by the provision just quoted the conveyance cannot be made or approved whether it be in the form of an agreement between the Indians and the companies or is accomplished by approval of a map of definite location under the acts of Congress cited in your letters.

In my memorandum of September 6, 1934, I had occasion to consider the restrictive provisions contained in section 4 of the Reorganization Act and, after pointing out that such provisions had no application to conveyances of estates less than the fee, such as grants of rights of way in the nature of easements, held that such rights of way might be granted where there was a specific act of Congress so authorizing. Such acts of Congress are not superseded or repealed by anything contained in the Reorganization Act. The only limitations which the Reorganization Act imposes upon the exercise of authority conferred by such specific acts of Congress are: (a) a tribe organized under section 16 may veto the grant under the broad power given it by that section "to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe" and (b) a tribe incorporated under section 17 may be given the power to make such grants without restriction.

Inasmuch as the Santo Domingo and Isleta Pueblos have not as yet organized or incorporated, limitations (a) and (b) above, are without application. The easement in each case, however, has received the approval of the pueblo. Approval may be given under the acts cited in your letters, but such letters should be revised to eliminate the erroneous statements referred to above.

NATHAN R.

MARGOLD,

viding for departmental approval may therefore be omitted.

(3) Paragraph C (2d) , page 8, fails to take into consideration the possibility that Mose Daniels may predecease the grantor. The paragraph should be amended to cover this contingency.

(4) The provision on page 2 of the trust agreement amounts to a conveyance in trust of the mineral estate whereas there is equally a conveyance in trust under the mineral grant. In other words, under the present set-up there are two instruments conveying the same property to the same person. It seems to me that the artistic and lawyer-like way of accomplishing the desired result would be to convey the property by separate deed, subject to the terms of the trust agreement, and then to provide in the trust agreement that this property, when conveyed, shall be subject to the same conditions as the cash and Government bonds, except as otherwise provided. It seems to me that the trust agreement should be changed so as to negative the possibility that it will be construed as a second conveyance.

(5) Paragraph 11, page 15, dealing with the fees to be collected by the trustee may not be seriously objectionable but I doubt if the provisions of the paragraph are stated with clarity sufficient to avoid misunderstanding in the future. For one thing, it is not clear whether the trustee expects to receive a final distribution fee based upon the mineral rights as a part of the corpus of the trust. In view of the substantial payments otherwise provided for the paragraph may well be reworded to preclude such a payment.

*Solicitor.*

Approved and referred to the Commissioner of Indian Affairs for appropriate action.
*Assistant Secretary.*

## STATUS OF ST. CROIX CHIPPEWAS

*February 8, 1937.*

*Memorandum to the Commissioner of Indian Affairs:*

The Solicitor's Office has been requested to determine the status of the St. Croix Chippewa Indians in Wisconsin for the purpose of determining their eligibility to organize under the Reorganization Act and of determining the beneficiary to be designated in the Trust Title of various camp site areas being purchased for these Indians from reorganization act funds.

This group of Indians numbers about 500 and are scattered in at least five counties in Wisconsin, frequently in clusters of 5 to 25 families. They have no reservation and those who have not established homes in white communities live as squatters on land to which they have no ownership rights. These Indians are commonly referred to by the Indian Office and by themselves as the "St. Croix Band of Lake Superior Chippewa Indians."

The question whether or not these Indians are a separate band of Indians or absentee members of one of the other bands of Lake Superior Chippewa Indians has already been finally decided by the Department and by Congress. The act of August 1, 1914 (38 Stat. 582, 606), directed the Secretary of the Interior to determine the status and tribal rights of these Indians and what benefits they would have received if they had removed to one of the reservations in Wisconsin and to make a roll of the Indians

