# United States Court of Federal Claims

October 7, 2009

## No. 08-512 L

—————————————————————

**Walter J. Rosales and
Karen Toggery,**

*Plaintiffs,*

v.

**United States of America,**

*Defendant.*

—————————————————————

Statute of Limitations; Issue
Preclusion; RCFC 19;
Necessary and Indispensable
Party; Indian Trust
Accounting Statute;
Continuing Claims Doctrine;
Sovereign Immunity; Subject
Matter Jurisdiction

—————————————————————

## No. 98-860 L

—————————————————————

**Walter J. Rosales,** *et al.,*

*Plaintiffs,*

v.

**United States of America,**

*Defendant.*

—————————————————————

*Patrick D. Webb*, Webb & Carey, San Diego, CA, for plaintiffs.

*Samantha Klein*, Natural Resources Section, United States Department of Justice, Washington, DC, for defendant.

# OPINION AND ORDER

**Block,** *Judge*.

Two cases before this court, *Walter J. Rosales and Karen Toggery v. United States*, No. 08-512 L ("*Rosales X*"), and *Walter Rosales, et al. v. United States*, No. 98-860 L ("*Rosales VI*"), arise out of a common set of facts and implicate similar principles of law.  For the purposes of judicial economy, the court addresses both cases in this single opinion.

Both cases stem from internecine disputes among the members and purported members of the Jamul Indian Village ("Village"), a federally-recognized tribal government.[1]  The two complaints before this court, in *Rosales VI* and *Rosales X*, represent but the most iterations of plaintiffs' persistent attempts—in the face of repeated dismissals and unfavorable judgments over the course of fifteen years—to invalidate a series of tribal elections and to wrest from the Village the beneficial ownership of two parcels of tribal land.  Plaintiffs have litigated or sought to litigate these same and related issues in no fewer than fourteen legal actions brought before tribal tribunals, administrative boards, and federal courts in California and the District of Columbia, all without success.[2]  Indeed, what this court previously observed in *Franklin Sav.*

---

[1] The court will use "Village" to refer to the recognized government of the Jamul Indians and "Tribe" to refer to the Jamul Indians as an organized group.

[2] The first round of litigation comprised administrative challenges, before the Department of the Interior Board of Indian Appeals ("IBIA"), concerning various Village elections, electoral procedures, and membership eligibility.  These cases are: (1) *Rosales v. Sacramento Area Dir.* ("*Rosales I*"), 32 I.B.I.A. 158 (1998); (2) *Rosales v. Sacramento Area Dir.* ("*Rosales II*"), 34 I.B.I.A. 50 (1999); (3) *Rosales v. Sacramento Area Dir.* ("*Rosales III*"), 34 I.B.I.A. 125 (1999); and (4) *Rosales v. Sacramento Area Dir.* ("*Rosales IV*"), 39 I.B.I.A. 12 (2003).
Contemporaneously, plaintiffs brought challenges in federal courts, seeking review of various matters relating to the election disputes at issue in *Rosales I–IV*.  These cases are: (5) *Jamul Indian Vill. v. Hunter*, No. 95-131 (S.D. Cal. voluntarily dismissed Sept. 30, 1996) (seeking to enforce a "judgment" from the "tribal court" of a faction of the Tribe that had lost in tribal elections); (6) *Rosales v. Townsend* ("*Rosales V*"), No. 97-769 (S.D. Cal. voluntarily dismissed Nov. 19, 1998); and (7) *Rosales v. United States* ("*Rosales VIII*"), 477 F. Supp. 2d 119 (D.D.C. 2007) (granting defendant's motion for summary judgment, and upholding IBIA's decisions in *Rosales I–IV*), *aff'd*, 275 F. App'x 1 (D.C. Cir. 2008).
In their most recent round of litigation, plaintiffs sought to secure beneficial ownership of several parcels of land that the Village has claimed.  These cases are: (8) *Rosales VI*; (9) *Rosales v. United States*, No. 01-951 (S.D. Cal. Feb. 14, 2002) ("*Rosales VII*"), *aff'd on other grounds*, 73 F. App'x 913 (9th Cir. 2003) ("*Rosales VII Affirmance*"), *cert. denied*, 541 U.S. 936 (2004); (10) *Rosales v. United States* ("*Rosales IX*"), No. 07-624, 2007 WL 4233060 (S.D. Cal. 2007), *appeal dismissed for failure to prosecute*, No. 08-55027 (9th Cir. Aug. 12, 2009); and (11) *Rosales X*.  As noted, *Rosales VI* and *Rosales X* are the subjects of the instant opinion.
Additionally, there are several cases which arise out of the same set of facts, but are tangential to the issues before this court.  Plaintiffs' counsel in this case also filed a challenge to the Village's casino gaming plan in (12) *Rosales v. Kean Argovitz Resorts, Inc.*, No. 00-1910

*Corp. v. United States*, 56 Fed. Cl. 720, 721 (2003), seems doubly apt here: "Despite vainly prosecuting myriad legal claims in every conceivable forum and fruitlessly propounding inventive and novel legal theories, plaintiffs have continually stared down the face of defeat, personifying Mason Cooley's aphorism, 'if you at first don't succeed, try again, and then try something else.'"  Plaintiffs' current attempt to defy their fate—an attempt this court strongly admonishes plaintiffs to make their last—miscarries again.

The court hereby grants defendant's motion to dismiss the complaint in *Rosales X*, and dismisses, on its own motion, the complaint in *Rosales VI*.

# I. BACKGROUND

The Village is a tribal governmental entity of the Kumeyaay Indians, which Congress recognized[3] pursuant to section 16 of the Indian Reorganization Act ("IRA") of 1934, 25 U.S.C. § 476.  *Rosales VIII* at 122.  The Village is located in Jamul, an unincorporated community in San Diego County, California.  *See id.*  The Village came into being in 1981, after twenty individuals petitioned the Bureau of Indian Affairs to organize as a community of "half-bloods"[4]

---

(S.D. Cal. Apr. 18, 2001), *aff'd*, 35 F. App'x 562 (9th Cir. 2002), *cert. denied*, 537 U.S. 975 (2002).  In parallel with *Jamul Indian Vill. v. Hunter*, plaintiffs' counsel filed (13) *Jamul Indian Vill. v. Sacramento Area Dir.*, 29 I.B.I.A. 90 (1996), purportedly on behalf of the Jamul Indian Village, but IBIA rejected that appeal as premature and procedurally deficient, *id.* at 90–91.  Finally, IBIA also summarily dismissed a case that Walter Rosales and Marie Toggery filed, along with San Diego County and the Board of Directors of the San Diego Rural Fire Protection District, (14) *San Diego Cty. v. Pac. Reg'l Dir.*, 37 I.B.I.A. 233 (2002).  In that case, the appellants sought review of a Finding of No Significant Impact ("FONSI"), made by the Pacific Regional Director of the Bureau of Indian Affairs, as to the proposed acquisition of approximately 101 acres of land for the Village pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321–70.  *Id.* at 233.  Because the Regional Director indicated that the Bureau of Indian Affairs was withdrawing its FONSI in favor of a full Environmental Impact Statement, IBIA dismissed the case as moot.  *See id.* at 233–34.

[3] "Federal acknowledgment or recognition of an Indian group's legal status as a tribe is a formal political act confirming the tribe's existence as a distinct political society and institutionalizing the government-to-government relationship between the tribe and the federal government."  COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[3] (2005).  That recognition creates a fiduciary relationship between the government and the tribe, formalizes the tribe's power to tax and to establish its own judiciary, and determines the tribe's eligibility for the congressionally-created programs and services that the Department of the Interior's Bureau of Indian Affairs provides.  *See id.*; *see generally* Mark D. Myers, *Federal Recognition of Indian Tribes in the United States*, 12 STAN. L. & POL'Y REV. 271 (2001).

[4] Section 19 of IRA, 25 U.S.C. § 479, defines the term "Indian" to include "all other persons of one-half or more Indian blood."  In reviewing a tribal constitution, the Department of the Interior has historically sought to exclude from tribal membership "a large number of applicants with a small degree of Indian blood."  *See* Kirsty Gover, *Genealogy as Continuity: Explaining the Growing Tribal Preference for Descent Rules in Membership Governance in the United States*,

pursuant to IRA and submitted a proposed "Village Constitution."[5]  *See id.* (citing *Rosales I* at 159–60).  Of the twenty-three individuals eligible to vote on the proposed Constitution, sixteen did so, all in favor.  *Id.* (citing *Rosales I* at 160).  The Acting Deputy Assistant Secretary of Indian Affairs approved the Village Constitution on July 7, 1981.  *Id.*  This original constitution made tribal membership available only to individuals with no less than "1/2 degree California Indian blood quantum."  *Id.*

Plaintiffs in *Rosales X*, Walter Rosales and Karen Toggery, are Native American residents of San Diego County, California, of one-half or more degree of California Indian blood.  *Rosales X*, Compl. ¶ 1.  Of the twelve plaintiffs named in the original complaint in *Rosales VI*, only two remain, Joe Comacho (also a Native American resident of San Diego County, *Rosales VI*, 3d Am. Compl. ¶ 1) and Walter Rosales; all other named plaintiffs have either died or withdrawn consent for suit since counsel filed the original complaint.[6]

## A. *The Underlying Dispute*

The path to the instant cases began in 1994, when a faction led by then Vice-Chairman Jane Dumas ("Dumas Faction") held an election to recall and replace four Village officials[7] who had been elected in 1992 ("Incumbent Faction").  *Rosales VIII* at 122–23.  The Superintendent

---

[33 Am. Indian L. Rev. 243, 262–69 (2009) (explaining the history and application of the Indian "blood quantum" and its role in tribal membership).