entitled to benefits. Pursuant to this act Mr. Wooster was detailed to make this study. He submitted a report on December 1, 1914, which found that these Indians were absentee members of the Lac Courte Oreille Band and that out of some 800 possible members of this group of Indians only 95 were entitled to be enrolled for the purpose of receiving compensation in lieu of the allotments which they might have obtained. He based his finding of fact upon extensive testimony indicating that the Lac Courte Oreille Indians admitted that the chief of the St. Croix Indians and his followers were members tribe and belonged on the Lac Courte Oreille Reservation. A further indication was that this chief of the St. Croix Indians signed the treaty of September 30, 1854 (10 Stat. 1109), as a Lac Courte Oreille Indian. Mr. Wooster based his legal conclusion that only 95 persons were entitled to enrollment for compensatory benefits on the ruling of the Oakes case (172 Fed. 305), and the Kadrie case (281 U.S. 206), which cases are to the effect that absentee members of a tribe who have severed their tribal relations are still entitled to tribal rights but that their children born away from the tribe are not so entitled. Among the pertinent facts shown in his report are the high degree of intermarriage with white people, and of departure from Indian culture and their scattered condition. A second report was submitted by him on January 13, 1915, in which he submitted a roll of these 95 selected persons which show them to be members of the Lac Courte Oreille and certain other tribes and suggested that these persons be compensated by Congress with the approximate value of an allotment.

---



These reports were submitted by the Department of the Interior to Congress on December 7, 1914 (H.D. No. 1253 63d Cong., 3d Sess.) and on March 3, 1915 (H.D. No. 1663 63d Cong., 3d Sess.). Copies of these reports are attached for your information. Expressly referring to these reports Congress has passed statutes providing funds for distribution among the enrolled Indians or for land purchases for them for their relief and compensation. See act of February 14, 1920 (41 Stat. 432, 433); and the act of March 3, 1921 (41 Stat. 1246). These acts did not refer to these Indians as a band but designated them as "St. Croix Chippewa Indians" and were designed expressly to benefit those Indians found to be members of the Lac Courte Oreille Band and other tribes.

In view of the foregoing only one conclusion is possible and that is that the St. Croix Indians cannot now be recognized as a band. Congress has closed the question after a departmental investigation and finding. It is noted that the Interior Department appropriation act for the fiscal year 1937 (act of June 22, 1936, 49 Stat. 1757, 1729), in making available the unexpended balances of appropriations for the St. Croix Indians made under the act of February 14, 1920 above referred to, speaks of the "care of aged and indigent Indians of the band." I do not think the use of the word "band" here is sufficient to reverse the former deliberate finding, especially as the previous appropriations now revived were only for the Indians enrolled by Mr. Wooster.

Accordingly, benefits under the Indian Reorganization Act must be limited to those Indians who are in fact of one half Indian blood or more. In providing land for these Indians it is not necessary to restrict beneficial rights to those Indians who were placed on the roll by Mr. Wooster, as that roll represents an entirely different class of persons from those who can receive benefits under the Indian Reorganization Act, namely, those Indians of the half blood or more. However, Mr. Wooster's roll may be of assistance in determining the degree of blood as this roll does indicate the quantum of blood of the Indians placed upon it.

My conclusion is different from that reached in the case of the Mole Lake Indians who are also commonly considered a "lost band" in Wisconsin who received no reservation under the 1854 treaty. However, the St. Croix situation is not similar to that of the Mole Lake Indians as the question of the status of the Mole Lake Indians was never definitely decided by the Department or by Congress and as the facts in the two cases are quite different. The Mole Lake Indians live in one principal Indian community which is looked upon as their band home, whereas the St. Croix Indians live in numerous white villages and towns throughout Wisconsin. Moreover, the St. Croix Indians are highly assimilated into the white population, whereas, the Mole Lake Indians are principally full bloods and near full bloods who have kept distinct from the white population. The testimony available in connection with the Mole Lake Indians shows that the other bands recognize them as a separate band, whereas in the case of the St. Croix Indians the Lac Courte Oreille Indians admitted the St. Croix Indians to be members of the Lac Courte Oreille Band. While the St. Croix Indians have inhabited certain areas on the St. Croix River for numerous generations and might have been recognized as a separate band at the time of the 1854 treaty, they now present no characteristics entitling them to recognition as a band, particularly as there exists no form of band organization, as there does in the Mole Lake group. The difference between these two groups is also found in the report of the anthropologist who investigated these Indians in 1936. He states, "The St. Croix are a completely disorganized and deculturated group. The only cohesion they have as a social entity is based solely on the possession of a common language and a common racial type. Even these are disappearing, * * *".