[5] Section 16 of IRA, 25 U.S.C. § 476, details the procedures for an Indian tribe to organize as a political unit and to establish the rules for its self-governance.

[6] Six of the original plaintiffs revoked permission for the attorney of record, Patrick D. Webb, to represent them in any pending litigation; five of those stated that they had *never* authorized Webb to represent them.  *Rosales VI*, Updated Mot. to Dismiss, Ex. 11, Declaration of Kenneth Meza ("Meza Decl."), Ex. B.  Another two plaintiffs withdrew from the litigation.  *Id.*  Kenneth Meza, the elected Tribal Chairman of Jamul Indian Village, has stated that five of the original plaintiffs are now deceased: Marie Toggery, along with four (Sarah Aldamas, Vivian Flores, Valentino Mesa, William Mesa) of the six plaintiffs who had previously revoked their permission for Webb to represent them.  Meza Decl. ¶ 7.  Finally, a tenth plaintiff, Bernice Mesa, is not named in the Third Amended Complaint submitted by plaintiffs in June of this year; the court presumes that Mesa, too, has either withdrawn from the suit or passed away.  Plaintiffs seek leave to substitute Karen Toggery for Marie Toggery (Karen is Marie's daughter and the personal representative of Marie's estate), arguing that the Federal Circuit has held that the court should be lenient in permitting substitution.  *Rosales VI*, Pls.' June Mot. at 9–10 (citing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999)).  While the ninety-day window to move for substitution may not yet have expired, *see Grass Valley Terrace v. United States*, 69 Fed. Cl. 506, 509 (2006), plaintiffs have not formally moved for substitution, as RCFC 5 and RCFC 25(a)(3) require, so this court need not consider whether it should allow the substitution.

[7] These officials are Raymond Hunter, Marcia Goring-Gomez, Mary Alveraz, and Lee Shaw-Conway.  *Rosales I* at 161.

and Area Director of the Bureau of Indian Affairs ("the Bureau") refused to uphold the 1994 recall election because the Dumas Faction had failed to comply with the Village Constitution's procedural requirements.  *Id.* at 123 (citing *Rosales I* at 160).  Had the Bureau upheld the recall election, plaintiff Karen Toggery would have been the Secretary-Treasurer of the Village.  *Id.* at 123 n.3.  Instead, the Bureau continued to recognize the Incumbent Faction.  *Id.* at 123.  In 1995, each faction held its own separate election, and, as a result of its respective contest, claimed to have the authority to lead the Village.  *Id.*  The Dumas Faction's disputes of the 1994 and 1995 elections trickled through the Department of the Interior's administrative review process, ultimately coming before the Department of the Interior Board of Indian Appeals ("IBIA").  *Rosales I* at 158–59.  IBIA could not determine whether either faction's 1995 election was valid, thus leaving the Incumbent Faction in control, because the 1992 election that had brought them to power was the most recent unchallenged election.  *Rosales VIII* at 123; *Rosales I* at 167.

The Dumas Faction, including Mr. Rosales, Ms. Toggery, and others, continued to challenge tribal election results at IBIA.  Next, they contested the propriety of the Village's 1996 "secretarial" election, concerning a proposed amendment to the Village Constitution that would reduce the blood quantum requirement for Village membership from one-half to one-quarter.  *See Rosales II*, 34 I.B.I.A. at 51–52.  The Village had voted in favor of, and the Deputy Commissioner of Indian Affairs had ultimately approved, that amendment.  *Id.*  IBIA dismissed the Dumas Faction's challenge for being procedurally defective, *see id.* at 51–54, evidently to plaintiffs' profound dismay.

Plaintiffs' grievance over the results of these tribal elections, in particular, the lowered blood quantum requirement for Village membership and plaintiffs' exclusion from membership in the Village (i.e., the tribal government), would set off what is now a fifteen-year campaign of legal challenges.

In their suits against defendant United States, plaintiffs have advanced two theories for relief, alleging defendant's breach of various fiduciary and trust duties.  The first theory is founded upon plaintiffs' challenge to the validity of tribal elections and the legitimacy of the current Village membership, while the second rests upon plaintiffs' claim to beneficial ownership of two parcels of tribal land.  The various complaints and amended complaints filed in the two cases before this court have invoked both theories for relief.

**B. *The Instant Litigation***

**1. *Rosales v. United States*, No. 08-512 ("*Rosales X*")**

Before the court are two iterations of plaintiffs' complaint: the original complaint, filed on July 15, 2008, and a proposed Amended Complaint, filed on June 24, 2009 along with plaintiffs' pending motion to amend and to consolidate this case with *Rosales VI*. *Rosales X*, Pls.' June 24, 2009 Mot. to Amend. ("Pls.' June Mot.").  The Amended Complaint adds nine pages (and nine numbered paragraphs), but is *substantively identical* to the original complaint (compare concurrent citations below).

Plaintiffs' *Rosales X* claims focus on two parcels of tribal land.  *See, e.g.*, *Rosales X*, Compl. ¶¶ 69, 74 (stating the primary basis for plaintiffs' two claims for relief); Am. Compl. ¶¶ 78, 83 (same).  The first of these, a parcel of land currently designated 597-080-04 ("Parcel 04"),

is the 4.66-acre portion of the original Mexican land grant of Rancho Jamul that Donald and Lawrence Daley conveyed, in 1978, to "'[t]he United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate.'" *See Rosales X*, Compl. ¶ 11, Ex. D (the 1978 Deed); Am. Compl. ¶ 13.   The other parcel, designated 597-080-05 ("Parcel 05"), comprises 1.372 acres of an original 2.21-acre plot of land that the Roman Catholic Bishop of San Diego conveyed on July 27, 1982, "to the United States of America in trust for the Jamul Indian Village."  *See Rosales X*, Compl. ¶ 21, Ex. F (the 1982 Deed); Am. Compl. ¶ 24.  The remaining 0.838 acres of that 2.21-acre plot, designated 597-080-06 ("Parcel 06"), remains the property of the Bishopric and is not at issue in either case.  *See Rosales X*, Compl. ¶ 22; Am. Compl. ¶ 25.

Plaintiffs in *Rosales X* assert that they, not the Village, are the rightful beneficial owners of Parcels 04 and 05.  *See Rosales X*, Compl. ¶ 69 and Am. Compl. ¶ 74 (claiming that defendant breached its duties to plaintiffs by "failing to enforce the deed to, and Plaintiffs' beneficial ownership of, [Parcels 04 and 05]"); *Rosales X*, Compl. ¶¶ 74–76 and Am. Compl. ¶¶ 83–85 (claiming that this same failure effected a taking). Plaintiffs previously made the same assertions in *Rosales IX*.  *See Rosales IX* at *4 (discussing plaintiffs' underlying assertion of their beneficial ownership interest in Parcel 04).   Echoing *Rosales IX*, plaintiffs also argue that the federal government has duties, under the Native American Graves Protection and Repatriation Act ("NAGPRA"),[8] to prevent inadvertent discoveries of human remains on those parcels of land, Parcels 04 and 05 among them, where Native American remains and funerary objects exist. *Compare Rosales X*, Compl. ¶ 63(4)–(10) *and* Am. Compl. ¶ 71(4)–(10) (setting forth plaintiffs' NAGPRA allegations) *with Rosales IX* at *8–*10 (rejecting plaintiffs' arguments that NAGPRA imposes has any such affirmative duties upon the federal government).   Plaintiffs assert that defendant violated these duties—duties allegedly owed to them as the beneficial owners of Parcels 04 and 05—primairily by failing to prevent the Village's grading of, and other construction activity on, the land.  *Rosales X*, Compl. ¶ 63(4); Am. Compl. ¶ 71(4).  Based on a panoply of statutes, including IRA and NAGPRA, plaintiffs allege that defendant breached its fiduciary and common law trust duties to manage Indian affairs (1) by failing to enforce plaintiffs' claims of, and rights to, beneficial ownership of Parcels 04 and 05, (2) by failing to prevent interference with the graves therein, and (3) by failing to prevent plaintiffs' eviction from these parcels.  *Rosales X*, Compl. ¶¶ 67, 69; Am. Compl. ¶¶ 76, 78.  Plaintiffs also charge that, through this allegedly unlawful inaction, defendant effected a taking of Parcels 04 and 05 without compensation, in violation of the Fifth Amendment.  *Rosales X*, Compl. ¶¶ 74–76; Am. Compl. ¶¶ 83–85.  Finally, plaintiffs claim that IRA and NAGPRA taken together constitute a money-mandating source, sufficient to invoke this court's jurisdiction.[9]  *Rosales X*, Pls.' Mem. in

---

[8] Codified, in pertinent part, at 25 U.S.C. §§ 3001–3013, NAGPRA lays out federal agencies' procedures and obligations when Native American human remains or associated funerary objects are discovered.  *See Rosales IX* at *2 n.3.  NAGPRA also sets forth the responsibilities of museums and federal agencies that controlled such remains or objects before NAGPRA became law.  *Id.*

[9] According to the "the network theory" of jurisdiction under the Tucker Act and Indian Tucker Act, a meshwork of statutes and regulations may, under some circumstances, substitute for a clear money-mandating statute.  *See United States v. Navajo Nation* ("*Navajo Nation I*"), 537 U.S. 488, 504–06 (2003) (explaining that a network of statutes and regulations can satisfy this

Opp'n to Def.'s Mot. to Dismiss ("Pls.' Opp'n.") at 6.