In view of the conclusion which I reached I suggest that the procedure for extending benefits to these Indians under the Reorganization Act be as follows: the title to the land purchases being made in certain of the larger Indian groupings should be taken for the St. Croix Chippewa Indians of the half blood or more who may be designated by the Secretary of the Interior until such time as they organize under section 16 of the Reorganization Act and then for the benefit of such organization. After the land purchase is completed the Indians who come to reside upon this land would then be entitled to organize as Indians residing on a reservation. No other organization of these Indians is now possible.

NATHAN R.

MARGOLD,

*Solicitor.*

in those acts of providing equal fishing opportunities to all citizens.

FREDERIC L. KIRGIS,

*Acting Solicitor.*

Approved: April 19, 1937.

OSCAR L. CHAPMAN, *Assistant* Secretary.

## STATUS OF NAHMA AND BEAVER INDIANS

*May 1, 1937.*

*Memorandum to the Commissioner of Indian Affairs.*

The Organization Division requested an examination in this office of the status of the Nahma and Beaver Island Indians in Michigan, with a view to determining their opportunities for organization under the Indian Reorganization Act. In the memorandum presented by the Organization Division the following information on these groups is given:

> "1. The Nahma Indians are located at Nahma, Michigan in Delta County Upper Peninsula). I am advised that they are members of the Ottawa Tribe but are today intermarried with the Chippewa Tribe. The exact number is not known, but there are about 90 children from one group attending school.
>
> "2. The Beaver Island Indians are located on Beaver, North Fox, South Fox, Hog and High Islands in Lake Michigan within the territorial jurisdiction of the State of Michigan. They are descendants of the Chippewa Tribe and number between 200 and 300 persons. Mr. Cavill visited these islands in 1918 and compiled an appraisal and estimate of some 30 allotments."

Aside from this information there appears to be very little material available in the Interior Department bearing upon their band status. The Indian Office Mails and Files Division reported that they have no files on these groups. A search of the files on the Ottawa and Chippewa Indians generally for the last 20 years reveals no material on these Indians. The only evidence on the status of these Indians is the last treaty made with the Ottawa and Chippewa Indians, that of July 31, 1855 (11 Stat. 621), and the interpretations put upon it by the Department.

The treaty of 1855 provided that various sections of land in Michigan should be set aside for a number of different bands. The third paragraph reads as follows:

> "For the Beaver Island Band-High Island, and Garden Island, in Lake Michigan, being fractional townships 38 and 39 north, range 11 west-40 north, range 10 west, and in part 39 north, range 9 and 10 west."

The fourth paragraph provides as follows:

> "For the Cross Village, Middle Village, L'Arbrechroche and Bear Creek bands, and of such Bay du Noc and Beaver Island Indians as may prefer to live with them, townships 34

> to 39, inclusive, north, range 5 west-townships 34 to 38, inclusive, north, range 6 west-townships 34, 36, and 37 north, range 7 west, and all that part of township 34 north, range 8 west, lying north of Pine River."

There is no mention of the Nahma Indians as such but it may be that the reference to the "Bay du Noc" Indians refers to the Nahma Indians since the Town of Nahma is situated on the Big Bay due Not. In any case the Bay du Not Indians are not referred to as a band. This treaty was signed by five-groups of bands, namely, the Sault Ste. Marie Bands, Grand River Bands, Grand Traverse Bands, Little Traverse Bands, and Mackinac Bands. These five groups were composed of numerous subbands, each with a chief and his following. Possibly, the Nahma and Beaver Island Indians were such subbands. But neither in the signature to the treaty nor in the band rolls made for the payment of treaty annuities are these subbands designated by name.

Article V of the 1855 treaty provides that the tribal organization of the Ottawa and Chippewa Indians "is hereby dissolved" and that future negotiations in reference to any matters contained in the treaty should be carried on only with those Indians locally interested. This article has been consistently interpreted by the Interior Department, for as far back as the available files go, as providing for the dissolution of all tribal relations, including band relations, and the Interior Department has refused to recognize any of the Ottawa and Chippewa groups as bands. A sample of this attitude, which is repeated in innumerable instances of correspondence with Ottawa and Chippewa Indians, in the letter of February 15, 1917, to Mr. Eugene Hamlin concerning his credentials as a representative of Ottawa and Chippewa Indians near Harbor Springs, Michigan:

---



> "Receipt is acknowledged of your letter of February 9, 1917, in which you say that you have been chosen as a delegate by certain of the Ottawa and Chippewa Indians of Michigan, and ask whether or not your credentials will be properly recognized to the end that you may be accorded a hearing when you visit this city.
>
> "In answer you are advised that the Ottawa and Chippewa tribes of Indians many years ago became citizens of the United States and of the state in which they reside and are now not under the jurisdiction and control of the Government. The Office could not, therefore, save in a merely advisory capacity, interfere in any of your personal matters, nor could it approve your appointment or selection by a number of your people as a delegate. * * *"
>
> "Of course it is to be understood that you or any of your people who may visit this city do so on their own responsibility and must look to their own resources for their expenses, etc."

The most recent test of the attitude of the Interior Department on the band status of the Ottawa and Chippewa groups occurred with relation to the Sault Ste. Marie Bands of Chippewa. A thorough investigation of the history of these bands was undertaken in an effort to prove their band status. It was found that a separate treaty was entered into with these bands subsequent to the July 31, 1855 treaty; that they were enrolled as separate bands in the money payment rolls of Ottawas and Chippewas from 1857

to 1867; that they retained their formal band organization down to the present time and continuous correspondence had been carried on between their band representatives and the Indian Office. However, in spite of this evidence tending to show their actual band status the Interior Department refused to accord them legal recognition as a band, in view of the dissolution of the Ottawa and Chippewa Tribe under the 1855 treaty and the cessation of the exercise of guardian over these Indians for nearly half a century.

If the Sault Ste. Marie Bands were not in a position to be recognized as a band by the Interior Department it is out of the question to establish any existing band status for the Mahna and Beaver Island Indians in view of the paucity of any evidence on the subject and in view of the fact that there is no showing in any treaty that the Nahma Indians were even recognized originally as a band.

There is no possibility of approaching organization for these Indians through their present land status as there are not existing reservations for these Indians. The land set aside under the third and fourth paragraphs of the 1855 treaty, quoted above, was entirely allotted and fee patented to individual Indians under other provisions of that treaty. The Executive order of August 9, 1855, provided for the withdrawal from sale of a number of sections and townships in Michigan to carry out the 1855 treaty, in which order High Island and Garden Island are named. However, all this land was disposed of by fee patenting in the manner provided by the treaty. No land of these Indians remains in trust status.

Accordingly I am of the opinion that the Nahma and Beaver Island Indians do not enjoy a status either as recognized bands or as Indians on a reservation entitling them to be organized under the Indian Reorganization Act and .that the only method of providing benefits is through the selection of those Indians among them who are of one half or more Indian blood and the purchase of land for them and their subsequent organization.

FREDERIC L.

KIRGIS,

*Acting Solicitor.*

1479

War Assets Administration: equipment, materials, and supplies of all kinds, with an appraised value of not to exceed $6,300,000 from the surplus stores of these agencies, for use in the schools, hospitals, and agencies, or by any operating division of the Bureau of Indian Affairs in the United States and Alaska * * *." I understand that several million dollars' worth of surplus property may still be obtained under this authorization. Such property could doubtless be used to provide a considerable amount of relief for the Navajo Indians. To the extent provided by this statutory authorization, the use of surplus property could be made an element of the Navajo program.

MASTIN G. WHITE ,
*Solicitor.*

## ORGANIZATION OF THE NOOKSACK INDIANS UNDER THE INDIAN REORGANIZATION ACT

M-35013
*December 9, 1947.*

For Indians to be able to organize under section 16 of the Indian Reorganization Act of June 18, 1934 (48 Stat. 987, 25 U.S.C. sec. 476), they must constitute a "tribe, or tribes, residing on the same reservation," Therefore. the Nooksack Indians of the State of Washington, for whom no reservation has ever been set aside and who possess no recognized tribal status, are not eligible to organize under this provision of the Indian Reorganization Act.

---

**1480**
**DECEMBER 9, 1947** **DEPARTMENT OF THE INTERIOR**

MASTIN G. W HITE , Solicitor:

Memorandum
To: The Commissioner of Indian Affairs.
From: The Solicitor. Subject: Proposed constitution for the Nooksack Indians.

I am returning to you the proposed constitution for the Nooksack Indians of the State of Washington, together with the covering letter to the Superintendent of the Tulalip Agency calling an election for the purpose of enabling these Indians to vote on the proposed constitution.