Defendant has moved to dismiss the original complaint for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the RULES OF THE COURT OF FEDERAL CLAIMS ("RCFC").  *Rosales X*, Mot. to Dismiss at 10–14.  Defendant identifies plaintiffs' failure to bring their claims within the Tucker Act's six-year statute of limitations as a jurisdictional defect mandating dismissal.  *Id.*  In addition, defendant argues that the Village, whose joinder is barred by sovereign immunity, is a necessary and indispensable party to the adjudication of plaintiffs' claims, and that issue preclusion bars plaintiffs from relitigating that threshold issue, which has been fully litigated and previously ruled upon by the *Rosales IX* court.  *Rosales X*, Mot. to Dismiss at 14–21.[10]  Defendant has also moved to strike plaintiffs' motion to amend (along with the proposed Amended Complaint).  *Rosales X*, Def.'s July 7, 2009 Mot. to Strike Pls.' Mot. to Amend.

### 2. *Rosales v. United States*, No. 98-860 ("*Rosales VI*")

After losing its election challenge in *Rosales I*, and in an apparent attempt to attack that decision collaterally, the Dumas Faction brought suit in this court, filing the first *Rosales VI* complaint in 1998.[11]  More than a decade and several amendments later,[12] the court has before it two wholly divergent incarnations of plaintiffs' complaint.

---

court's Indian Tucker Act jurisdiction when the "network" establishes specific rights and duties that go beyond a general trust relationship); *Samish Indian Nation v. United States*, 82 Fed. Cl. 54, 61–66 (2008) (recounting the history of the network theory and explaining that a network of statutes may satisfy this court's jurisdictional requirement of a money-mandating source when the network establishes a fiduciary relationship between the government and an Indian tribe). However, *Navajo Nation I* foreclosed the application of this theory in most cases, by requiring that a plaintiff identify "*specific* rights-creating or duty-imposing statutory or regulatory prescriptions" in place of a clear money-mandating statute.  537 U.S. at 506 (emphasis added); *see United States v. Navajo Nation* ("*Navajo Nation II*"), _ U.S. _, 129 S. Ct. 1547, 1554–55 (2009) (explaining that *Navajo Nation I* foreclosed application of the network theory where the statutes comprising the network only created an implied duty).

[10]  In the alternative, defendant has moved to dismiss for failure to state a claim, pursuant to RCRC 12(b)(6), but, curiously, does not cite RCFC 12(b)(7) (which permits dismissal for failure to join a party under Rule 19).

[11]  Plaintiffs' counsel, Patrick D. Webb, filed *Rosales VI* despite not being admitted to this court's bar at the time.  *See Rosales VI*, Compl. at 1; *Rosales VI*, Defect Slip, Mar. 17, 1999 (stating that the complaint did not comply with RCFC 81(d)(1) because Mr. Webb was not admitted to this court's bar).

[12]  The court first stayed *Rosales VI* from April 19, 2000 through February 26, 2004, and ordered the parties to file a joint status report following the conclusion of *Rosales IV*.  *Rosales VI*, Docket No. 39 (Order of Apr. 19, 2000 Granting Stay) & Docket No. 40 (Order of Feb. 26, 2004).  The court stayed *Rosales VI* a second time, from March 19, 2004 through September 26, 2008, at the parties' request, pending the outcome of *Rosales VIII*.  *Rosales VI*, Docket No. 43 (Order of Mar.

The Second Amended Complaint, the last amendment filed with the court's leave, essentially continues the election challenges first launched in *Rosales I*. Plaintiffs claim that defendant breached its trust responsibilities by "dealing with non-members of JAMUL as if they were, in fact, members of JAMUL, and by independently and in conspiracy with the NON-MEMBERS,[13] violating the Jamul Constitution and ordinances." *Rosales VI*, 2d Am. Compl. ¶ 41. The complaint also challenges defendant's recognition of the Incumbent Faction, *see id.* ¶ 19 (complaining of the purported NON-MEMBERS' receipt of federal funding and benefits), its "funding and facilitating . . . [the] staging of an illegal election for an illegal amendment to the JAMUL INDIAN VILLAGE Constitution," *id.* ¶ 20 (referring to the 1996 secretarial election), and state and federal law enforcement officials' treatment of the Incumbent Faction as the lawful tribal government, *see id.* ¶ 26. The source of all of these charges is the series of Village elections that the Dumas Faction lost, along with IBIA's refusal in *Rosales I–IV* to overturn them. *See id.* ¶¶ 24–25 (asserting the validity of the Dumas Faction's tribal court judgments, despite the unambiguous language of *Rosales III* to the contrary). Defendant has moved to dismiss the Second Amended Complaint, on jurisdictional and justiciability grounds, notably, plaintiffs' lack of standing to bring suit either individually or on behalf of the Jamul Tribe. *Rosales VI*, Updated Mot. to Dismiss at 14–27.

On March 6, 2009, plaintiffs filed a memorandum, opposing defendant's updated motion to dismiss and seeking to consolidate this case with *Rosales X*, along with an eleven-page exhibit purporting to be a Third Amended Complaint. *Rosales VI*, Pls.' Mem. in Opp'n to Def.'s Updated Mot. to Dismiss ("Pls.' Opp'n.") at 2; Ex. A. In their memorandum, plaintiffs "voluntarily dismiss[ed] those portions of their Second Amended Complaint not contained in their proposed Third Amended Complaint." *Rosales VI*, Pls.' Opp'n. at 2. On June 24, 2009— the same day they filed their *Rosales X* motion to amend—plaintiffs filed a formal motion to amend the complaint in *Rosales VI*, along with an expanded, 41-page iteration of their Third Amended Complaint. *Rosales VI*, Pls.' June 24, 2009 Mot. to Amend. ("Pls.' June Mot."). Plaintiffs' *Rosales VI* June motion reiterates their abandonment of the elections-based claims, stating that, "[a]s pleaded in the proposed [third] amended complaint, Plaintiffs no longer make claims based upon their being the lawfully elected leaders of the tribe. Nor do they make claims for injury to tribal property, tribal assets, or any tribal interests." *Rosales VI*, Pls.' June Mot. at 4. Instead, in an apparent attempt to sidestep defendant's updated motion for dismissal and to start this case anew, plaintiffs' Third Amended Complaint in *Rosales VI* is a *verbatim duplicate* of the *Rosales X* Amended Complaint.[14] *Compare Rosales VI*, 3d Am. Compl. ¶¶ 6–75 *with*

---

19, 2004 Granting Parties' Stay Request); Order of Sept. 26, 2008 Lifting Stay. Then-Chief Judge Damich transferred *Rosales VI* to this judge on September 26, 2008. *Rosales VI*, Docket No. 75 (Order Transferring Case).

[13] These styled "NON-MEMBERS" include the four members of the Incumbent Faction whose recall was at issue in *Rosales I*. *Compare* note 7, *supra* (listing the officials at issue), *with Rosales VI*, 2d Am. Compl. ¶ 7 (including those same officials in the list of "NON-MEMBERS"). *See also id.* ¶ 9 (alleging that the "NON-MEMBERS" have never been enrolled members of the Village).

[14] There are only two differences between the two complaints: (1) the inclusion of Joe Comacho

*Rosales X*, Am. Compl ¶¶ 5–74.  Defendant has moved to strike plaintiffs' motion to amend. *Rosales X*, Def.'s July 7, 2009 Mot. to Strike Pls.' Mot. to Amend.

### C. The Court Admits the Amended Complaints

In *Rosales VI*, the court hereby grants plaintiffs' motion for leave to substitute the Third Amended Complaint.  Accordingly, the court denies as moot defendant's updated motion to dismiss, which was based on the claims asserted in the now-abrogated Second Amended Complaint.

In *Rosales X*, the court hereby grants plaintiffs' motion for leave to substitute the Amended Complaint.  Because the Amended Complaint in *Rosales X* alters nothing of the substance of the original complaint, however, the court deems defendant's previously filed motion for dismissal to apply to the Amended Complaint.