For Indians to be able to organize under section 16 of the Indian Reorganiztion Act of June 18, 1934 (48 Stat. 987, 25 U.S.C. sec. 476) , they must constitute a "tribe, or tribes, residing on the same reservation." The Nooksack Indians do not fit this description.

The Nooksack Indians hold no tribal land. No reservation has ever been set apart for them by treaty, act of Congress, or Executive order. Some of them received homestead allotments on the public domain, but apparently these are noncontiguous. Although they all live in Whatcomb County, they do not live in any one locality. No lands appear to have been purchased for them pursuant to the acquisition

provisions of the Indian Reorganization Act.

The Nooksack Indians were included in the enumeration of ,the tribes or bands of nontreaty Indians who were authorized to sue the United States in the jurisdictional act of February 12, 1925 (43 Stat. 886)) and, pursuant to that act, they asserted a claim against the United States based on aboriginal occupancy of lands alleged to have been taken from them by the United States. In the subsequent litigation, however, the Court of Claims found that the lands claimed by the Nooksack Indians were ceded to (the United States by the Indians who were parties to the Point Elliott Treaty of January 22, 1855 (12 Stat. 927)) and that on the basis of the evidence there was no possibility "of definitely determining the exact status of the Indians and ,the relationship between them and the Government." *Duwamish, et al. Indians* v. *United* States, 79 Ct. Cl. 530, 606, cert. denied 295 U.S. 755.

The Court stated in the *Duwamish* case: *"There* is no doubt that after the execution of the Point Elliott Treaty they [the Nooksack Indians] were placed under the charge of an Indian agent, and after the ratification of the treaty came under the charge of the Indian agent for the Lummi Reservation, and participated in the distribution of benefits set forth in the treaty." In this connection, the court cited the Report of the Commissioner of Indian Affairs for the year 1877, p. 198. Earlier reports of the Commissioner indicate, that while the Nooksack Indians probably constituted at one time a separate tribe or band in contact with the Lummi Indians, they later became allied with the Lummi Tribe (1854, p. 257; 1857, p. 326; 1858, p. 223; *1867, p. 59; 1870,* p. 17). The *Handbook of American Indians* (Bureau of American Ethnology, Bulletin 30, Part 2) gives the following information with respect to the Nooksack Indians:

> "Nooksack (Mountain men). The name given by the Indians on the coast to a Salish tribe, said to be divided into three small bands, on a river of the same name, in Whatcomb Co., Wash. About 200 Nooksack were officially enumerated in 1906, but Hill-Tout says there are only about 6 true male Nooksack. They speak the same dialect as the Squawmish, from whom they are said to have separated."

On the basis of the existing authorities, and in the absence of other evidence, it is not possible for me to conclude that the Nooksack Indians constitute a "tribe, or tribes, residing on the same reservation," which may adopt a constitution pursuant to the provisions of the Indian Reorganization Act.

MASTIN G. WHITE ,
*Solicitor*

# EXHIBIT K

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

Tribal Government Services - TR
2611 MS/MIB

JUL 1 1993

Honorable Raymond Hunter
Chairman, Jamul Indian Village
P. O. Box 612
Jamul, California 91935

Dear Chairman Hunter:

We have completed our legal and technical review of the proposed revised Constitution of the Jamul Indian Village submitted by the Sacramento Area Director by memorandum of September 18, 1992. The proposed revised constitution was accompanied by an unnumbered resolution adopted by the Jamul General Council on August 15, 1992, requesting that the Secretary of the Interior (Secretary) call and conduct an election to permit the qualified voters of the Village to vote on the adoption or rejection of the proposed revised document. The resolution complies with Article XVI of the Village constitution.

As a result of our review, we recommend modification to it. The changes in the enclosed version are to make the document legally and technically sufficient, that is not contrary to Federal law. Other modifications are to clarify the apparent intent of the drafters. The modifications are discussed below.

While many of the proposed changes are merely cosmetic, the primary thrust of the revision deals with the membership portion of the constitution. The Village proposes to revise the constitution by lowering the blood quantum from one-half (1/2) or more California Indian blood to one-quarter (1/4) degree. Lowering of the blood quantum would affect the very basis and foundation of the recognition of the Jamul Indian Village and could jeopardize continued recognition.