The court admits the newly amended complaints not because the circumstances satisfy the Supreme Court's standard for granting leave to amend.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Indeed, plaintiffs arguably fail that standard in both cases and on multiple counts, including likely prejudice to defendant at this late stage in the suit (in both cases), bad faith on the part of plaintiffs (especially in *Rosales VI*, given the enormous departure that the purported "amendment" represents), and the futility of the amendments (in both cases).  *See id.*  To the contrary, the court grants leave to amend, for one *last* time in each case, in the hope of persuading plaintiffs of the inexorable futility of their obstinate fifteen-year campaign.  In *Rosales VI*, the court would have granted defendant's updated motion to dismiss the Second Amended Complaint, on precisely the grounds articulated therein, and now dismisses *sua sponte* plaintiffs' Third Amended Complaint.  Moreover, with two negligible exceptions (*see supra* note 14, and *infra* Section III), plaintiffs' Third Amended Complaint in *Rosales VI* and the Amended Complaint in *Rosales X* are *verbatim duplicates*, leaving before the court a single complaint, in all but name.  In the shadow of plaintiffs' fifteen-year campaign of legal challenges, perpetuated in the face of repeated dismissals and adverse judgments on the merits, a campaign that has already wasted enormous administrative and judicial resources, the court will not refuse plaintiffs' inadvertent gift.

Having, in part, unscrambled the Rubik's Cube of where *Rosales VI* and *Rosales X* currently stand, and with identical complaints now before the court in both cases, the court's analysis begins—and ends—with the threshold question of whether it can adjudicate the merits of plaintiffs' claims in either case.

---

as a plaintiff, and (2) the recitation of two additional, wholly subordinate claims in the *Rosales VI* Third Amended Complaint (see *infra* Section III for discussion of these differences).

# II. *ROSALES X*

Because of the significance for the court's decision of the near-identity of the Third Amended Complaint in *Rosales VI* and the Amended Complaint in *Rosales X*, the court routinely cites *both* complaints in the discussion below.

## A. The Tucker Act's Statute of Limitations Is a Jurisdictional Bar to Plaintiffs' Claims

Before adjudicating the merits of a case, a court must first ensure that it has jurisdiction to hear and decide the matter before it. *E.g.*, *Hardie v. United States*, 367 F.3d 1288, 1290 (Fed. Cir. 2004); *PIN/NIP, Inc. v. Platt Chem. Co.*, 304 F.3d 1234, 1241 (Fed. Cir. 2002). As the Supreme Court recently reiterated, "[w]ithout jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing th[at] fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). The court should begin by "presum[ing] that a cause of action lies outside the limited jurisdiction of the federal courts." *Blueport Co. v. United States*, 533 F.3d 1374, 1381 (Fed. Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994)). Plaintiffs, as the party requesting the exercise of judicial power, bear the burden of establishing, by a preponderance of the evidence, the court's jurisdiction. *See Blueport*, 533 F.3d at 1381.

### 1. The Tucker Act's Statue of Limitations Is a Jurisdictional Requirement for Suits in This Court

This court's jurisdiction flows principally from the Tucker Act, codified in pertinent part at 28 U.S.C. § 1491. Claims under the Tucker Act are subject to a six-year statute of limitations: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. Unlike most statutes of limitations, which are typically treated as affirmative defenses, § 2501 is "a jurisdictional requirement for a suit in the Court of Federal Claims" and one that "may not be waived." *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1354 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130, 128 S. Ct. 750 (2008); *see also Martinez v. United States*, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc) ("It is well established that statutes of limitation for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature."). Accordingly, this court has an ongoing duty to address, even *sua sponte*, the application of § 2501 to the instant cases. *See, e.g.*, *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) ("[s]ubject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte*"). Moreover, because § 2501 is a jurisdictional requirement, the running of the limitations period is "not susceptible to equitable tolling." *John R. Sand & Gravel Co.*, 128 S. Ct. at 755; *see also Black v. United States*, 84 Fed. Cl. 439, 450 (2008) ("[E]quitable tolling of . . . § 2501 is foreclosed by the Supreme Court's decision in *John R. Sand & Gravel Co.*").

### 2. Claim Accrual Under § 2501

A claim accrues under § 2501, and the six-year limitations period begins to run, "when all events have occurred to fix the government's alleged liability, entitling the claimant to

demand payment and sue here for his money." *Martinez*, 333 F.3d at 1303.  Further, "it is not necessary that the damages from the alleged [wrong] be complete and fully calculable before the cause of action accrues." *Fallini v. United States*, 56 F.3d 1378, 1382 (Fed. Cir. 1995).  Instead, the proper focus "is upon the time of the [defendant's] *acts*, not upon the time at which the consequences of the acts became most painful." *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980).

A narrow "accrual suspension" rule allows "the accrual of a claim against the United States [to be] suspended, for purposes of 28 U.S.C. § 2501, . . . . [only if] the plaintiff [can] either show that the *defendant has concealed its acts* with the result that plaintiff was unaware of their existence or . . . that its injury was *inherently unknowable* at the accrual date." *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (emphasis added) (internal quotation marks an citations omitted).  The accrual suspension rule is strictly and narrowly applied.  *Martinez*, 333 F.3d at 1319.  In line with the Supreme Court's foreclosure of equitable considerations under § 2501, *John R. Sand & Gravel*, 128 S. Ct. at 755, the accrual suspension rule does not create a constructive notice requirement of the traditional sort:

> It is sometimes stated that accrual . . . will be suspended until the claimant "knew or should have known" that the claim existed. That articulation of the rule is not meant to set forth a different test . . . . [T]he "concealed or inherently unknowable" formulation . . . is both more common and more precise and we therefore endorse that formulation as the preferable one.

*Ingrum v. United States*, 560 F.3d 1311, 1315 n.1 (Fed. Cir. 2009) (internal citations omitted).  Indeed, absent active concealment by defendant, accrual suspension requires what is tantamount to sheer impossibility of notice.  *See Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 359 (Ct. Cl. 1967) ("An example of [an inherently unknowable injury] would be when defendant delivers the wrong type of fruit tree to plaintiff and the wrong cannot be determined until the tree bears fruit."); *Roberts v. United States*, 312 Fed. App'x 340, 342 (Fed. Cir. 2009) (affirming dismissal of plaintiffs' claims as untimely under § 2501, where plaintiff failed to demonstrate that his military service records were wholly unavailable).

### 3. Plaintiffs' Claims Accrued No Later Than 1982

Plaintiffs' claims all arise out of defendant's recognition of the Village as the beneficial owner of Parcels 04 and 05, and its failure to enforce plaintiffs' purported ownership interest in these parcels.  *See, e.g.*, *Rosales X*, Am. Compl. ¶¶ 71, 78, 83; *Rosales VI*, 3d Am. Compl. ¶¶ 72, 83, 88.  Plaintiffs' focus, *Rosales X*, Pls.' Opp'n at 2, 37, on their 2007 eviction is misguided.  *See Del. State Coll.*, 449 U.S. at 258.  While this eviction may be an additional injury resulting from defendant's act, and while it may set the accrual date for a hypothetical claim against the *Village*, it is wholly immaterial to accrual of the claims against defendant.  *Id.*  Similarly, any on-going grading, excavation, or other construction activity conducted by the Village, on Parcels 04 and 05, flows from the Village's exercise of beneficial ownership of these parcels.  While this construction activity may represent further injury to plaintiffs, and may be the "most painful" yet of the consequences of defendant's acts, it is irrelevant to setting the accrual date for plaintiffs' claims.  *Id.*  Therefore, the NAGPRA violations alleged by plaintiffs are likewise tethered to defendant's initial grant of beneficial ownership over Parcels 04 and 05 to the Village.  By that

act, defendant repudiated any trust obligation that it allegedly owed plaintiffs—whether under IRA, NAGPRA or the common law—and, if plaintiffs were indeed the rightful beneficial owners of the land, effected a taking without just compensation. *See Jones v. United States*, 801 F.2d 1334, 1335–36 (Fed. Cir. 1986) ("A trustee may repudiate an express trust by words . . . or by actions inconsistent with his obligations under the trust.").

The same reasoning leads the court to reject plaintiffs' contention that the "continuing claims" doctrine restores the timeliness of their claims. *See Rosales X*, Pls.' Opp'n at 37–38. The continuing claims doctrine allows the adjudication of claims that would otherwise be untimely when the claims are "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages," and when at least one of these events falls within the limitations period. *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997) ("*Brown Park*"). However, "a claim upon a single distinct event, which may have *continued ill effects* later on, is *not* a continuing claim." *Id.* (emphasis added). On similar facts, the court previously refused to apply the continuing claims doctrine where plaintiffs alleged that the United States' "continued and repeated refusal to recognize [plaintiffs] as the rightful owners of [the disputed parcel] should be considered a continuing wrong." *Voison v. United States*, 80 Fed. Cl. 164, 176 (2008). Plaintiffs here conclude that their claims did not accrue until March 10, 2007, the date on which the Village allegedly evicted them from their homes. *Rosales X*, Pls.' Opp'n at 2. By their logic, it is unclear to the court why they do not contend that their claims are accruing still, since they allege that the grading and excavation of Parcels 04 and 05 are on-going. *See, e.g.*, *Rosales X*, Am. Compl. ¶¶ 60, 71(4); *Rosales VI*, 3d Am. Compl. ¶¶ 61, 72(4). Regardless, plaintiffs' contention is flawed. While the 2007 eviction may be a belated injury caused by defendant's acts, it is not an "independent and distinct event or wrong," *Brown Park*, 127 F.3d at 1456, for which defendant is responsible, and thus does not support application of the continuing claims doctrine.