The origin of the Jamul Indian Village is different from that of an historic tribe. The term "tribe" as used in Federal Indian affairs generally refers to a community of people who have continued as a body politic without interruption since time immemorial and retain powers of inherent sovereignty. When such a tribe is organized pursuant to the Indian Reorganization Act (IRA), its governing authority is derived from acknowledgment of the fact that as a single identifiable group, it has historically governed itself. By adopting an approved IRA constitution, the historic tribe enters into a government-to-government relationship with the United States whereby the Federal Government agrees to acknowledge that the tribe possesses inherent powers of self-government as modified by applicable Federal law.

EXHIBIT C 25

You will recall that prior to 1980, the Jamul Indian Village was not a federally recognized tribal entity. During the 1970's representatives of the Village explored with the Bureau of Indian Affairs (Bureau) means whereby it could obtain Federal recognition and were variously advised the only avenues open to them were to seek a legislative solution, go through the Federal acknowledgment process, or the more limiting action of recognition by the Secretary as a half-blood organization. It was pointed out that acknowledgment of existence as an Indian tribe and of existence as a half-blood community are two different things. In order for the Secretary to acknowledge the Jamul community as a tribe under 25 CFR Part 83, previously 25 CFR 54, it would have to submit a detailed petition and undergo a lengthy process of consideration. Several years would have been required to complete this. If the community was not determined to exist as a tribe after this consideration, it would still have the option to organize as a half-blood community under the IRA. Representatives of the Village opted to seek recognition as a half-blood Indian community even though they were aware of the limitations that result from organizing as a half-blood Indian community.

On April 23, 1975, the Sacramento Area Director submitted 23 uncertified family tree charts of Jamul Indians who filed for the California judgment awards to be included with their request for Federal recognition. Consequently, on November 7, 1975, the Commissioner of Indian Affairs, in response to the Area Director's assertion that 20 of the 23 Indians who reside in the Jamul community possess one-half or more degree of Indian blood, notified the Area Director that pursuant to Section 19 of the Indian Reorganization Act (IRA) of June 18, 1934 (25 U.S.C. §479), certain benefits of that Act are available to persons of one-half or more Indian blood even though they lack membership in a federally recognized tribe. The Commissioner found that while those individuals at Jamul of one-half degree or more Indian blood do not now constitute a federally recognized entity and do not possess a land base, they are entitled to services provided by the Bureau to individual Indians pursuant to Section 19 of the IRA. The Commissioner further held that should these Jamul half-bloods secure, in trust status, the tract of land on which they reside they would be eligible to organize as a community of adult Indians of one-half degree or more Indian blood under Section 16 of the IRA.

On July 12, 1979, the Commissioner of Indian Affairs in response to an inquiry advised the Sacramento Area Director that:

> [A]cknowledgment of existence as an Indian tribe and of existence as a half-blood community are two different processes. In order for the Secretary to acknowledge the Jamul community as a tribe under 25 CFR 54 as requested by Superintendent Tomhave, it would have to submit a detailed petition and undergo a lengthy process of consideration. Several years would probably be required

complete this. If the community was not determined to exist as a tribe after this consideration, it would still have the option to organize as a half-blood community under the Indian Reorganization Act.

The Jamul community has already been determined to be eligible to organize as a community of persons of one-half degree or more Indian blood. To be treated as such a community, however, the Jamul Indians must first organize under the Indian Reorganization Act. We understand that the community is currently working on a proposed organizational document. When this proposal has been adopted by the community in an election called by the Secretary, and has been approved by the Secretary, the Jamul Indians will be able to receive services as a community.

The Jamul Indians lived on one acre of private land and on land deeded to the Diocese of San Diego as an Indian cemetery. On June 28, 1979, the United States acquired from Bertha A. and Maria A. Daley a portion of the land known as "Rancho Jamul" which it took "in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate." Subsequently on May 25, 1982, the Roman Catholic Bishop of San Diego conveyed to the United States in trust for the Jamul Indian Village 1.372 acres. The United States accepted these conveyances of land in accordance with the authority contained in Sections 5 and 19 of the Indian Reorganization Act of 1934.