In sum, it is a single act by defendant, with respect to each of these two parcels, that marked the final event "fix[ing] the government's alleged liability, entitling [plaintiffs] to demand payment and sue here for [their] money." *Martinez*, 333 F.3d at 1303. Based largely on plaintiffs' own pleadings, the court fixes the time of this accrual-triggering event at nearly three decades ago. Plaintiffs claim that defendant failed to enforce the deeds to, and plaintiffs' beneficial ownership of, Parcels 04 and 05. *Rosales X*, Am. Compl. ¶ 71(1); *Rosales VI*, 3d Am. Compl. ¶ 72(1). Parcel 04 was conveyed to the United States, in trust for "half-blood Jamul Indians," on December 12, 1978; the grant deed was recorded on December 27 of that year. *Rosales X*, Am. Compl. ¶ 13; *Rosales VI*, 3d Am. Compl. ¶ 14. As the Ninth Circuit previously observed in 2003, the Jamul Indian Village began asserting beneficial ownership over Parcel 04 no later than 1981. *See Rosales VII Affirmance*, 73 F. App'x at 914. Parcel 05 was deeded to the United States "in trust for the Jamul Indian Village"—not for plaintiffs as individuals—on July 27, 1982. *Rosales X*, Am. Compl. ¶ 24, Ex. F; *Rosales VI*, 3d Am. Compl. ¶ 25, Ex. F. Therefore, as to Parcel 05, plaintiffs' claims accrued on July 27, 1982, when defendant accepted that parcel in trust for the Village. As to Parcel 04, plaintiffs' claims accrued some time in 1981, when the Jamul Indian Village was formed, *Rosales X*, Am. Compl. ¶ 22, *Rosales VI*, 3d Am. Compl. ¶ 23, and began exercising jurisdiction over that parcel, *Rosales VII Affirmance*, 73 F. App'x at 914.

Finally, defendant's acts must have been actively concealed or inherently unknowable for plaintiffs' claims to be eligible for accrual suspension. *Ingrum*, 560 F.3d at 1315 n.1. Plaintiffs have not alleged that defendant concealed, or sought to conceal, its acceptance of Parcels 04 and 05 in trust for the Jamul Tribe collectively or its recognition of the Village as the beneficial owner of these parcels. Nor was this injury inherently unknowable, by any stretch of the imagination. Plaintiffs, therefore, cannot hope to meet the stringent standard for accrual suspension.

### 4. The Indian Trust Accounting Statute Is Unavailable to Suspend the Accrual of Plaintiffs' Claims

In the alternative, plaintiffs contend that the Indian Trust Accounting Statute ("ITAS"), Pub. L. No. 108-108, 117 Stat. 1263 (2003),[15] operates to suspend the accrual of their claims until defendant provides plaintiffs with a complete accounting of their trust. *Rosales X*, Pls.' Opp'n at 35–37. Defendant responds that ITAS only applies to trust *funds*, not trust assets such as the land parcels at issue. The court agrees. ITAS states, in pertinent part:

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including a claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds from which the beneficiary can determine whether there has been a loss.

Pub. L. No. 108-108, 117 Stat. 1263 (2003). Thus, when ITAS applies, the Tucker Act's statute of limitations does not begin to run, nor does a claim accrue for breach of fiduciary duty regarding a trust fund, until the complaining Indian tribe or individual has received an accounting, thereby learning of the trustee's repudiation. *See Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1347–48 (Fed. Cir. 2004).

*Shoshone* held that ITAS only applies to trust *funds*, and that the statute does not toll a claim for breach of fiduciary duty regarding trust *assets*. *See id.* at 1348–50. As the Federal Circuit explained, claims regarding trust funds include claims concerning the trustee's duty (1) to collect payments under tribe contracts, (2) to deposit collected money into the tribes' interest-bearing trust accounts, and (3) to assess contractual penalties for late payment against breaching parties. *Id.* at 1350. In contrast, ITAS does not apply to *assets* held in trust, such as sand and gravel, timber, or oil and gas assets. *See Shoshone*, 364 F.3d at 1350 (holding that ITAS did not apply to gravel and sand assets); *Oenga v. United States*, 83 Fed. Cl. 594, 609 (2008) (holding ITAS only extended the statute of limitations concerning the collection of royalties from gas and oil assets, i.e., funds); *Simmons v. United States*, 71 Fed. Cl. 188, 193 (2006) (holding that ITAS did not apply to a claim for breach of fiduciary duty for government mismanagement of timber assets).

---

[15] ITAS was first adopted in 1990, and has been readopted each year since without any material changes. Because plaintiffs cite to the 2003 version of ITAS, so does the court.

Here, plaintiffs' claims for breach of fiduciary duty center on parcels of land, which are assets held in trust, not trust funds.  ITAS is therefore unavailable to toll the accrual of plaintiffs' claims.

### 5. Plaintiffs' Claims Are Barred by the Statute of Limitations

Plaintiffs' claims accrued in 1981 and 1982, as to Parcels 04 and 05, respectively. The six-year limitations period, under § 2501, thus expired no later than 1988, nearly two decades before plaintiffs filed their original complaint in *Rosales X*, on July 15, 2008.[16]  Because plaintiffs' claims are ineligible for accrual suspension, and because neither ITAS nor the continuing claims doctrine are apposite, plaintiffs' claims cannot clear the jurisdictional bar of the Tucker Act's statute of limitations.

### B. Issue Preclusion Bars Adjudication of Plaintiffs' Claims

Assuming, *arguendo*, that plaintiffs' claims in *Rosales X* are timely, the Village's absence as a party to this litigation is a sufficient, independent ground for dismissal. Plaintiffs' claims in *Rosales X* rest upon the foundational assumption that plaintiffs, not the Village, are the rightful beneficial owners of Parcels 04 and 05.  *See Rosales X*, Am. Compl. ¶¶ 75–87.  Over the course of the labyrinthine history of these disputes, other courts have determined that plaintiffs cannot maintain any claims that assert, explicitly or implicitly, beneficial ownership of tribal land, such as Parcels 04 and 05, without joining the Village, a "necessary and indispensable" party.  *Rosales VII Affirmance* at 914–15; *Rosales IX* at *5–*6.  The doctrine of issue preclusion bars plaintiffs from challenging that determination.

Issue preclusion, or collateral estoppel,[17] is "grounded on the theory that one litigant cannot unduly consume the time of the court at the expense of other litigants, and that, once the court has finally decided an issue, a litigant cannot demand that it be decided again." *Warthen v. United States*, 157 Ct. Cl. 798, 798 (1962).  Issue preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 & n.5 (1979); *Morgan v. Dep't of Energy*, 424 F.3d 1271, 1274 (Fed. Cir. 2005).  Granting preclusive effect to the determination of issues upholds a "fundamental precept of common-law adjudication," namely, that a "right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties . . . ." *Montana v. United States*, 440 U.S. 147, 153 (1979).  Thus, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a

---

[16] The Amended Complaint in *Rosales X*, asserting the identical claims and  arising out of the identical "conduct, transaction, or occurrence" set out in the original complaint, qualifies for relation back to the original filing date, pursuant to RCFC 15(c)(1).

[17] While this court prefers the doctrine's more precise label of "issue preclusion," many courts continue to use the term "collateral estoppel" either exclusively or interchangeably with "issue preclusion."

subsequent action between the parties, whether on the same or a *different claim*." RESTATEMENT (SECOND) OF JUDGMENTS[18] § 27 (1982) (emphasis added).

Plaintiffs' claims in the instant case rest upon the foundational assumption that they, not the Village, are the rightful beneficial owners of Parcels 04 and 05. Adjudication of their claims thus requires, as a first step, a determination of the ownership status of these two parcels. The success of plaintiffs' claims in *Rosales IX* was likewise contingent on their claim of beneficial ownership to Parcel 04. *See Rosales IX* at *4. In that case, plaintiffs claimed, as they do before this court, that the Native American Graves Protection and Repatriation Act (NAGPRA) imposed an affirmative duty of trust upon the federal government to prevent construction on those parcels of land, including Parcel 04, where Native American remains allegedly exist. *See Rosales IX* at *2, *8–*10. Plaintiffs asserted that this duty was owed to them as the beneficial owners of Parcel 04. *Id.* The *Rosales IX* court held that plaintiffs could not dispute the ownership of that land in the absence of the Village, whose ownership interest was directly implicated, and whose joinder was barred by sovereign immunity. *Id.* at *5–*6. Concluding that the United States could not adequately represent the Village's interests, the *Rosales IX* court refused to allow its plaintiffs to "make an end run around tribal sovereign immunity by suing the United States" and litigating the ownership status of Parcel 04 without the Village. *Id. Rosales IX* held that, pursuant to Rule 19 of the FEDERAL RULES OF CIVIL PROCEDURE ("FRCP"),[19] the Village is a "necessary and indispensable" party to any such litigation; the court granted, with prejudice, the government's motion for dismissal. *Id.* at *10. Significantly, that court denied plaintiffs leave to amend their complaint, noting that any amendment asserting that the land at issue is federal, rather than tribal, would be futile. *Id.*

---

[18] In *Young Engineers, Inc. v. United States International Trade Commission*, 721 F.2d 1305, 1314 (Fed. Cir. 1983), the Federal Circuit cited and quoted relevant provisions of the RESTATEMENT (SECOND) OF JUDGMENTS (1982) in order to determine issues of *res judicata*, collateral estoppel, and issue and claim preclusion. The Federal Circuit continues to rely on the RESTATEMENT to guide its analysis of preclusion, and continues to cite *Young Engineers* in support of that reliance. *See, e.g., Jet, Inc. v. United States*, 223 F.3d 1360, 1362 (Fed. Cir. 2000) (citing *Young Engineers* for the proposition that the "Federal Circuit would receive guidance from RESTATEMENT (SECOND) OF JUDGMENTS (1982)").