On December 16, 1980, in response to a petition submitted by the half-blood Indian community of Jamul requesting an IRA election, the Commissioner of Indian Affairs authorized the Superintendent, Southern California Agency, to call and conduct a Secretarial election to permit the qualified voters of the community to vote on the adoption or rejection of the proposed IRA constitution. The Commissioner noted in his letter that membership in the community was limited to individuals possessing one-half degree or more California Indian blood. The Constitution of the Jamul Indian Village was approved by the Deputy Assistant Secretary - Indian Affairs on July 7, 1981. In approving the IRA Constitution, the Village was authorized to exercise those self-governing powers that have been delegated by Congress or that the Secretary permits it to exercise. A number of "tribes" have been created, from communities of adult Indians, or expressly authorized by Congress under provisions of the IRA and other Federal statutes. For example, some IRA entities availed themselves of the opportunity to adopt an IRA constitution and are considered to be IRA "tribes." However, they are composed of remnants of tribes who were gathered onto trust land. Those persons had no historical existence as self-governing units. They now possess only those powers set forth in their IRA constitution. They are not an inherent sovereign. Rather, that entity is a created tribe exercising delegated powers of self-government. Such is the case with Jamul Indian Village.

It has been the longstanding policy of the Bureau to require that organizational documents adopted by half-blood communities contain a membership requirement of one-half degree Indian blood or more. Consistent with the intent of Section 19 of the IRA, the Department of the Interior has over the more than 50 years since the passage of the IRA interpreted Section 19 to mean that those who seek recognition as a half-blood Indian community and subsequently organize under the IRA are forever restricted in their membership. In other words, once a half-blood Indian community, always a half-blood community. Therefore, the Village's proposal to lower the blood quantum from one-half degree California Indian blood to one-quarter or more degree is contrary to applicable Federal law and if adopted we would disapprove the constitution or any amendment that contained such language or intent. Any departure from the limitations imposed by Section 19 of the IRA could jeopardize the Village's continued right to Federal recognition and the rights of its members to Federal benefits and services. Further, since the United States acquired the Village's land in trust for Jamul Indians of 1/2 or more Indian blood, any action by the Secretary to approve membership of less than 1/2 degree Indian blood could be viewed as a breach of trust owed to those of 1/2 degree or more and thus a violation of applicable Federal law. Accordingly, we recommend you continue with the language as it now appears in the Village's existing constitution. The language was developed specifically to comply with the law.

We might also point out that even if it were possible to lower the blood quantum, the Council's proposal to amend each and every subsection of Section 1 of Article III is flawed. If it were possible to lower the blood quantum, which it is not, it could only be prospective in nature. That is, only persons of one-quarter degree California Indian blood born after the date of the adoption of an approved amendment would be eligible for enrollment. Thus, subsections (a), (b), (c) and (d) would remain as is with the addition of a new subsection to provide for those quarter bloods born after the adoption of the amendment.

The Village proposes to amend Section 4 of Article V - Elections by adding a proviso that the general council may waive the prohibition against convicted felons and those convicted of misdemeanors holding office in those instances it determines involve mitigating circumstances. In the first place constitutional prohibitions are not subject to waiver and in the second place, even if they were, in those instances where discretion is involved, the potential for unequal treatment exists. We recommend against this proposed amendment.

The Village proposes to amend Sections 1 and 2 of Article VI - Removal, Recall and Forfeiture by altering the timeframes within which to call a general council meeting from receipt of a petition for removal. If the executive committee takes the full 30 days to call the meeting, sufficient time will not be available to notice the meeting. We recommend the Village consider modifying the number of days by either reducing the number of days to call the meeting or extending the timeframe to hold the meeting.

Regarding the addition of the phrase "unless the general council waives this provision for mitigating circumstances" in Section 3, we recommend against this proposal as discussed above with reference to Section 4 of Article V because it creates the potential for unequal treatment.