[19] FRCP 19 is identical, in pertinent part, to RCFC 19. As part of the 2007 amendments to FRCP 19, the word "necessary" was replaced with "required" in subparagraph (a), and the term "indispensable" was deleted from subparagraph (b), for being at once redundant and conclusory. *See* Advisory Committee's Notes on 2007 Amendment to FRCP 19. The current version to RCFC 19 follows suit. Many courts, however, including the *Rosales IX* court, have continued to use the label of "necessary and indispensable," in referring to a party whose joinder is required under Rule 19(a), but who cannot be joined, and without whom the court decides, pursuant to Rule 19(b), that it cannot proceed. This court prefers to follow the current language of the rule. However, the significance of the *Rosales IX* opinion to this court's present holding counsels in favor of using the language of "necessary and indispensable party," lest differences in terminology obfuscate the substantive similarities between the two matters.

Pointing to the holding in *Rosales IX*, defendant raises issue preclusion as a bar to plaintiffs' claims.[20] *Rosales X*, Mot. to Dismiss at 15–16.  Under the Federal Circuit's test, the party invoking issue preclusion must show that:

> (1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action.

*Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001).  The court addresses the four prongs of this test, *seriatim*.

### 1. Identity of the Issue

Under the first prong of the test, the question is whether the issue of the Village's status as a necessary and indispensable party is the same in the instant litigation as it was in *Rosales IX*.

The *Rosales X* claims rest no less critically upon plaintiffs' assertion of beneficial ownership of tribal land (Parcels 04 and 05) than did their unsuccessful claims in *Rosales IX*.  *Compare Rosales X*, Am. Compl. ¶¶ 78 (claiming that defendant breached its duties to plaintiffs by "failing to enforce the deed to, and Plaintiffs' beneficial ownership of, [Parcels 04 and 05]") *and* 83–85 (claiming that this same failure effected a taking), *with Rosales IX* at *4 (discussing plaintiffs' claims of beneficial ownership in Parcel 04).  Plaintiffs still rely, as they did in *Rosales IX*, upon NAGPRA to establish defendant's alleged breach of its fiduciary duty, in failing to stop construction activity on Parcels 04 and 05.  *Compare Rosales X*, Am. Compl. ¶ 71(4)–(10) (setting forth plaintiffs' NAGPRA claims) *with Rosales IX* at *8–*10 (rejecting plaintiffs' arguments that the government has any affirmative duties pursuant to NAGPRA to prevent the inadvertent discovery of human remains on these same parcels).

Moreover, the facts that plaintiffs marshal in support of their *Rosales X* claims duplicate, in large swaths, the facts alleged in *Rosales IX*.  *Compare, e.g.*, *Rosales X*, Am. Compl. ¶¶ 11–21, 28–51 (detailing plaintiffs' claims to beneficial ownership of Parcel 04) *with Rosales IX*, Am. Compl. ¶¶ 19–30, 33–42, 44–54 (same); *see also Rosales VI*, 3d Am. Compl. ¶¶ 12–22, 29–52 (same).  The evidence that plaintiffs use to support their present complaint is likewise recycled: of thirteen exhibits that accompanied the *Rosales IX* complaint, plaintiffs have attached eleven to their *Rosales X* Amended Complaint (and to the Third Amended Complaint in *Rosales VI*).  *Compare Rosales X*, Am. Compl., Exs. List, *with Rosales IX*, Am. Compl, Exs. List; *see also Rosales VI*, 3d Am. Compl, Exs. List.  Even typographical errors in the *Rosales X* complaint (and in the *Rosales VI* Third Amended Complaint) unwittingly reveal the extent to which plaintiffs are re-litigating *Rosales IX*.  Specifically, the complaints share the same mistyped citation to a Memorandum of the Solicitor of the Department of the Interior: "*supra* not [sic] 76, at 1497."  *Compare Rosales X*, Am. Compl. ¶ 42 *and Rosales VI*, 3d Am. Compl. ¶ 43 *with Rosales IX*, Am. Compl. ¶ 45.

---

[20] Remarkably, in arguing that issue preclusion should not bar their claims, plaintiffs cite cases from the Sixth, Eighth, and Ninth Circuits, whose precedent is not binding upon this court, while failing to cite a single Federal Circuit case, concerning the effect or scope of issue preclusion.  *See Rosales X*, Pls.' Opp'n at 40–44.

Thus, it is manifest that *Rosales IX* decided the identical issue now before this court, namely, whether the Village is an indispensable party to the adjudication of claims challenging the Village's ownership interest in tribal land.

Finally, aside from the exact identity of the issue, the policy underlying the doctrine of issue preclusion supports its application in this instance. Where exact identity of an issue is lacking, "[t]he problem involves a balancing of important interests: on the one hand a desire not to deprive the litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute." RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. c (1982). After myriad chances, in numerous venues, to litigate their claims—either disputing the results of tribal elections and defendant's recognition thereof, or asserting that defendant unlawfully transferred plaintiffs' land to the Village—plaintiffs cannot plausibly protest that they have been deprived of their day in court. This court can only conclude that plaintiffs in *Rosales X* have simply recycled their NAGPRA-based breach of duty claims from *Rosales IX*, while adding sparse references to IRA in an attempt to invoke this court's jurisdiction.

### 2. Whether the Issue Was Actually Litigated

The second prong of the Federal Circuit's test for issue preclusion asks whether the issue has been litigated previously. *See Innovad*, 260 F.3d at 1334. This prong merely requires that the issue was (1) properly raised (by the pleadings or otherwise), (2) submitted for determination, and (3) determined. *Franklin Sav. Corp.*, 56 Fed. Cl. at 738 (citing *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001) and RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. d (1982)).

First, upon review of the procedural history in *Rosales IX*, it is clear that the Village's status as a necessary and indispensable party was properly raised in that case. The claims in the *Rosales IX* complaint, as cited above, clearly implicate this issue. Second, the parties in *Rosales IX* obviously submitted this issue for determination: the issue was addressed in the defendant's motion to dismiss and in plaintiffs' opposition thereto, and was the subject of oral argument before the *Rosales IX* court. *See Rosales IX*, Mot. to Dismiss at 12–17; *Rosales IX*, Pls.' Opp'n at 25–31. Finally, the *Rosales IX* court made clear that its dismissal, with prejudice and without leave to amend, was grounded squarely in its determination that the Village was a necessary and indispensable party to the adjudication of any claims implicating the ownership status of the land at issue. *Rosales IX* at *5–6, *10. The second prong of the test for erecting issue preclusion as a bar to plaintiffs' claims is thus easily met.

### 3. Whether Determination of the Issue Was Essential to the Resulting Judgment

The inquiry under the third prong of the test does not require that the prior determination of an issue "be so crucial that, without it, the [prior] judgment could not stand." *Mother's Rest., Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1571 (Fed. Cir. 1983). Rather, this third requirement seeks to prevent a mere incidental or collateral determination of a nonessential issue from precluding that issue's determination in a later litigation. *Id.* The final judgment in *Rosales IX* was a dismissal without leave to amend. *Rosales IX* at *10. Significantly, the *Rosales IX* court

emphasized that any attempts to amend the complaint would be futile because "plaintiffs cannot assert a claim that the land is federal without joining the [Village]." *Id.* Thus, it is clear that this prior determination of the issue in question—that the Village is a necessary and indispensable party in any dispute implicating the ownership status of tribal land—was not incidental, but necessary to the final judgment in *Rosales IX*.

### 4. Whether Plaintiffs Had a Full and Fair Opportunity to Litigate

Finally, a party against whom issue preclusion is sought must have had a "full and fair opportunity" to litigate in the prior proceeding. *Banner*, 238 F.3d at 1354; *Jet, Inc.*, 223 F.3d at 1366. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28(5)(C) (1982). In assessing whether a party had such an opportunity, the court should consider: (1) whether there were significant procedural limitations in the prior proceeding; (2) whether the party had incentive to fully litigate the issue; and (3) whether the nature of, or relationship between, the parties limited effective litigation. *See Banner*, 238 F.3d at 1354 (citing 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4423 (1981)).