Article VIII, Subsection 1(k) authorizes the Village to "levy and collect taxes and raise revenue." As we noted earlier, Jamul as a created entity is not an inherent sovereign and can exercise only those powers of self-government delegated to it. Those powers not within the power of a community include the power to condemn land of members of the village community, the regulation of inheritance of property of community members, the levying of taxes upon community members or others, and the regulation of law and order. It is within the community's authority to levy assessment and fees upon its members for the use of community property and privileges as these assessments would be incidental to the ownership of the property. The village community may also levy assessments on non-members coming or doing business on village lands. However, such assessments would be levied in its exercise of the community's powers as a land owner, not some historical, inherent power to tax.

no tribal gov

Article X - Tribal Enactments. The Village proposes to amend Section 2 by including a reference to "tribal council". We believe this is an inaccurate reference since the constitution does not provide for a tribal council but rather a general council. We believe the appropriate reference should therefore be the general council and recommend accordingly.

Section 5 proposes to increase the timeframe from ten (10) days to twenty (20) for submission of tribal enactments to the local Bureau Superintendent. It also provides that such enactments will become effective when approved by the Secretary or automatically at the expiration of ninety (90) days from submission. While we have no objection to the proposal, we note for the record that the timeframes imposed in Section 5 do not apply to actions provided for in Article XVI - Amendments. Federal law controls actions taken in Article XVI.

We note the omission of the phrase "an offense punishable by" in Section 5 (j) of Article X - Bill of Rights. Section 5(j) should read:

> (j) Deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six (6) persons.

Article XI - Meetings. The Village proposes to amend Article XI by changing the numerical requirement for requesting special meetings by the general membership from "8 members" to "twenty-five percent" in Section 2 and by changing the quorum in Section 3 from "thirty percent" to "twenty-five percent." We have no objections to these changes.

The Village proposes to eliminate from Section 3 of Article XII - Duties of Officers the requirement for an annual audit and the provision that financial records should be open at all times for inspection by the Bureau. We have no objection to this proposal. However, this does not preclude the Bureau from auditing and inspecting these records when required by Federal law.

The Village proposes to amend Articles XVI and XVII to provide that amendments to the constitution are automatically effective after ninety (90) days have elapsed from the date of submittal of such amendments. These proposals are contrary to Federal law, specifically the requirements of the Indian Reorganization Act of June 18, 1934, as amended by the Act of November 1, 1988, and, if adopted, the Secretary could not approve a constitution or an amendment which contained the proposed language. We, therefore, recommend the deletion of the phrase "or after ninety (90) days have elapsed from the date of submittal it shall become automatically effective" from both Articles XVI and XVII. Since specific duties were imposed upon the Secretary by Congress in the 1988 amendments to the IRA, it is not necessary to include time limitations. However, Article XVI could be amended as follows to reflect the statutory basis of these duties. The last sentence of Article XVI could read as follows:

> The amendment shall become effective when approved by the Secretary of the Interior or his duly authorized representative or when deemed approved by the Secretary by operation of law.

This concludes our technical comments. Please review and consider them and advise us accordingly. Should the Village have any questions about our comments or recommended modifications, we will be glad to discuss them with you in order to resolve any differences prior to the election. Should the Village agree with our recommendations, in accordance with Part III of the Secretary's Revised Guidelines for the Review of Proposed Constitutions, Revisions and Amendments dated March 4, 1988, please make a final written request accompanied by a resolution and the Secretary will issue an authorization letter to the Superintendent, Southern California Agency, to call and conduct an election consistent with the Secretary's election regulations found in Title 25 of the Code of Federal Regulations, Part 81.

Should the Village decide not to adopt any or all of the Bureau's modifications, the Village should submit a final written request accompanied by an appropriate resolution together with a copy of the document upon which the Secretarial election shall be called and an explanation as to why our modifications were not accepted. Such submission will ensure that all parties are agreed upon the document that is the subject of the Secretarial election. The Village's final request for a Secretarial election should be made directly to the BIA's Washington Office, Division of Tribal Government Services, MIB-2611, 1849 C Street N.W., Washington, D.C. 20240, to expedite action.

Upon receipt of the Village's final request for a Secretarial election, the election will be authorized without delay. However, such authorization does not carry with it the presumption of Secretarial approval should the constitution be adopted. Further, if adopted it will not be effective under Federal law until it is approved by the Secretary. Copies of the Village's final request should be furnished to the Superintendent, Southern California Agency, and to the Sacramento Area Director.

Sincerely,

/S/ CAROL A. BACON

Director, Office of Tribal Services

cc: Area Director, Sacramento
Superintendent, Southern California Agency
Regional Solicitor, Sacramento