Here, the court can easily dispense with the latter two factors. As their filings in that case indicate, plaintiffs clearly had a strong incentive to litigate *Rosales IX*. There, as in *Rosales X*, plaintiffs alleged that their family members' gravesites were being desecrated and their remains and associated funerary objects removed or destroyed by on-going excavation and construction. *Compare, e.g.*, *Rosales X*, Am. Compl. ¶¶ 52–55, 60 (detailing plaintiffs' factual allegations concerning their family members' remains), *with Rosales IX*, Am. Compl. ¶¶ 62–63, 67–73 (reciting identical allegations). According to plaintiffs, that interference with their family members' remains "has caused and will continue to cause severe personal, physical, and bodily injury, including severe emotional distress." *Id.* ¶¶ 72–73. This court cannot conclude that plaintiffs' incentive to litigate *Rosales IX* was in any way insufficient. *See Franklin*, 56 Fed. Cl. at 739 (citing WRIGHT, MILLER & COOPER for the proposition that the stakes of prior litigation may prove the full incentive to litigate). The multiple cases in which plaintiffs have previously litigated related or similar claims, *see supra* note 2, also indicates the strength of their incentive to litigate. *See id.* at 739–40 (inferring the existence of this incentive "from the she[e]r number of times [the plaintiff] litigated [its] claims). As for the third factor, the nature or relationship of the parties did not limit plaintiffs' opportunity to litigate in *Rosales IX*, because plaintiffs were neither members of a disabled class requiring a guardian nor were they *pro se* litigants. *See id.* at 740 (citing WRIGHT, MILLER & COOPER).

Nor do plaintiffs fare any better on the first factor, which considers whether there was a significant procedural hurdle in *Rosales IX*. As the Supreme Court has observed, "the full and fair opportunity to litigate" criterion is generally satisfied as long as the procedures in the first action comported with minimum due process requirements. *See Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481 (1982). In other words, plaintiffs cannot establish this factor without establishing that they were unrepresented by counsel, unable to appeal, denied a public hearing, or deprived of necessary facts fraudulently concealed by the government. *See Franklin* 56 Fed. Cl. at 741. Plaintiffs have not identified any such procedural hurdle. In short, the *Rosales IX* plaintiffs had, and certainly made the most of, their full and fair opportunity to litigate.

Having satisfied all four prongs of the Federal Circuit's test for issue preclusion, the *Rosales IX* decision thus bars the adjudication of plaintiffs' claims in *Rosales X*, absent the Village.  Because plaintiffs have not and cannot cure the defect of the Village's absence, this court cannot permit "[s]uch a fundamental departure from traditional rules of preclusion," as adjudicating plaintiffs' claims would require.  *See Kremer*, 456 U.S. at 485.

### C. The Village Remains a Necessary and Indispensable Party

Assuming, *arguendo*, that plaintiffs' claims could escape the preclusive effect of *Rosales IX*, the court nonetheless must dismiss the complaint in *Rosales X*, pursuant to RCFC 19, for failure to join the Village, a necessary and indispensable party.  As the court has noted repeatedly, plaintiffs' claims in *Rosales X* rest critically upon plaintiffs' assertion that they, not the Village, are the rightful beneficial owners of Parcels 04 and 05.  This court is convinced, for many of the reasons recited above in Section II.B, that the Village must be a party to this or *any* litigation in which its ownership interests are implicated and, indeed, would be implicitly abrogated by a judgment in favor of plaintiffs.  Simply put, this court agrees with the substantive analysis of the *Rosales IX* court.[21]

### 1. The Village Is a Necessary Party, Whose Joinder Is Required Under RCFC 19(a)

Pursuant to RCFC 19, this court must ask whether an absent party is necessary to the litigation, and its joinder thus required.  *United Keetoowah Band of Cherokee Indians of Okla. v. United States* ("*UKB*"), 480 F.3d 1318, 1324 (Fed. Cir. 2007); *see* RCFC 19(a).  In relevant part, RCFC 19(a) states that joinder is required if:

> [T]hat [party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party]'s absence may: (i) as a practical

---

[21] This court disagrees, however, with the jurisdictional label that the *Rosales IX* court attached to its determination. *See Rosales IX* at *5 ("Because the Tribe enjoys sovereign immunity and cannot be joined, the court lacks subject matter jurisdiction."). Both RCFC 19(b) and FRCP 19(b) (the latter governing the *Rosales IX* court) state that a court must decide "in equity and good conscience," whether to dismiss an action for non-joinder of a required party. In other words, Rule 19 codifies an *equitable* doctrine, not a jurisdictional requirement as the *Rosales IX* court suggested. Indeed, the "indispensability question . . . is not, nor has it ever been, jurisdictional." *Rippey v. Denver United States Nat'l Bank*, 42 F.R.D. 316, 318–319 (D. Colo. 1967). Rather, Rule 19 calls for determining whether the court ought to proceed without the absent party, not whether it has jurisdiction to proceed against those who are present." *Id.* In *Shields v. Barrow*, the Supreme Court explained that "when speaking of a case where an indispensable party [is] not before the court, we do not put th[e] case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction; we put it on the ground that no court can adjudicate directly upon a person's right, without the party being either actually or constructively before the court." 58 U.S. 130, 141 (1855). *See* 7 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 1611 (3d ed. 1998). Needless to say, Rule 19 does codify a threshold inquiry, which, like the jurisdictional inquiry, may operate to foreclose adjudication on the merits.

matter *impair or impede the [party]'s ability to protect the interest*; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

RCFC 19(a) (emphasis added).

Plaintiffs' contention that the Village's interest is merely "indirect and contingent," *Rosales X*, Pls.' Opp'n at 46, is at odds with reality. Defendant has a duty as the trustee of Parcels 04 and 05, and is liable to the beneficial owners for any breach of that duty. Adjudicating plaintiffs' claims would require determining the threshold question of plaintiffs' beneficial ownership of Parcels 04 and 05, and thus necessarily implicates the Village's ownership interest. *See, e.g.*, *Rosales IX* at *5–*6. This court would require from the Village a waiver of sovereign immunity, which waiver the court does not have, in order to render a judgment in this matter. Any potential judgment in plaintiffs' favor, requiring defendant to remedy what plaintiffs characterize as interference with their ownership rights to Parcels 04 and 05, would necessarily "impair or impede" the Village's ownership interest in that land.

The Village has the additional and "substantial interest in protecting the rulings of its judicial system from collateral attack." *St. Pierre v. Norton*, 498 F. Supp. 2d 214, 220 (D.D.C. 2007). The Jamul Tribal Court has determined, in upholding plaintiffs' 2007 eviction, that plaintiffs were *not* the beneficial owners of Parcel 04. *Rosales X*, Mot. to Dismiss, Exs. 7–8. Plaintiffs' contention that the recognized Jamul Tribal Court is invalid, *Rosales X*, Pls.' Opp'n at 43–45, is irrelevant. Even if this court were inclined to agree, contrary to the decisions of all previous courts and administrative bodies adjudicating the Village's electoral disputes, the Village would *still* have an interest in challenging that determination and asserting the validity of its court's decisions.

Finally, this court rejects plaintiffs' conclusory contention that the Village has no legally protected interest at issue in the instant case. *See Rosales X*, Pls.' Opp'n at 48–49. That contention is based on plaintiffs' oft-asserted, but never-successful theory that the Village, a political entity permitting membership to those of at least *one-quarter* Jamul Indian blood, has never had proper beneficial ownership of Parcels 04 or 05, which parcels instead remain in trust only for individuals of *one-half* Jamul Indian blood. *Id.* at 49 (citing *Rosales X*, Compl. ¶¶ 14–15, 27–28, 31–37, 40, 44–46 & Ex. E); *see also Rosales VI*, Pls.' Opp'n. at 48–49 (making the same argument). Both the *Rosales VII* and *Rosales IX* courts flatly rejected this legal just-so story; so, too, does this court.

Rather, the Village has substantial interests in the outcome of this case, and those interests would be impaired by proceeding in the Village's absence. Joinder of the Village is, therefore, required under RCRC 19(a). That joinder, which ordinarily is subject to court order, is barred by the Village's sovereign immunity.

## 2. The Village Is an "Indispensable" Party

Where joinder is required under RCFC 19(a) but is not feasible, a court must determine whether, "in equity and good conscience, the action should proceed among the existing parties or be dismissed." RCFC 19(b). If a court decides that the matter should be dismissed, the absent

party is thus deemed "indispensable."  *See, e.g.*, *UKB*, 480 F.3d at 1324.  Rule 19 identifies four factors that are relevant to deciding whether a matter may proceed without the absent party:

> (1) the extent to which a judgment rendered in the [party]'s absence might prejudice that [party] or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures;
>
> (3) whether a judgment rendered in the [party]'s absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

RCFC 19(b).

The claims that plaintiffs advance—seeking redress for the United States' alleged breach of its duty to them as beneficial owners of Parcels 04 and 05—directly implicate the Village's ownership interests in, and its exercise of jurisdiction over, that land.  Therefore, this court cannot fashion relief that would not prejudice the interests of the Village in asserting its beneficial ownership of the land at issue, *see Rosales VII Affirmance* at 914; *Rosales IX* at *5–*6, or in enforcing the judgments of its tribal courts, *St. Pierre*, 498 F. Supp. 2d at 220.

This court is persuaded by the Ninth Circuit's body of precedent, which holds that the United States cannot adequately represent the interests of an absent tribe in an "intertribal" dispute, a category that includes disputes between a tribe and non-tribe groups or individuals. Upon similar facts, the Ninth Circuit held that "no partial or compromise remedy exists that will not prejudice the [tribal government], since a finding that the [claimants have] rights to the beneficial ownership of the [land] or that the [United States] government owes certain duties to the [claimants] will prejudice the [tribal government]'s right to govern the Tribe, which is the designated beneficial owner of the land." *Pit River Home & Agr. Coop. Ass'n v. United States*, 30 F.3d 1088, 1101 (9th Cir. 1994).  Further persuasive is the *Rosales VII Affirmance*, which held, upon review of the same facts giving rise to the instant action, that "[t]he United States is not an adequate representative of the Village's interests in this action because the United States cannot adequately represent the interests of one tribe in an intertribal dispute."  73 F. App'x at 914.

Because the United States cannot adequately represent the interests of the Village, and because the court cannot otherwise fashion relief that would not prejudice those substantial interests, this court cannot, in equity and good conscience, proceed to adjudicate plaintiffs' claims in the Village's absence.  Because the Village has not waived its sovereign immunity, the court is without power to compel the Village's joinder.   The Village is, therefore, an indispensable party to the instant action.   Assuming, *arguendo*, that all other grounds for dismissal are inadequate, the court must nonetheless dismiss the complaint in *Rosales X*, pursuant to RCFC 19.

# III. *ROSALES VI*

The Third Amended Complaint in *Rosales VI* is a verbatim copy of the *Rosales X* Amended Complaint, with three notable, though ultimately inconsequential exceptions.

## A. The Two Additional Claims Raise No New Issues

In their Third Amended Complaint, the *Rosales VI* plaintiffs recite four claims for relief: the two claims made in *Rosales X*—(1) taking, and (2) breach of trust—along with two additional claims for (3) breach of contract, and (4) accounting. *Rosales VI*, 3d Am. Compl. ¶¶ 76–79, 93–98. The two additional claims, however, raise no new issues for the court to consider: they rest upon the identical allegations of fact and the identical theories of defendant's liability as do the *Rosales X* claims. Most significantly, these additional claims rest squarely upon the same foundational assumption that plaintiffs, not the Village, are the beneficial owners of parcels 04 and 05, and thus likewise implicate the Village's interests.

## B. The Earlier Filing Date Still Leaves the Claims in Rosales VI Untimely Under § 2501

The original complaint in *Rosales VI* was filed on November 12, 1998, nearly a decade before the original *Rosales X* filing. However, because the six-year limitations period for plaintiffs' claims expired in 1988, the 1998 filing date in *Rosales VI* is still a decade too late.[22]

Claim accrual under § 2501 may be suspended only where the injury is actively "concealed or inherently unknowable," *Ingrum*, 560 F.3d at 1315 n.1, a standard that plaintiffs cannot hope to satisfy. There is otherwise no traditional requirement of notice, in order for a claim to accrue, or for the limitations period to run, under § 2501. Prior to the Supreme Court's holding in *John R. Sand & Gravel*, however, language in some opinions, issued by the Court of Federal Claims and by the Federal Circuit, arguably suggested otherwise. In *Mitchell v. United States*, 10 Cl. Ct. 63, 68 (1986), the court declared that "[k]nowledge of a cause of action sufficient to trigger the running of the [Tucker Act's] statute of limitations may, therefore, be as much a matter of constructive notice as of actual notice." Nearly a decade later, the Federal Circuit seemed to sound a similar note, writing that "[t]he question whether the pertinent events [for claim accrual] have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini*, 56 F.3d at 1380. While the quoted language unambiguously disavowed a requirement of *actual* notice, it seemed to evince a *constructive*-notice requirement under § 2501.

Defendant, in its motion to dismiss *Rosales X*, cites to these cases, apparently conceding that constructive notice may be required. *See Rosales X*, Mot. to Dismiss at 11. Accordingly, defendant cites the language of the 1982 deed to Parcel 05, *see supra* Section III.A.3, which the court agrees is sufficient to support a finding of constructive notice. *Rosales X*, Mot. to Dismiss

---

[22] The court assumes, without deciding, that the Third Amended Complaint qualifies for relation back to the date of the original complaint, under RCFC 15(c)(1). Absent this assumption, of course, the Third Amended Complaint, submitted in 2009, would be even tardier than the original complaint in *Rosales X*.

at 13.   As to parcel 04, defendant's *Rosales X* motion points only to plaintiffs' admission to having *actual* notice, in 2001, of defendant's recognition of the Village's beneficial ownership of that parcel.  *Id.* at 12 (citing *Rosales VII*, Compl. ¶¶ 18–19).   Defendant is content to rely on the 2001 date, in its *Rosales X* motion, because even that date is early enough to render time-barred plaintiffs' 2008 complaint.   The original *Rosales VI* complaint, on the other hand, was filed in 1998.   Lest plaintiffs, in their litigious zeal, see an opening here, the court assures them there is none.

No hypothetical notice requirement can restore the timeliness of plaintiffs' complaint in *Rosales VI*.   In order for the 1998 filing to be timely, plaintiffs' claims need to have accrued no earlier than November 13, 1992.   Defendant recognized the Village's beneficial ownership of parcels 04 and 05, in 1981 and 1982, respectively.   It defies the imagination that, over the course of the subsequent decade, plaintiffs did not have *actual*, let alone constructive, notice of defendant's act, or of conduct by the Village inconsistent with their beneficial ownership, as individuals, of the land in question.

## C. The Village's Status As an Indispensable Party Is Unaltered by the Presence of a New Plaintiff

Of the twelve plaintiffs named in the original *Rosales VI* complaint, only two remain: Walter Rosales and Joe Comacho.  *See supra* note 6.   Plaintiff Comacho was not a named plaintiff in *Rosales IX* and thus would ordinarily be exempt from the preclusive effect of that judgment.  *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) ("Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue . . . .  Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.").  *See Baker v. Gen. Motors Corp.*, 522 U.S. 222, 238 (1998) ("In no event, we have observed, can issue preclusion be invoked against one who did not participate in the prior adjudication.").

However, the claims in *Rosales VI* implicate no less than do the *Rosales X* claims the Village's interests in asserting its beneficial ownership over Parcels 04 and 05, and in protecting the integrity of its judicial system.   Mr. Comacho's presence as a plaintiff, therefore, cannot alter this court's own substantive holding that the Village is a necessary and indispensable party, in whose absence the court cannot proceed to adjudicate the merits of plaintiffs' claims.

Nor is there consequence to the absence of a party motion for dismissal on this ground.   Because the court admits plaintiffs' Third Amended Complaint through its present order, defendant has not had an opportunity to submit a new motion to dismiss, responsive to plaintiffs' revised complaint, and thus has not raised the issue of the Village's absence as a ground for dismissal in *Rosales VI*.   However, as the Supreme Court recently reiterated, a court may consider *sua sponte* the absence of a required party, under Rule 19, and dismiss an action for non-joinder.  *Philippines v. Pimentel*, _ U.S. _, 128 S. Ct. 2180, 2188 (2008) (reversing the lower court's decision to adjudicate an interpleader action amongst the remaining parties, after two parties originally named in the suit invoked sovereign immunity and were dismissed).

Therefore, despite the above differences between the *Rosales X* and *Rosales VI* complaints, the court's grounds for dismissing the former support no less surely dismissal of the latter.

## IV. CONCLUSION

Plaintiffs' motion to admit the Amended Complaint in *Rosales X* is **GRANTED**. The court concludes that plaintiffs' claims in *Rosales X* are untimely under the Tucker Act's statute of limitations, leaving the court without jurisdiction to hear them. To the extent that any of plaintiffs' claims are timely, the doctrine of issue preclusion nonetheless bars plaintiffs from relitigating the defect that mandated dismissal in *Rosales IX*. Finally, even if plaintiffs' claims were both timely and somehow exempt from the preclusive effect of *Rosales IX*, this court concludes that it must dismiss the action due to the absence of the Village, a necessary and indispensable party. Accordingly, defendant's motion to dismiss in *Rosales X* is **GRANTED**, and plaintiffs' motion for summary judgment and all other outstanding motions in *Rosales X* are therefore **DENIED-AS-MOOT**.

Plaintiffs' motion to admit the Third Amended Complaint in *Rosales VI* is **GRANTED**. As in *Rosales X*, the court concludes that plaintiffs' claims in *Rosales VI* are untimely under the Tucker Act's statute of limitations, leaving the court without jurisdiction to hear them. To the extent that any of plaintiffs' claims are timely, the Village remains a necessary and indispensable party, in whose absence the court must dismiss the action. Accordingly, the Third Amended Complaint in *Rosales VI* is **DISMISSED**, and defendant's updated motion to dismiss the prior Second Amended Complaint and all other outstanding motions in *Rosales VI* are therefore **DENIED-AS-MOOT.**

Furthermore, based on plaintiffs' history of repeating the same claims across multiple suits and venues, and their pattern, in these proceedings, of non-responsive filings, of repeated noncompliance with the rules of this court, of poor citation practices, and of wholesale copying of previous filings in other venues that were dismissed with prejudice, this court assigns **COSTS TO DEFENDANT**.

**IT IS SO ORDERED.**

s/ *Lawrence J. Block*

Lawrence J. Block
Judge